# Exhibit 1

| **SOLICITATION, OFFER, AND AWARD** (Construction, Alteration, or Repair) | 1. SOLICITATION NO. FA4897-16-B-0003-0004 | 2. TYPE OF SOLICITATION [X] SEALED BID (IFB) [ ] NEGOTIATED (RFP) | 3. DATE ISSUED 20-Sep-2016 | PAGE OF PAGES 1 OF 25 |
|---|---|---|---|---|

**IMPORTANT - The "offer" section on the reverse must be fully completed by offeror.**

| 4 CONTRACT NO. FA4897-16-C-3009 | 5. REQUISITION/PURCHASE REQUEST NO. F3F3CE5309AW02 | | 6. PROJECT NO. |
|---|---|---|---|

| 7. ISSUED BY          CODE | FA4897 | 8. ADDRESS OFFER TO  (If Other Than Item 7) CODE |
|---|---|---|
| 366 CONS/LGCB 366 GUNFIGHTER AVE STE 498 MOUNTAIN HOME AFB ID 83648-5258 | | **See Item 7** |
| TEL: 208-828-2664          FAX: 208-828-4031 | | TEL:          FAX: |

| 9. FOR INFORMATION CALL: | A. NAME ARIC R SIEVERS | B. TELEPHONE NO.  (Include area code)   (NO COLLECT CALLS) 208-828-1950 |
|---|---|---|

## SOLICITATION

**NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".**

10. THE GOVERNMENT REQUIRES PERFORMANCE OF THE WORK DESCRIBED IN THESE DOCUMENTS          (Title, identifying no., date)

REPAIR CRU FLOORING, BLDGS 206 AND 1335--QYZH100065

MAGNITUDE OF CONSTRUCTION PROJECT ESTIMATED BETWEEN $250,000.00 AND $500,000.00.

SECTION K, L, AND M WILL BE REMOVED FROM ANY RESULTANT AWARD. SECTION K WILL BE INCORPORATED, BY REFERENCE, IN ANY SUCH AWARD.

THE ACQUISITION IS 100% SET-ASIDE FOR SMALL BUSINESS.

SOLICITATION MAY RESULT IN A FIRM-FIXED CONTRACT.

ENTER PRICES IN SECTION B.

"NOTICE TO OFFERORS: FUNDS ARE NOT PRESENTLY AVAILABLE FOR THIS PROJECT. NO AWARD WILL BE MADE UNDER THIS SOLICITATION UNTIL FUNDS ARE AVAILABLE. THE GOVERNMENT RESERVES THE RIGHT TO CANCEL THIS SOLICITATION, EITHER BEFORE OR AFTER THE CLOSING DATE. IN THE EVENT THE GOVERNMENT CANCELS THIS SOLICITATION, THE GOVERNMENT HAS NO OBLIGATION TO REIMBURSE AN OFFEROR FOR ANY COSTS."

11. The Contractor shall begin performance within ___10___ calendar days and complete it within ___120___ calendar days after receiving [ ] award, [X] notice to proceed. This performance period is [X] mandatory, [ ] negotiable. (See 52.211-10 _____.)

12 A. THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS? (If "YES," indicate within how many calendar days after award in Item 12B.)   [X] YES [ ] NO          12B. CALENDAR DAYS 10

13. ADDITIONAL SOLICITATION REQUIREMENTS:

A. Sealed offers in original and ___1___ copies to perform the work required are due at the place specified in Item 8 by ___03:00 PM___ (hour) local time ___09 Aug 2016___ (date). If this is a sealed bid solicitation, offers must be publicly opened at that time. Sealed envelopes containing offers shall be marked to show the offeror's name and address, the solicitation number, and the date and time offers are due.

B. An offer guarantee [X] is, [ ] is not required.

C. All offers are subject to the (1) work requirements, and (2) other provisions and clauses incorporated in the solicitation in full text or by reference.

D. Offers providing less than ___90___ calendar days for Government acceptance after the date offers are due will not be considered and will be rejected.

NSN 7540-01-155-3212          1442-101          **STANDARD FORM 1442** (REV. 4-85) Prescribed by GSA FAR (48 CFR) 53.236-1(e)

USAF1_00001

SOLI___TION, OFFER, AND AWARD (Continued)
_nstruction, Alteration, or Repair)

OFFER (Must be fully completed by offeror)

| 14. NAME AND ADDRESS OF OFFEROR (Include ZIP Code) | 15. TELEPHONE NO. (Include area code) |
|---|---|
| ProTech Coatings Inc. 1949 W. 2300 S. SLC UT 84119 | 801-563-9898 |
| | 16. REMITTANCE ADDRESS (Include only if different than Item 14) |
| | See Item 14 |
| CODE ___        FACILITY CODE | |

17. The offeror agrees to perform the work required at the prices specified below in strict accordance with the terms of this solicitation, if this offer is accepted by the Government in writing within _____ calendar days after the date offers are due.    (Insert any number equal to or greater than the minimum requirements stated in Item 13D. Failure to insert any number means the offeror accepts the minimum in Item 13D.)

| AMOUNTS | SEE SCHEDULE OF PRICES |
|---|---|

18. The offeror agrees to furnish any required performance and payment bonds.

### 19. ACKNOWLEDGMENT OF AMENDMENTS
(The offeror acknowledges receipt of amendments to the solicitation – give number and date of each)

| AMENDMENT NO. | | 2 | 3 | 4 | | | | |
|---|---|---|---|---|---|---|---|---|
| DATE | 6-23-16 | 7-22-16 | 8-3-16 | 8-5-16 | | | | |

| 20A. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER (Type or print) Chad Diamond V.P. | 20B. SIGNATURE Chad Diamond | 20C. OFFER DATE 8-8-16 |
|---|---|---|

### AWARD (To be completed by Government)

21. ITEMS ACCEPTED:

SEE SCHEDULE

| 22. AMOUNT $190,379.00 | 23. ACCOUNTING AND APPROPRIATION DATA SEE SECTION G |
|---|---|

| 24. SUBMIT INVOICES TO ADDRESS SHOWN IN (4 copies unless otherwise specified) | ITEM SECTION G | 25. OTHER THAN FULL AND OPEN COMPETITION PURSUANT TO ☐ 10 U.S.C. 2304(c)    ☐ 41 U.S.C. 253(c) |
|---|---|---|
| 26. ADMINISTERED BY        CODE ___ SEE ITEM 7 | | 27. PAYMENT WILL BE MADE BY:    CODE F87700 DFAS DEAMS-F87700 ACCTG DISB STA NR 387700 DFAS DEAMS 27 ARKANSAS RD LIMESTONE, ME 04751-6216 |

CONTRACTING OFFICER WILL COMPLETE ITEM 28 OR 29 AS APPLICABLE

| ☐ 28. NEGOTIATED AGREEMENT (Contractor is required to sign this document and return _____ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all work, requisitions identified on this form and any continuation sheets for the consideration stated in this contract. The rights and obligations of the parties to this contract shall be governed by (a) this contract award, (b) the solicitation, and (c) the clauses, representations, certifications, and specifications or incorporated by reference in or attached to this contract. | ☒ 29. AWARD (Contractor is not required to sign this document.) Your offer on this solicitation, is hereby accepted as to the items listed. This award consummates the contract, which consists of (a) the Government solicitation and your offer, and (b) this contract award. No further contractual document is necessary. |
|---|---|
| 30A. NAME AND TITLE OF CONTRACTOR OR PERSON AUTHORIZED TO SIGN (Type or print) Chad Diamond V.P. | 30D. NAME OF CONTRACTING OFFICER (Type or print) Eric Nagel FA8208-B2B-3115    Sourceric Nagel@us.af.mil |
| 30B. SIGNATURE Chad Diamond | 30C. DATE 8-8-16 | 31B. UNITED STATES OF AMERICA BY [signature] | 31C. AWARD DATE 20 SEP 2016 |

NSN 7540-01-155-3212

STANDARD FORM 1442 BACK    (REV. 4-85)

FA4897-16-C-3009

Page 4 of 25

Section E - Inspection and Acceptance

## INSPECTION AND ACCEPTANCE TERMS

Supplies/services will be inspected/accepted at:

| CLIN | INSPECT AT | INSPECT BY | ACCEPT AT | ACCEPT BY |
|------|-----------|-----------|-----------|-----------|
| 0001 | Destination | Government | Destination | Government |
| 0002 | Destination | Government | Destination | Government |

CLAUSES INCORPORATED BY REFERENCE

| 52.246-12 | Inspection of Construction | AUG 1996 |
|-----------|---------------------------|----------|

CLAUSES INCORPORATED BY FULL TEXT

252.201-7000    CONTRACTING OFFICER'S REPRESENTATIVE (DEC 1991)

(a) "Definition. Contracting officer's representative" means an individual designated in accordance with subsection 201.602-2 of the Defense Federal Acquisition Regulation Supplement and authorized in writing by the contracting officer to perform specific technical or administrative functions.

(b) If the Contracting Officer designates a contracting officer's representative (COR), the Contractor will receive a copy of the written designation. It will specify the extent of the COR's authority to act on behalf of the contracting officer. The COR is not authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract.

(End of clause)

USAF1_00004

Section I - Contract Clauses

CLAUSES INCORPORATED BY REFERENCE

| | | |
|---|---|---|
| 52.202-1 | Definitions | NOV 2013 |
| 52.203-3 | Gratuities | APR 1984 |
| 52.203-5 | Covenant Against Contingent Fees | MAY 2014 |
| 52.203-6 | Restrictions On Subcontractor Sales To The Government | SEP 2006 |
| 52.203-7 | Anti-Kickback Procedures | MAY 2014 |
| 52.203-8 | Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity | MAY 2014 |
| 52.203-10 | Price Or Fee Adjustment For Illegal Or Improper Activity | MAY 2014 |
| 52.203-12 | Limitation On Payments To Influence Certain Federal Transactions | OCT 2010 |
| 52.203-17 | Contractor Employee Whistleblower Rights and Requirement To Inform Employees of Whistleblower Rights | APR 2014 |
| 52.204-4 | Printed or Copied Double-Sided on Postconsumer Fiber Content Paper | MAY 2011 |
| 52.204-9 | Personal Identity Verification of Contractor Personnel | JAN 2011 |
| 52.204-10 | Reporting Executive Compensation and First-Tier Subcontract Awards | OCT 2015 |
| 52.204-13 | System for Award Management Maintenance | JUL 2013 |
| 52.209-6 | Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended, or Proposed for Debarment | OCT 2015 |
| 52.209-10 | Prohibition on Contracting With Inverted Domestic Corporations | NOV 2015 |
| 52.219-6 | Notice Of Total Small Business Set-Aside | NOV 2011 |
| 52.219-8 | Utilization of Small Business Concerns | OCT 2014 |
| 52.219-14 | Limitations On Subcontracting | NOV 2011 |
| 52.222-3 | Convict Labor | JUN 2003 |
| 52.222-4 | Contract Work Hours and Safety Standards- Overtime Compensation | MAY 2014 |
| 52.222-6 | Construction Wage Rate Requirements | MAY 2014 |
| 52.222-7 | Withholding of Funds | MAY 2014 |
| 52.222-8 | Payrolls and Basic Records | MAY 2014 |
| 52.222-9 | Apprentices and Trainees | JUL 2005 |
| 52.222-10 | Compliance with Copeland Act Requirements | FEB 1988 |
| 52.222-11 | Subcontracts (Labor Standards) | MAY 2014 |
| 52.222-12 | Contract Termination-Debarment | MAY 2014 |
| 52.222-13 | Compliance With Construction Wage Rate Requirements and Related Regulations | MAY 2014 |
| 52.222-14 | Disputes Concerning Labor Standards | FEB 1988 |
| 52.222-15 | Certification of Eligibility | MAY 2014 |
| 52.222-21 | Prohibition Of Segregated Facilities | APR 2015 |
| 52.222-26 | Equal Opportunity | APR 2015 |
| 52.222-27 | Affirmative Action Compliance Requirements for Construction | APR 2015 |
| 52.222-37 | Employment Reports on Veterans | FEB 2016 |

USAF1_00012

| 52.222-40 | Notification of Employee Rights Under the National Labor Relations Act | DEC 2010 |
|---|---|---|
| 52.222-50 | Combating Trafficking in Persons | MAR 2015 |
| 52.222-54 | Employment Eligibility Verification | OCT 2015 |
| 52.222-55 | Minimum Wages Under Executive Order 13658 (Dec 2014) | DEC 2014 |
| 52.223-5 | Pollution Prevention and Right-to-Know Information | MAY 2011 |
| 52.223-6 | Drug-Free Workplace | MAY 2001 |
| 52.223-15 | Energy Efficiency in Energy-Consuming Products | DEC 2007 |
| 52.223-17 | Affirmative Procurement of EPA-Designated Items in Service and Construction Contracts | MAY 2008 |
| 52.223-18 | Encouraging Contractor Policies To Ban Text Messaging While Driving | AUG 2011 |
| 52.225-13 | Restrictions on Certain Foreign Purchases | JUN 2008 |
| 52.227-1 | Authorization and Consent | DEC 2007 |
| 52.227-2 | Notice And Assistance Regarding Patent And Copyright Infringement | DEC 2007 |
| 52.227-4 | Patent Indemnity-Construction Contracts | DEC 2007 |
| 52.228-2 | Additional Bond Security | OCT 1997 |
| 52.228-5 | Insurance - Work On A Government Installation | JAN 1997 |
| 52.228-11 | Pledges Of Assets | JAN 2012 |
| 52.228-12 | Prospective Subcontractor Requests for Bonds | MAY 2014 |
| 52.228-14 | Irrevocable Letter of Credit | NOV 2014 |
| 52.228-15 | Performance and Payment Bonds--Construction | OCT 2010 |
| 52.229-3 | Federal, State And Local Taxes | FEB 2013 |
| 52.232-5 | Payments under Fixed-Price Construction Contracts | MAY 2014 |
| 52.232-17 | Interest | MAY 2014 |
| 52.232-23 | Assignment Of Claims | MAY 2014 |
| 52.232-27 | Prompt Payment for Construction Contracts | MAY 2014 |
| 52.232-33 | Payment by Electronic Funds Transfer--System for Award Management | JUL 2013 |
| 52.232-39 | Unenforceability of Unauthorized Obligations | JUN 2013 |
| 52.232-40 | Providing Accelerated Payments to Small Business Subcontractors | DEC 2013 |
| 52.233-1 | Disputes | MAY 2014 |
| 52.233-3 | Protest After Award | AUG 1996 |
| 52.233-4 | Applicable Law for Breach of Contract Claim | OCT 2004 |
| 52.236-2 | Differing Site Conditions | APR 1984 |
| 52.236-3 | Site Investigation and Conditions Affecting the Work | APR 1984 |
| 52.236-4 | Physical Data | APR 1984 |
| 52.236-5 | Material and Workmanship | APR 1984 |
| 52.236-6 | Superintendence by the Contractor | APR 1984 |
| 52.236-7 | Permits and Responsibilities | NOV 1991 |
| 52.236-8 | Other Contracts | APR 1984 |
| 52.236-9 | Protection of Existing Vegetation, Structures, Equipment, Utilities, and Improvements | APR 1984 |
| 52.236-10 | Operations and Storage Areas | APR 1984 |
| 52.236-11 | Use and Possession Prior to Completion | APR 1984 |
| 52.236-12 | Cleaning Up | APR 1984 |
| 52.236-13 | Accident Prevention | NOV 1991 |
| 52.236-14 | Availability and Use of Utility Services | APR 1984 |
| 52.236-15 | Schedules for Construction Contracts | APR 1984 |

USAF1_00013

| 52.236-17 | Layout of Work | APR 1984 |
| 52.236-21 | Specifications and Drawings for Construction | FEB 1997 |
| 52.236-26 | Preconstruction Conference | FEB 1995 |
| 52.242-13 | Bankruptcy | JUL 1995 |
| 52.242-14 | Suspension of Work | APR 1984 |
| 52.243-4 | Changes | JUN 2007 |
| 52.244-6 | Subcontracts for Commercial Items | FEB 2016 |
| 52.246-21 | Warranty of Construction | MAR 1994 |
| 52.248-3 | Value Engineering-Construction | OCT 2015 |
| 52.249-2 Alt I | Termination for Convenience of the Government (Fixed-Price) (Apr 2012) - Alternate I | SEP 1996 |
| 52.249-10 | Default (Fixed-Price Construction) | APR 1984 |
| 52.253-1 | Computer Generated Forms | JAN 1991 |
| 252.203-7000 | Requirements Relating to Compensation of Former DoD Officials | SEP 2011 |
| 252.203-7001 | Prohibition On Persons Convicted of Fraud or Other Defense-Contract-Related Felonies | DEC 2008 |
| 252.203-7002 | Requirement to Inform Employees of Whistleblower Rights | SEP 2013 |
| 252.203-7997 (Dev) | Prohibition on Contracting with Entities that Require Certain Internal Confidentiality Agreements (Deviation 2016-O0003) | OCT 2015 |
| 252.203-7997 (Dev) | Prohibition on Contracting with Entities that Require Certain Internal Confidentiality Agreements (Deviation 2016-O0003) | OCT 2015 |
| 252.204-7003 | Control Of Government Personnel Work Product | APR 1992 |
| 252.204-7012 | Safeguarding Covered Defense Information and Cyber Incident Reporting. | DEC 2015 |
| 252.205-7000 | Provision Of Information To Cooperative Agreement Holders | DEC 1991 |
| 252.209-7004 | Subcontracting With Firms That Are Owned or Controlled By The Government of a Country that is a State Sponsor of Terrorism | OCT 2015 |
| 252.223-7006 | Prohibition On Storage, Treatment, and Disposal of Toxic or Hazardous Materials | SEP 2014 |
| 252.223-7008 | Prohibition of Hexavalent Chromium | JUN 2013 |
| 252.225-7012 | Preference For Certain Domestic Commodities | FEB 2013 |
| 252.232-7010 | Levies on Contract Payments | DEC 2006 |
| 252.236-7000 | Modification Proposals-Price Breakdown | DEC 1991 |
| 252.243-7001 | Pricing Of Contract Modifications | DEC 1991 |
| 252.243-7002 | Requests for Equitable Adjustment | DEC 2012 |
| 252.244-7000 | Subcontracts for Commercial Items | JUN 2013 |
| 252.247-7023 | Transportation of Supplies by Sea | APR 2014 |
| 252.247-7024 | Notification Of Transportation Of Supplies By Sea | MAR 2000 |

CLAUSES INCORPORATED BY FULL TEXT

52.204-19 INCORPORATION BY REFERENCE OF REPRESENTATIONS AND CERTIFICATIONS (DEC 2014)

The Contractor's representations and certifications, including those completed electronically via the System for Award Management (SAM), are incorporated by reference into the contract.

USAF1_00014

FA4897-16-C-3009

Page 25 of 25

Section J - List of Documents, Exhibits and Other Attachments

ATTACHMENTS

| Document Type | Description | Pages | Date |
|---|---|---|---|
| Attachment 1 | CRU Floor Bldgs 206 and 1335 Specifications | 91 | 1 April 2016 |
| Attachment 2 | Schedule of Material Submittals | 1 | February 2005 |
| Attachment 3 | Wage Determination – Building | 5 | 13 May 2016 |
| Attachment 4 | Grandview Gate Information | 1 | N/A |
| Attachment 5 | Construction Data Sheet | 19 | 17 June 2013 |
| Attachment 6* | Deleted | 1 | N/A |
| Attachment 7* | Deleted | 1 | N/A |
| Attachment 8 | Addendum 1 | 1 | 2 August 2016 |

*Will be removed at time of award.

USAF1_00025

3.5.2    Disposal

a. Collect lead-contaminated waste, scrap, debris, bags, containers,
   equipment, and lead-contaminated clothing that may produce airborne
   concentrations of lead particles. Label the containers in accordance
   with 29 CFR 1926.62 and 40 CFR 262. Dispose of lead-contaminated
   waste material at an EPA approved hazardous waste treatment,
   storage, or disposal facility off Government property.

b. Place waste materials in U.S. Department of Transportation (49 CFR
   178) approved 208 liter 55 gallon drums. Properly label each drum to
   identify the type of waste (49 CFR 172) and the date the drum was
   filled. For hazardous waste, the collection drum requires
   marking/labeling in accordance with 40 CFR 262 during the
   accumulation/collection timeframe. The Contracting Officer or an
   authorized representative will assign an area for interim storage of
   waste-containing drums. Do not store hazardous waste drums in
   interim storage longer than 90 calendar days from the date affixed
   to each drum.

c. Handle, transport, and dispose lead or lead-contaminated material
   classified as hazardous waste in accordance with 40 CFR 260, 40 CFR
   261, 40 CFR 262, 40 CFR 263, 40 CFR 264, and 40 CFR 265. Comply with
   land disposal restriction notification requirements as required by 40
   CFR 268.

d. All material, whether hazardous or non-hazardous shall be disposed in
   accordance with laws and provisions and Federal, State, or local
   regulations. Ensure waste is properly characterized. The result of
   each waste characterization (TCLP for RCRA materials) will dictate
   disposal requirements.

3.5.2.1    Disposal Documentation

Submit written evidence to demonstrate the hazardous waste treatment, storage,
or disposal facility (TSD) is approved for lead disposal by the EPA, State or
local regulatory agencies. Submit one copy of the completed hazardous waste
manifest, signed and dated by the initial transporter in accordance with 40
CFR 262.                       Contractor shall provide a certificate that
the waste was accepted by the disposal facility. Provide turn-in documents or
weight tickets for non-hazardous waste disposal.

3.5.3    Payment for Hazardous Waste

Payment for disposal of hazardous and non-hazardous waste will not be made
until a signed copy of the manifest from the treatment or disposal facility
certifying the amount of lead-containing materials or non-hazardous waste
delivered is returned and a copy is furnished to the Government.

-- End of Section --

USAF1_00079

PART 3    EXECUTION

3.1    SURFACE PREPARATION

Completely remove existing resilient flooring and adhesive. Protect adjacent surfaces not scheduled to receive the flooring by masking, or by other means, to maintain these surfaces free of the flooring material.

3.1.1    Concrete Surfaces

3.1.1.1    Mechanical Cleaning

Completely remove dirt, wax, paint, and laitance, by grinding with a terrazzo machine, sanding with coarse open grid sandpaper, sand blasting, chipping, bush hammering, or wire brushing.

3.1.1.2    Steam Cleaning

Completely remove all grease, and oil using a high pressure steam cleaner equipped with a soap injection system. Scrape the surface to remove any build-up of debris. Then thoroughly saturate the surface with hot caustic solution. Allow the solution to remain on the floor for 15 to 20 minutes. Apply steam, with caustic, over the presoaked area until all contamination is removed. Leach the caustic residue from the surface using one or more applications of steam without caustic. Flush the floor with warm water.

3.1.1.3    Paint Stripping

Brush or spray on a paint stripping material that has been demonstrated to effectively remove the paint. Leave the stripping material on the surface until the paint has softened or blistered. Remove paint by scraping, brushing, or wiping. Rinse the surface in accordance with the stripping material manufacturer's recommendations. Avoid strippers containing toxic methylene chloride.

3.1.1.4    Air Drying

After cleaning, allow concrete surface to air dry thoroughly prior to application of surfacing. Blowers or oil free compressed air may be used. Do not use flame-drying methods. Prior to application of surfacing, test concrete surface for excessive moisture in at least two locations. Place rubber mats at each location with smooth side against concrete and place weight on top of mat to hold in position and ensure contact with concrete. Polyethylene with all edges taped may be used in lieu of mats. After 8 hours remove mat or sheeting and examine floor surface for moisture accumulation. If tests indicate accumulation of moisture at either location, perform additional air drying until additional tests show no moisture accumulation.

3.1.1.5    Waste Water Handling

Waste and degreaser water must not be allowed to drain into floor drain, sanitary sewer or storm drain. Water must be collected in United Nations (UN) or Department of Transportation (DOT) approved containers, submitted for chemical analysis, and stored at the project site until analysis has been completed to determine proper disposal. Contractor is responsible for the cost associated with obtaining the laboratory analysis. Laboratory analysis shall include total metals, Volatile Organic Compounds, Semi Volatile Organic Compound, and pH.

3.1.1.6    Waste Blast Material Handling

**SECTION 09 67 23.14   Page 79**

USAF1_00084

Waste blast material must be collected in UN or DOT approved containers, submitted for TCLP analysis, and stored at the project site until analysis has been completed to determine proper disposal. Contractor is responsible for the cost associated with obtaining the laboratory analysis, and obtaining copies of the laboratory analysis reports. Analysis shall include TCLP of the RCRA 8 metals.

### 3.1.2   Substrate Cracks, Spalls, Joints, and Depressions

Fill all cracks, joints, spalls, and other depressions in the substrate with a rigid epoxy crack filler or other compatible product, as recommended by the manufacturer compatible with the floor surfacing material. Joints shall have backer rod and filled with rigid epoxy. After epoxy expansion joints are cured, joints shall be saw cut again to one half inch wide and filled with expandable, flexible joint caulking material. Any joints damaged or wider than the required one half inch shall be repaired with an epoxy/mortar joint material.

### 3.2   MIXING

Proportion and mix the floor surfacing components in accordance with the manufacturer's instructions. Submit flooring manufacturer's descriptive data, mixing, proportioning, and installation instructions. Include maintenance literature for resinous flooring.

### 3.3   APPLICATION

Submit complete instructions for application of flooring system including any precautions or special handling instructions required to comply with OSHA 29 CFR 1910-Subpart Z. Apply primer, floor surfacing, and seal coat in accordance with the manufacturer's recommendations and the following requirements.

### 3.3.1   Primer

Apply primer uniformly over the entire area to receive floor surfacing using clean rubber squeegees or clean steel trowels. Do not allow primer to collect in depressions. Allow primer to dry thoroughly before the next coat is applied. Reprime porous areas or areas where primer has dried.

### 3.3.2   Floor Surfacing

Apply mixed surfacing material to provide a finish floor surfacing not less than 3.17 mm inch thick. The entire surfacing in any one room or area must be one continuous operation except for placement of divider strips at structural floor control joints or as indicated. All surfaces must be flush, true to plane and line, and level within 2 mm in one meter 1/4 inch in 10 feet.

### 3.3.3   Seal Coat

Apply seal coat uniformly covering all surfaces after floor surfacing has cured and as recommended by the supplier.

### 3.4   PROTECTION

Allow surfacing to set for a minimum period of 48 hours before traffic is allowed on the floor. Protect finished flooring from traffic by covering with 13.5 kg 30 pound building paper or other equally effective means until final acceptance of the project.

-- End of Section --

**SECTION 09 67 23.14   Page 80**

MOUNTAIN HOME AFB (MHAFB)
ENVIRONMENTAL SPECIFICATION
ENVIRONMENTAL PROCEDURES
Updated 3 March 2015

**PART 1** GENERAL

## 1.1 SUMMARY

The Contractor is responsible for complying with all current Air Force, local, state, and federal laws and regulations regarding protection of the environment and resources, including Environmental Protection Agency (EPA) and Idaho Department of Environmental Quality (IDEQ). Nothing in this specification section is intended to relieve or exempt the Contractor from the responsibility to comply with all applicable local, state, or federal environmental statute, rules and regulations. In the event of conflicting requirements, the Project Manager will specify which one to follow.

## 1.2 QUALITY CONTROL

1.2.1 The Contractor and subcontractors shall establish and maintain a quality control system for environmental protection of all items set forth in this contract.

1.2.2 Environmental Management Plan (EMP): The Contractor shall develop an EMP and submit to the Contracting Officer (CO) or Contracting Officer Representative (COR) who will submit to 366 CES/CEIE for review and approval 14 calendar days prior to beginning work. Any compliance deficiencies identified in the EMP shall be corrected by the Contractor prior to beginning work. The Contractor shall not proceed with associated tasks until the EMP is approved, or otherwise notified by the CO/COR.

    1.2.2.1 The EMP shall address all requirements outlined in this specification.

1.2.3 Environmental Point of Contact (POC): The Contractor shall appoint a person as the Environmental POC who is responsible to ensure compliance with federal, state and local laws; Air Force Instructions and MHAFB specific permit and facility requirements. Contact information for the POC shall be documented in the EMP.

1.2.4 Notifications: The CO/COR will notify the Contractor in writing whenever noncompliance with federal, state, or local laws, regulations, or permits is observed. In such cases, the Contractor shall provide written response to the CO/COR, outlining the proposed corrective actions and take such actions after receiving approval from the CO/COR.

1.2.5 Environmental Management System (EMS): MHAFB has implemented ISO 14001 EMS in accordance with Executive Order 13423. It is a management tool to be used for recognizing the environmental impacts of our job, reducing our environmental footprint and for always looking to improve the way we conduct business at MHAFB. Anyone doing business on MHAFB shall take the free, 20 minute EMS Awareness Training through the ESOH-Training Network (https://esohtn.com/index.html) and submit training records to 366 CES/CEIE via the CO/COR.

## 1.3 HAZARDOUS MATERIALS (HM)

1.3.1 Contractors will provide a list of hazardous materials using Attachment 1 with manufacturer specific SDSs to the CO/COR who will provide it to the Installation Hazardous Materials Manager

1

USAF1_00087

(IHMM) for review and approval prior to bringing the materials onto base.

1.3.2  If the duration of the contract exceeds 30 days, contractors will fill out and provide the CO/COR with the MHAFB Contractor Hazardous Materials Monthly Usage Reporting in Attachment 2 to document products and quantities of materials used in the project, until completion of the project. Upon completion of the project, the contractor will provide the CO/COR with the final form to close out the project. The CO/COR will provide these documents to the IHMM for processing and evaluation.

1.3.3 The Contractor shall be responsible for providing proper storage equipment (e.g. flammable materials lockers, corrosive materials lockers, secondary containment pallets, spill kits, etc) and practice safe usage and handling of materials in accordance with OSHA and MHAFB requirements.

1.3.4  All remaining full, partially full, or empty HM containers used during performance of the contract are the property of the Contractor and shall be removed from MHAFB before the Contractor can be released from the project or project site, unless specific prior arrangements have been made with the CO/COR in coordination with the IHMM and the 366 CES/CEIE.

1.4 **HAZARDOUS WASTE**

1.4.1  Coordination: The Contractor shall notify the CO/COR of any hazardous substance or waste, as defined in 40 CFR Part 261. The CO/COR will coordinate with 366 CES/CEIEC HW PM to ensure that the Contractor properly identifies, segregates, samples, stores, transports, and disposes of any hazardous wastes. The Contractor shall be responsible for the proper handling, storage, transporting, disposal and regulatory compliance with all such substances and the cost incurred for complying with all applicable regulatory requirements.

1.4.2  Compliance with Regulations: Contractor operations shall be in compliance with the Resource Conservation and Recovery Act (RCRA) 40 CFR Parts 260-272, and Idaho Rules and Standards for Hazardous Waste (IDAPA 58.01.05) at all times.

1.4.3  Accumulation Limits: No more than 55 gallons, total, of hazardous waste shall be accumulated by the Contractor on site. The Contractor shall provide secondary containment for all hazardous liquids to include required labels and signage IAW RCRA requirements. The containment shall be compatible with the materials and capable of containing 110% of the volume of the largest container.

1.4.4  Transportation and Disposal: The Contractor shall be responsible for transportation and disposal of all hazardous waste off of MHAFB.

   1.4.4.1  Manifest: Hazardous wastes shall be manifested for shipment off of MHAFB. The 366 CES/CEIEC are the ONLY manifest signature authorities for hazardous waste transportation/disposal for MHAFB. The Contractor shall coordinate with the 366 CES/CEIEC through the CO/COR to arrange for manifesting hazardous waste off MHAFB.

1.4.5  Universal Waste/PCBs: Universal waste consists of designated items that, in accordance with 40 CFR Part 273, have to be collected, managed and disposed via special direction. The Contractor shall provide a copy of all shipping and/or disposal documents to the CO/COR for all controlled materials like universal wastes and PCBs.

   1.4.5.1  The shipping documents shall provide a document number, for tracking purposes, and the total weight in US pounds for each class of items.

2

USAF1_00088

1.4.5.2  Universal Waste items consist of (1) batteries of all sizes and types (other than alkaline batteries of all sizes, or lead/acid vehicle batteries); (2) fluorescent or incandescent bulbs of all sizes and types; (3) pesticides and (4) mercury containing items such as thermostats, thermometers, etc.

## 1.5  **TOXIC SUBSTANCES**

1.5.1  Soils: There is the potential for many of the soils being removed from MHAFB by construction activities to contain hazardous constituents. Because of this, any suspect soils as determined by 366 CES/CEIE shall be tested prior to disposal to determine the proper disposal method. One of the major concerns is pesticides, which can be expected in the soil under all building slabs, and outside and inside of the foundation walls of any structures built until 1983. All soil within these defined areas that are excavated during demolition or construction activities shall be placed back into excavation as near the point of origin as possible. If working in an area where a building has been demolished and the foundation is not identifiable, the entire area needs to be considered for possible residual pesticide materials. Under no circumstances shall the soil be transported off the project site unless prior approval has been obtained from 366 CES/CEIEC and proper sampling/analysis has been conducted. The definition of "project site" is the immediate vicinity of the construction/demolition activities within the project boundaries.

1.5.1.1  The EMP shall include details for excavation, handling, and transportation of contaminated soils being removed from MHAFB by construction and demolition activities.

1.5.1.2  The EMP shall include a site sketch showing the area where the soil is being removed, and if applicable, the width and depth of excavation under building slabs and outside and inside of the foundation walls of any structures being demolished.

1.5.1.3  The EMP shall include a copy of the analytical data or reference the study in which the soil analysis was conducted.

1.5.1.4  The EMP shall include a copy of the acceptance letter from the landfill where soils will be disposed.

1.5.1.5  Soils coming on to MHAFB as fill material needs to be tested by Methods 8260 for Volatile Organic Compounds (VOCs), 8270 for Semivolatile Organic Compounds (SVOCs), 6010/7470 RCRA (8) Metals, 8081 for Pesticides, and 8082 for PCBs to demonstrate non-contaminated before being used on a project. Submit analytical to 366 CES/CEIE via CO/COR for approval of fill material.

1.5.1.6  In accordance with the Idaho DEQ Air Quality Tier I Operating Permit issued to MHAFB, all reasonable precautions shall be taken to prevent PM from becoming airborne in accordance with IDAPA 58.01.01.650-651. See Section 1.11.2 for fugitive dust control requirement.

1.5.2  Asbestos Containing Materials (ACM)

1.5.2.1  In the event asbestos abatement or removal is required, the Contractor shall file an EPA Notification of Demolition and Renovation 10 business days prior to the start of the project. Due to the MHAFB's Tier I Air Quality Permit, these notifications shall be submitted to IDEQ 1410 N. Hilton Boise, ID 83706. Submit notification copies with IDEQ received stamp date to the CO/COR prior to the start of work.

USAF1_00089

1.5.2.2  The Contractor shall ensure that the details of the abatement procedures (containment/work area, clean rooms, load-out, clearance samples) are documented in the EMP and have been reviewed by a certified industrial hygienist and meet applicable federal and OSHA regulations for asbestos abatement or removal projects.

1.5.2.2.1  The EMP shall include copies of the Contractor's Asbestos NESHAP Training Certification(s).

1.5.2.2.2  The EMP shall include details of off-base ACM disposal by the Contractor at an approved landfill.

1.5.2.3  The Contractor shall submit weight tickets for ACM disposal to CO/COR monthly or at the end of the project if lasting less than one month.

1.5.2.4  During excavation, there is a potential to encounter ACM (transite) pipe.  In the event that the Contractor encounters ACM, the Contractor shall stop all work immediately and contact CO/COR.

1.5.2.5  Asbestos Contingency Plan (Attachment 3) shall be used to address the procedures that will be utilized in the unlikely event demolition, renovation, or construction activities result in ACM that, according to 40 CFR Part 61, Subpart M, becomes regulated asbestos containing material.

1.5.3  Lead-based Paint (LBP)

1.5.3.1  In the event LBP abatement is required, the Contractor shall file an EPA Notification of LBP Abatement Activities Form to the EPA.  The Contractor shall submit notification copies with EPA received stamp date to the CO/COR prior to the start of work.

1.5.3.2  The Contractor shall ensure that the details of the abatement procedures (containment/work area, clean rooms, load-out, clearance samples), sampling data, handling and transportation of LBP material are documented in the EMP.

1.5.3.2.1  The abatement procedures shall be reviewed by a certified industrial hygienist and meet applicable federal and OSHA regulations for LBP abatement projects.

1.5.3.2.2  The EMP shall include copies of the Contractor's LBP Abatement Training Certification(s).

1.5.3.3  For disposal of construction/demolition materials, the Contractor shall characterize the waste using Toxicity Characteristic Leaching Procedures (TCLP) to determine if the waste is hazardous or solid waste. The EMP shall include details of off-base LBP material disposal by the Contractor at an approved landfill.

1.5.3.4  The Contractor shall submit weight tickets for LBP material disposal to CO/COR monthly or at the end of the project if lasting less than one month.

1.5.3.5  In the event waste is characterized as hazardous, refer to section 1.4 for hazardous waste procedures.

4

USAF1_00090

| Environmental Office (366 CES/CEAN) - Preconstruction Checklist | | PAGE 1 OF 2 | | |
|---|---|---|---|---|
| Project Name: | | QPR: 366 CES/CEAN | | |
| Project Number: | | Date: | | |

| # | ITEM | Yes | No | N/a |
|---|---|---|---|---|
| 1 | ENVIRONMENTAL MANAGEMENT SYSTEM (EMS): A management system for environmental programs that drives continuous improvement<br>- Everyone has a role in the Environmental Management Systems<br>- EMS will help reduce environmental impacts in day-to-day operations<br>- EMS focuses on continuous improvement<br>EMS is the tool for accomplishing the core goals of mission sustainability, pollution prevention and environmental compliance | | | |
| 2 | SPILL REPORTING & CLEAN-UP: Call 911 if using a Base phone line (call 828-1117 if using a cell phone) in the event of a chemical spill or release of all Hazardous Materials. All spills shall be reported regardless of size or if cleaned up. Also notify 366 CES/CEAN at 828-6351. The contractor is responsible for clean-up of spills. If the spills are not cleaned up to the Government's satisfaction, the Government may charge the contractor for additional cleanup costs incurred. | | | |
| 3 | GENERAL: Contractor shall comply with all applicable State and Federal environmental laws and regulations, including, but not limited to: the Clean Air Act, the Resource Conservation and Recovery Act, the Clean Water Act, the Occupational Safety and Health Act, and others. Questions concerning compliance with environmental standards may be directed to the 366 CES/CEAN at 828-6351. | | | |
| 4 | HAZARDOUS MATERIALS: Contractor shall submit Material Safety Data Sheets (MSDS) through appropriate channels to the HAZMAT Program Manager (Bldg 1297, 1100 Liberator Ave, Ph 828-6351) for approval prior to bringing material on base. Contractor shall maintain MSDS for all materials for as long as the materials remain on-base. Contractor must handle and store hazardous materials IAW all local, state and federal laws and IAW MHAFB HAZMAT Monitors Handbook. Store all bulk liquids in secondary containment. | | | |
| 5 | HAZARDOUS WASTE: Contractor shall dispose of all hazardous waste off Mountain Home AFB (MHAFB) in accordance with 40 CFR 260 et seq, unless directed otherwise. Copies of hazardous waste manifests, receiving records, and characterization documents shall be submitted to 366 CES/CEAN through appropriate channels for all waste generated on MHAFB. CEAN is the only office authorized to sign hazardous waste manifests as the generator for Haz Waste leaving the Base. | | | |
| 6 | RECYCLING: Contractor shall coordinate all recycling efforts with 366 CES/CEAN prior to starting the project. Weight tickets must be forwarded to 366 CES/CEAN on a monthly basis and/or end of a short project. Weight estimates are acceptable. Contact number is 828-4212. | | | |
| 7 | DECONSTRUCTION: Demolition projects must utilize deconstruction practices as much as feasible. All materials removed from facilities prior to demolition for re-use must be weighed and weights must be reported to 366 CES/CEAN on a monthly and/or end of project basis. | | | |
| 8 | GREEN PROCUREMENT: Contractor shall purchase environmentally preferable materials containing recycled materials as much as possible in accordance with Executive Order 13423, RCRA Section 6002, and 366 Wing Plan 3213-(Current Version) | | | |
| 9 | NATURAL RESOURCES: The contractor shall not remove, cut, deface, injure, or destroy natural resources including trees, shrubs, especially sagebrush, vines, grasses, or wetlands without permission from the Environmental Flight except as otherwise specified. The contractor shall not disturb or drive through wetland areas, including playas, vernal pools, or slick spots. The contractor shall comply with the Integrated Natural Resource Management Plan. The contractor will complete Natural and Cultural Resource Training provided by CES/CEAN prior to the start of construction. | | | |
| 10 | CULTURAL RESOURCES: The contractor shall comply with MHAFB's Cultural Resource Management Plan. If cultural resources, including artifacts, either historical or prehistoric, or human remains, are discovered during the course of performance of the contract, the contractor shall stop work immediately, leaving the cultural materials in place, and, through appropriate channels, notify CES/CEAN at 828-6351. Examples of cultural materials include but are not limited to: cans, bottles, arrowheads, ceramics, pottery, military items, papers, wooden artifacts, etc. Any man-made object may be a cultural resource. When Natural and Cultural Training is required by the contract, the contractor shall complete the Natural and Cultural Training, as provided by the CES/CEAN, prior to the start of construction. For questions and concerns call the Cultural Resource Manager at 828-6351. | | | |
| 11 | STORM WATER: On contracts requiring disturbance of 1 or more acres of land, the contractor shall submit Notice of Intent (NOI) to EPA and allow EPA review period of 7 calendar days prior to the start of construction. The contractor shall implement adequate erosion control measures as required by the Storm Water National Pollution Discharge Elimination System (NPDES) Permit. The contractor shall ensure there are no unauthorized discharges to the storm water system. All discharges to the base sanitary sewer system shall be in accordance with the requirements of the Wastewater Treatment Plant NPDES Permit. For more information call 366 CES/CEAN at 828-6351. The attached web page is for small construction activity waivers, ht!Q://cfuub.eQa.gov/n:gdes/stormwater/waiver.cfm . | | | |

8/2011

FA4897-16-B-0003

| Environmental Office (366 CES/CEAN) - Preconstruction Checklist | PAGE 2 OF 2 |
|---|---|

Project Name:

| # | ITEM | Yes | No | N/a |
|---|---|---|---|---|
| 12 | PESTICIDES: Contractors shall brief all employees including subcontractors that MHAFB facilities did use pesticides as a means of pest control around the foundations of buildings. Disturbing soils in and around foundations or in old building foot prints could result in disturbing residual concentrations of pesticides. If soils are to be excavated then they need to be returned as close to the original excavation as possible. All off site soil disposal needs to be coordinated through the environmental office at 828-6351 prior to any movement. | | | |
| 13 | SOLID WASTE: Non-hazardous solid waste shall be disposed of in a permitted off-base landfill in accordance with all posted restrictions and restrictions of this construction contract. All disposals shall be in accordance with the contractor's Waste Disposal and Recycling Plan. All waste loads shall be covered to prevent litter. Prior to the start of construction the contractor shall submit to CES/CEAN a copy of the contractor's Waste Disposal and Recycling Plan. | | | |
| 14 | ASBESTOS: Contractors shall brief all employees including subcontractor's that MHAFB facilities contain asbestos containing materials (ACM) unless otherwise directed. If asbestos work or abatement is required, the contractor shall conform to 40 CFR Part 61, subpart M; OSHA 1910 and 1926. When required, the contractor shall be responsible to file with IDEQ/EPA and 366 CES/CEAN the 10 day notification (and re-notifications, if applicable) for asbestos work. The notification(s) will be sent to both offices at the same time. ACM can also be encountered in the form of active, or abandoned underground water or sewer lines. These lines may, or may not appear on the contractor's dig permit. See the dig permit instructions for assistance. All contractors must use an approved off-base landfill for asbestos containing materials. | | | |
| 15 | LEAD and LEAD BASED PAINTS: Contractor's shall brief all employees including subcontractor's that MHAFB facilities contain lead based paint unless otherwise directed. If lead work or abatement is required, the contractor shall conform to 40 CFR 745, subpart L; OSHA 1910 and 1926. When required, the contractor will be responsible to file with EPA and 366 CES/CEAN the 5 day notification for lead work. The notification(s) will be sent to both offices at the same time. Lead containing materials may be considered hazardous waste and will need to be tested in order to determine if it's considered hazardous or solid waste for disposal purposes. | | | |
| 16 | REQUIRED BY CEAN PRIOR TO CONSTRUCTION (when applicable):<br>• NPDES Storm Water – for projects over 1 acre. Copies of NOI and SWPPP<br>• For Rock Crushers, Hot Mix Asphalt Plants, Batch Plants, and Associated Generators, the Contractors must have a processed Idaho Permit for their equipment prior to moving the equipment to the project.<br>  – CEAN requires copies of all permits and<br>  – (after operations begin) copies of all the through-put quantities (include generator hours).<br>  – A copy of Idaho Department of Environmental Quality (IDEQ) project review, checklists and IDEQ approval of all water and waste-water projects. | | | |
| 17 | AIR QUALITY:<br>• The contractor must control dust particles, aerosols, and gaseous by-products from construction and demolition activities, processing, and preparation of materials at all times, including weekends, holidays, and hours when work is not in progress.<br>• Control hydrocarbons and carbon monoxide emissions from equipment to Federal and Idaho State allowable limits at all times.<br>• In addition, the contractor is required to use low-noise emission equipment and products certified by the EPA to the maximum extent possible.<br>• Class I Ozone Depleting Substances are prohibited and substitutes for Class II Ozone Depleting Substances shall be used whenever technically and economically feasible.<br>• Burning without the consent of the CO and CEAN is prohibited. | | | |

CEAN REPRESENTATIVE: _____ DATE: _____

CONTRACT ADMINISTRATOR'S SIGNATURE: _____ DATE: _____

CONTRACTOR'S SIGNATURE: _____ DATE: _____

8/2011

Attachment 1                                                                                    FA4897-16-B-0003

# Exhibit 2



**DEPARTMENT OF THE AIR FORCE**
366TH CONTRACTING SQUADRON (ACC)
MOUNTAIN HOME AIR FORCE BASE IDAHO

MEMORANDUM FOR: PROTECH COATINGS, INC.
ATTN: MR. CHAD DIAMOND
1949 W. 2300 S.
SALT LAKE CITY, UT 84119

FROM: 366 CONTRACTING SQUADRON/LGCB
366 GUNFIGHTER AVENUE SUITE 498
MOUNTAIN HOME AFB ID 83648-5258

SUBJECT: Designation of Government Personnel for Contract FA4897-16-C-3009, Repair CRU Flooring Bldg. 206 & 1335

1. The following individuals have been appointed as Government points of contact for subject Contract.

   *Project Inspector: Shawn Young*

   a. Contracting Officer Representative (COR): Paul Derr, phone 208-828-2764

   b. Project Engineer: Daniel W. Keppler, phone 208-828-3973

   c. Contract Administrator: SrA Donald Carter, phone 208-828-3110

2. The Contracting Officer for the project is: SSgt Eric Nagel, phone 208-828-3115 or Cindy R. Dixon, phone 208-828-3116.

3. Please address all contract correspondence to the following address:

   366 CONTRACTING SQUADRON/LGCB
   366 GUNFIGHTER AVENUE SUITE 498
   MOUNTAIN HOME AFB ID 83648-5258

*18 oct 2016*

ERIC W. NAGEL
Contracting Officer

Global Power For America

# Exhibit 3



**DEPARTMENT OF THE AIR FORCE**
366TH CONTRACTING SQUADRON (ACC)
MOUNTAIN HOME AIR FORCE BASE IDAHO

MEMORANDUM FOR: PROTECH COATINGS, INC.
                              ATTN: MR. CHAD DIAMOND
                              1949 W. 2300 S.
                              SALT LAKE CITY, UT 84119

FROM   366 CONTRACTING SQUADRON/LGCB
        366 GUNFIGHTER AVENUE SUITE 498
        MOUNTAIN HOME AFB ID 83648-5258

SUBJECT:  Designation of Contracting Officer Representative (COR) for Contract FA4897-16-C-3009, Repair CRU Flooring Bldg. 206 & 1335

1. The following person is the appointed COR on subject contract:

      Primary: Paul Derr, phone 208-828-2764

2. As the COR, the above referenced person is responsible to ensure that all technical provisions are complied with and for the inspection of all work performed for the government during the contract period.

3. COR's have limited authority.  COR's **do not** possess requisite authority to:

- Clarify, make or infer legal interpretations on the scope or intent of the contract for the contractor.

- Approve the contractor's procedures.

- Authorize the expenditure of funds.

- Levy or impose any task not specifically provided for in the contract.

- Enter into contractual agreements with the contractor.

- Issue directives to the contractor.

- Offer advice or recommendations to the contractor that could directly or indirectly affect pending Contracting Officer determinations as to fault or negligence.

- Circumvent procedures and have deficiencies corrected for or on behalf of the Government or the contractor.

                                                           18 oct 2016

                                    ERIC W. NAGEL
                                    Contracting Officer

Global Power For America

# Exhibit 4

**DEPARTMENT OF THE AIR FORCE**
**366TH CONTRACTING SQUADRON (ACC)**
**MOUNTAIN HOME AIR FORCE BASE, IDAHO**

19 August 2016

MEMORANDUM FOR PROTECH COATINGS, INC.
ATTN: MR. CHAD DIAMOND
1949 W. 2300 S.
SALT LAKE CITY, UT 84119

FROM: 366 CONTRACTING SQUADRON
366 GUNFIGHTER AVE, SUITE 498
MOUNTAIN HOME AFB ID 83648-5258

SUBJECT: Solicitation FA4897-16-B-0003, CRU Floor Repair B206 & B1335, Bid
Verification

1. Verify that you understand the full extent of the requirements and workload as stated in the
   100% Specifications dated 1 April 2016 (Solicitation Attachment 1).

2. Verify that you used the appropriate wages listed in the Wage Determination ID 160020, and
   that you understand all fringe benefits and payroll taxes that are associated with these wages.
   The Wage Determination was included in the solicitation as Attachment 3.

3. Verify your total dollar amount for your proposal is correct. The bid you submitted was
   $39,621.00 less than the next low bid.

4. Response is required by 11:00am MST, 19 August 2016. If you have any questions or
   concerns, please do not hesitate to contact SrA Donald Carter via phone at (208)828-3110 or
   email at donald.carter.12@us.af.mil or the undersigned at (208)828-3116.

CINDY R. DIXON
Contracting Officer

FOR OFFICIAL USE ONLY

# Exhibit 5



## Small Business, Minority/ Woman Owned, DBE Certified

August 19, 2016

Department of the Air Force
Cindy Dixon
Contracting Officer
366 Contracting Squadron
366 Gunfighter Ave, Ste 498
Mountain Home AFB ID. 83648-5258

Re:  Solicitation FA4897-16-B-0003, CRU Floor Repair B206 & B1335, Bid Verification Response

Ms. Dixon,

This letter is written in response to your letter dated 8-19-16 requesting bid verification to the above solicitation. Answers to each question are as follows:

1.  ProTech understands the full extent of the requirements and workload as stated in the 100% specifications dated 1 April, 2016 (Solicitation Attachment 1). All surface preparation, joint repairs and joint filling are included.  Surface concrete repair is included. An equivalent to the specified moisture vapor control floor coating system is included per Amendment.  A binder is applied with fillers to the Moisture Control Primer system as specified.  A UV stable, light grey CRU topcoat is applied with a random chip broadcast and 80 grit aluminum oxide as specified.  A second, clear CRU topcoat is applied to seal the color chips (exceeding the specification and providing a total thickness of 3/16" approx).  Line striping and safety markings are included. Resilient base is included.  A ProTech reference page and material data sheet are attached to this letter for your review.

2.  ProTech understands and has used Wage Determination ID 160020 including all benefits and taxes.

3.  ProTech's proposal amount of $190,379.00 is correct.

If you have any additional questions or need further clarification, don't hesitate to ask.

Regards,

Chad Diamond

CONCRETE RESTORATION / REPAIR / WATERPROOFING / COATINGS

1949 W. 2300 S. SLC, Utah 84119 www.protechcoatings.net  PH: 801-563-9898 TOLL FREE: 800-963-1415  FX: 801-563-9703

USAF1_00144

# Exhibit 6



**DEPARTMENT OF THE AIR FORCE**
366TH CONTRACTING SQUADRON (ACC)
MOUNTAIN HOME AIR FORCE BASE IDAHO

MEMORANDUM FOR: PROTECH COATINGS, INC.
ATTN: MR. CHAD DIAMOND
1949 W. 2300 S.
SALT LAKE CITY, UT 84119

FROM: 366 CONTRACTING SQUADRON/LGCB
366 GUNFIGHTER AVENUE SUITE 498
MOUNTAIN HOME AFB ID 83648-5258

SUBJECT: Superintendence by Contractor for Contract FA4897-16-C-3009, Repair CRU Flooring
Bldg. 206 & 1335

1. It is a responsibility of the prime contractor to personally supervise contract performance, or have a
foreman/superintendent satisfactory to the Contracting Officer on the site at all times with authority to
act for him, until the work is completed.

2. In accordance with the FAR 52.236-6 contract clause "Superintendence by Contractor", the
government requests the name, local address, and local telephone number of the individual who will be
on the site at all times during progress with authority to act for the prime contractor. The local address
and telephone number is needed in case of emergencies after normal working hours.

3. Request that you fill out the lower portion and return to this office immediately.

18 oct 2016

ERIC W. NAGEL
Contracting Officer

TO: 366 CONS/LGCB
366 GUNFIGHTER AVENUE SUITE 498
MOUNTAIN HOME AFB ID 83648-5258

1. In accordance with the contract clause "Superintendence by Contractor", Mr/Ms _Rob Lund_ will be
on the site at all times during progress with authority to act for me.

2. He/She may be reached at the following local address: _See Below_ and/or
telephone number: _801-509-0300_ in case of emergency after normal working hours.

\*\*BW Foothills Inn 1080 US-20, Mtn Home, ID 83647
208-587-8477

Signature

_Scott Carey_
Typed Name of Individual

_ProTech Coatings, Inc._
Typed Name of Firm

Global Power For America

# Exhibit 7



**DEPARTMENT OF THE AIR FORCE**
366TH CONTRACTING SQUADRON (ACC)
MOUNTAIN HOME AIR FORCE BASE, IDAHO

NOV 2 8 2016

MEMORANDUM FOR  PROTECH COATINGS, INC.
ATTN: MR. CHAD DIAMOND
1949 W. 2300 S.
SALT LAKE CITY, UT 84119

FROM  366 CONTRACTING SQUADRON/LGCB
366 GUNFIGHTER AVENUE SUITE 498
MOUNTAIN HOME AFB ID 83648-5258

SUBJECT: Notice to Proceed For Contract FA4897-16-C-3009, Repair CRU Flooring Bldg. 206 & 1335

1. You are authorized and obligated to proceed with the performance required by the terms of contract FA4897-16-C-3009. All work shall be accomplished in strict accordance with the contract's terms, conditions, plans, and specifications. Work shall begin within 10 days after issuance of this Notice to Proceed. A progress schedule shall be submitted and approved before work begins on this project.

2. Request that you acknowledge receipt of this Notice to Proceed in the space provided below and return one (1) copy to this office as soon as possible. You may retain the original for your records. Work must be completed no later than 28 Mar 2017.

ERIC W. NAGEL
Contracting Officer

cc: 366 CES/CEPM

TO: 366 CONS/LGCB
366 GUNFIGHTER AVENUE SUITE 498
MOUNTAIN HOME AFB ID 83648

Contractor hereby acknowledges receipt of the foregoing Notice to Proceed for Contract No. FA4897-16-C-3009

CONTRACTOR:  ProTech Coatings, Inc.          DATE:  November 28, 2016

BY:

TITLE: Secretary

*Global Power For America*

# Exhibit 8

## NAGEL, ERIC W SSgt USAF ACC 366 CONS/LGCB

| | |
|---|---|
| **From:** | Scott Carey <scott@protechcoatings.net> |
| **Sent:** | Wednesday, December 21, 2016 9:20 AM |
| **To:** | NAGEL, ERIC W SSgt USAF ACC 366 CONS/LGCB |
| **Cc:** | GILPATRICK, LARRY G JR SSgt USAF ACC 366 CONS/LGCA1; DERR, PAUL R GS-11 USAF ACC 366 CES/CENM |
| **Subject:** | RE: waste blast material |

I have the samples being sent to a lab in SLC to be tested, I pulled a sample from each bag of removal dust from each building (1335 and 206). I will have them tested for Lead and provide the analytical report. That is what the plan was on my end. We had done preliminary testing with the lead detector pens and had no trace of lead with those, so I am confident we will show no signs of lead in the removal dust.

Scott Carey
Project Manager

1949 W. 2300 S. SLC, UTAH 84119
Company: 801-563-9898
Mobile: 801-509-0301
FX: 801-563-9703
Toll free 1-800-963-1415

scott@protechcoatings.net


-----Original Message-----
From: NAGEL, ERIC W SSgt USAF ACC 366 CONS/LGCB [mailto:eric.nagel@us.af.mil]
Sent: Wednesday, December 21, 2016 9:14 AM
To: Scott Carey <scott@protechcoatings.net>
Cc: GILPATRICK, LARRY G JR SSgt USAF ACC 366 CONS/LGCA1 <larry.gilpatrick@us.af.mil>; DERR, PAUL R GS-11 USAF ACC 366 CES/CENM <paul.derr.1@us.af.mil>
Subject: FW: waste blast material

Scott,

See below from Paul Derr. How are you all addressing the waste material that requires testing per the specifications? Our Environmental department is interested in the method.

-----Original Message-----
From: DERR, PAUL R GS-11 USAF ACC 366 CES/CENM
Sent: Wednesday, December 21, 2016 9:04 AM
To: NAGEL, ERIC W SSgt USAF ACC 366 CONS/LGCB <eric.nagel@us.af.mil>
Subject: FW: waste blast material


-----Original Message-----

1

From: DERR, PAUL R GS-11 USAF ACC 366 CES/CENM
Sent: Thursday, December 15, 2016 10:30 AM
To: GILPATRICK, LARRY G JR SSgt USAF ACC 366 CONS/LGCA1 <larry.gilpatrick@us.af.mil>; NAGEL, ERIC W SSgt USAF ACC 366 CONS/LGCB <eric.nagel@us.af.mil>
Cc: YOUNG, SHAWN C GS-08 USAF ACC 366 CES/CENM <shawn.young.8@us.af.mil>; KEPPLER, DANIEL W GS-12 USAF ACC 366 CES/CENM <daniel.keppler@us.af.mil>; PAQUETTE, RYLEY R 2d Lt USAF ACC 366 CES/CEIE <ryley.paquette.1@us.af.mil>; KEPPLER, DANIEL W GS-12 USAF ACC 366 CES/CENM <daniel.keppler@us.af.mil>; DERR, PAUL R GS-11 USAF ACC 366 CES/CENM <paul.derr.1@us.af.mil>
Subject: waste blast material

Gil, Eric,

The specifications require the contractor to collect the waste blast material in UN or DOT approved containers. They have collected this material in plastic bags. The contractor bought a lead paint test kit and planned to self-perform the analysis. The specifications require laboratory analysis to include TCLP of the RCRA 8 metals. I am concerned that the contractor is not following the specifications that they bid on. We need laboratory analysis reports showing TCLP of the RCRA 8 metals. Please provide direction to the contractor.

Paul

Paul R. Derr, Civil Engineer, EIT
366CES/CENM
Mt Home AFB, ID 83648
DSN: 728-2764
COMM: 208-828-2764

# Exhibit 9

## NAGEL, ERIC W SSgt USAF ACC 366 CONS/LGCB

| | |
|---|---|
| **From:** | Scott Carey <scott@protechcoatings.net> |
| **Sent:** | Thursday, March 02, 2017 3:57 PM |
| **To:** | NAGEL, ERIC W SSgt USAF ACC 366 CONS/LGCB |
| **Subject:** | RE: Waste Blast Material |

The waste was disposed of on Feb 8th 2017 by Snake River Rubbish at the Simco Road Regional Landfill (16415 NW Waste Site Dr, 13 mi NW on Simco Cutoff Rd, Boise ID). I am awaiting the waste receipt from them the disposal, as soon as I get it I will forward. ALS will be testing for all 8 RCRA metals hope to have the results no later than Tuesday.

Scott Carey
Project Manager

1949 W. 2300 S. SLC, UTAH 84119
Company: 801-563-9898
Mobile: 801-509-0301
FX: 801-563-9703
Toll free 1-800-963-1415

scott@protechcoatings.net

-----Original Message-----
From: NAGEL, ERIC W SSgt USAF ACC 366 CONS/LGCB [mailto:eric.nagel@us.af.mil]
Sent: Thursday, March 2, 2017 3:51 PM
To: Scott Carey <scott@protechcoatings.net>
Subject: FW: Waste Blast Material

Scott,

This is what our environmental team needs with regards to the disposal of material.

-----Original Message-----
From: OHLSEN, CURTIS D CIV USAF ACC 366 CES/CEIEC
Sent: Thursday, March 02, 2017 3:42 PM
To: NAGEL, ERIC W SSgt USAF ACC 366 CONS/LGCB <eric.nagel@us.af.mil>
Cc: ROBERTSON, SHERI L CIV USAF ACC 366 CES/CEIE <sheri.robertson@us.af.mil>; DERR, PAUL R GS-11 USAF ACC 366 CES/CENM <paul.derr.1@us.af.mil>; OHLSEN, CURTIS D CIV USAF ACC 366 CES/CEIEC <curtis.ohlsen@us.af.mil>
Subject: RE: Waste Blast Material

SSgt Nagel,

We need more information. Specifically, where and when (date) it was disposed, the name of the disposal company, any invoice, receipt or paperwork they may have of the disposal, if any, etc.

Thanks,

Curt Ohlsen | HM & HW PM
366 CES/CEIE
Mountain Home AFB, ID
(208) 828-4120
DSN 728-4120


-----Original Message-----
From: NAGEL, ERIC W SSgt USAF ACC 366 CONS/LGCB
Sent: Thursday, March 02, 2017 3:20 PM
To: OHLSEN, CURTIS D CIV USAF ACC 366 CES/CEIEC <curtis.ohlsen@us.af.mil>; ROBERTSON, SHERI L CIV USAF ACC 366
CES/CEIE <sheri.robertson@us.af.mil>
Subject: FW: Waste Blast Material

Curtis/Sheri,

See below from Protech regarding the 1335 waste material.

v/r
Eric W. Nagel, SSgt, USAF
Contracting Officer
366 CONS/LGCB
Mountain Home AFB, ID, 83648
Phone: 208-828-3115
DSN: 728-3115

-----Original Message-----
From: Scott Carey [mailto:scott@protechcoatings.net]
Sent: Thursday, March 02, 2017 12:49 PM
To: NAGEL, ERIC W SSgt USAF ACC 366 CONS/LGCB <eric.nagel@us.af.mil>; YOUNG, SHAWN C GS-08 USAF ACC 366
CES/CENM <shawn.young.8@us.af.mil>; Tammi Owens <tammi@protechcoatings.net>; GILPATRICK, LARRY G JR SSgt
USAF ACC 366
CONS/LGCA1 <larry.gilpatrick@us.af.mil>; DERR, PAUL R GS-11 USAF ACC 366 CES/CENM <paul.derr.1@us.af.mil>
Subject: RE: Waste Blast Material

Eric,
It has been disposed of! I think I misread the results when I got them back. I am more concerned for my crew and the
fact that they worked on this without protection. I am going to research the results and what they mean.

Scott Carey
Project Manager

1949 W. 2300 S. SLC, UTAH 84119
Company: 801-563-9898
Mobile:  801-509-0301
FX: 801-563-9703
Toll free 1-800-963-1415

scott@protechcoatings.net

-----Original Message-----
From: NAGEL, ERIC W SSgt USAF ACC 366 CONS/LGCB [mailto:eric.nagel@us.af.mil]
Sent: Thursday, March 2, 2017 12:14 PM
To: Scott Carey <scott@protechcoatings.net>; YOUNG, SHAWN C GS-08 USAF ACC
366 CES/CENM <shawn.young.8@us.af.mil>; Tammi Owens <tammi@protechcoatings.net>; GILPATRICK, LARRY G JR
SSgt USAF ACC 366
CONS/LGCA1 <larry.gilpatrick@us.af.mil>; DERR, PAUL R GS-11 USAF ACC 366 CES/CENM <paul.derr.1@us.af.mil>
Subject: Waste Blast Material
Importance: High

Scott,

Greg Lewis informed me that material from 1335 was disposed of already through conventional trash pickup. This could
be an issue since the material tested positive for lead above the thresholds as stated by our Engineer Paul Derr. We need
you to verify if the material has indeed been disposed of for 1335, and if so, has it been disposed of properly based on
the QC results.
Please get back to me by COB today.

v/r
Eric W. Nagel, SSgt, USAF
Contracting Officer
366 CONS/LGCB
Mountain Home AFB, ID, 83648
Phone: 208-828-3115
DSN: 728-3115

-----Original Message-----
From: Scott Carey [mailto:scott@protechcoatings.net]
Sent: Wednesday, March 01, 2017 2:31 PM
To: YOUNG, SHAWN C GS-08 USAF ACC 366 CES/CENM <shawn.young.8@us.af.mil>; Tammi Owens
<tammi@protechcoatings.net>; NAGEL, ERIC W SSgt USAF ACC 366 CONS/LGCB <eric.nagel@us.af.mil>; GILPATRICK,
LARRY G JR SSgt USAF ACC 366
CONS/LGCA1 <larry.gilpatrick@us.af.mil>
Subject: RE: Mountain Home AFB / Entry Passes / Request for Approval

I was told that environmental did not get the results of the Lead testing in Bldg. 206 and 1335. I have attached the
results, I apologize for them not being sent when we received them. Please let me know if you need anymore info.

Scott Carey
Project Manager

1949 W. 2300 S. SLC, UTAH 84119
Company: 801-563-9898
Mobile: 801-509-0301
FX: 801-563-9703
Toll free 1-800-963-1415

scott@protechcoatings.net

# Exhibit 10

Title: **Mountain Home Air Force Base Chromium Waste Remedial Evaluation Report**

Date: **July 7, 2017**



Prepared for:

Mountain Home Air Force Base, ID 83648-5292

Prepared by: **AGEISS**

AGEISS Inc.
12477 W. Cedar Dr., Suite 103
Lakewood, CO 80228

# TABLE OF CONTENTS

**Section**                                                                          **Page**

1.0    INTRODUCTION........................................................................................................1
       1.1    Purpose..........................................................................................................1
       1.2    Report Organization.......................................................................................1
2.0    ISSUE BACKGROUND...............................................................................................2
       2.1    Hazardous Waste Generation and Testing......................................................2
       2.2    Disposal Site Description, Location and Operation.........................................3
3.0    CHROMIUM LEACHATE GENERATION................................................................3
4.0    REMEDIAL ALTERNATIVES....................................................................................5
       4.1    Alternative 1: No Action................................................................................5
       4.2    Alternative 2: Leave the Waste in Place.........................................................9
       4.3    Alternative 3: Extract Waste and Send to an Incineration Facility................10
       4.4    Alternative 4: Extract Waste, Send to Vendor for Stabilization / Disposal at Their
              RCRA Subtitle C Landfill.............................................................................10
       4.5    Alternative 5: Extract Waste, Return to MHAFB, Stabilize, and Dispose of at
              RCRA Subtitle C Landfill.............................................................................11
5.0    RISK DETERMINATION............................................................................................11
       5.1    Risk Determination for Leaving Waste in Place.............................................11
       5.2    Risk Determination for Waste Excavation.....................................................12
6.0    HISTORICAL PRECEDENTS FOR LEAVING WASTE IN PLACE....................13
7.0    CONCLUSIONS AND RECOMMENDATIONS........................................................13
8.0    REFERENCES..............................................................................................................16

## LIST OF TABLES

**Table**                                                                            **Page**

Table 1. Data Used to Calculate Leachate Chromium Concentrations.......................................3
Table 2. Alternatives for Mitigation of Chromium Waste Generated by MHAFB and Currently
Residing in the IWS Landfill.....................................................................................................6
Table 3. Non-compliance Wastes Approved by the IDEQ to Remain in Landfills....................14

## LIST OF APPENDICES

**Appendix**

Appendix A    ALS Laboratory Data
Appendix B    Applicable or Relevant and Appropriate Requirements
Appendix C    Assumptions and Cost Estimates for Remedial Alternatives
Appendix D    Construction and Utility Maintenance Worker Risk Scenario
Appendix E    Historical Leaving Waste in Place Cases In Idaho

USAF1_00242

## 2.2    Disposal Site Description, Location and Operation

The IWS Landfill is located in the southwest quarter of the southeast quarter of Section 7, Township 2 South, Range 5 East (Boise Meridian, Idaho). The MHAFB waste was deposited in the landfill at latitude and longitude 43.259590, -115.902060 (decimal degrees) (OTS, 2017).

Approximately 4,000 lbs of waste from MHAFB Building 1335, which is about a volume of 1.5 cubic yards, was deposited into IWS Landfill Cell 2A. The current landfill practice for refuse disposal uses the area-fill method. "Refuse is unloaded as close to the working face of the landfill as possible, then spread into a thin layer and compacted into cells, using heavy equipment. A cell consists of the volume of solid waste placed in the landfill during a given time. For example, a daily cell consists of one day's volume of solid waste that is compacted and covered with daily cover or alternative cover as approved by the health district. A set of cells constructed at one elevation represents a landfill lift. The lift of solid waste then becomes the base for the next set of daily cells. When the last lift is filled, its surface becomes the subgrade for the final cover." (Project Delivery Group, 2015).

The total disposal volume of Cell 2A is 290,050 cubic feet, which is 10,743 cubic yards (Project Delivery Group, 2015). The volume of waste from MHAFB was approximately 1.5 cubic yards, which is 0.014% of the total cell volume.

Landfill operations use Alternative Daily Cover consisting primarily of Automobile Shredder Residue (ASR). Although chromium is in ASR, it has low potential to leach as measured by TCLP, but it could increase background chromium in a sample analyzed as total chromium (http://www.scielo.br/scielo.php?script=sci_arttext&pid=S1980-993X2015000200253#f2).

## 3.0    CHROMIUM LEACHATE GENERATION

The potential chromium concentration in Cell 2A leachate that may result from mixing with leachate produced by MHAFB waste is estimated below. This estimate is used to determine whether or not the resulting leachate solution would exceed the TCLP criterion for chromium. Data used in the calculations are presented in Table 1 below.

**Table 1. Data Used to Calculate Leachate Chromium Concentrations**

| Parameter | Value | Source |
|---|---|---|
| Concentration of total chromium in MHAFB waste leachate | 32 mg/L | ALS (2017), higher of two results. |
| Concentration of total chromium in the current Cell 2A leachate | 0.0421 mg/L | SVL Analytical (2017), higher of two results. |
| Volume of MHAFB leachate | 36,363 L | See equation 1 below |
| Pore volume of Cell 2A landfill collection and removal system (LCRS) | 29,050 ft³ | Project Delivery Group (2017), page 7 |
| Dilution during TCLP extraction, mass liquid/mass solid | 20 | U.S. Environmental Protection Agency (EPA) SW-846 Method 1311 |

USAF1_00246

LCRS protect the groundwater from contaminated leachate. The groundwater at the IWS Landfill is 490 feet below ground surface.

Based on these conditions, the 4,000 lbs of MHAFB waste disposed in the IWS Landfill Cell 2A are not considered to pose an unacceptable risk to human health and the environment.

## 5.2    Risk Determination for Waste Excavation

To assess the potential risk to workers from excavating the MHAFB waste from the IWS Landfill, a risk screen was used, where the concentration of chromium in the waste is compared to EPA RSL 2016 tables for worker air exposure and worker soil exposure (see Appendix D for definition of worker). The analysis was limited to a screening because there were only two chromium waste values. A comparison was also provided to the occupational exposure to chromium VI of $0.2 \, \mu g/m^3$ 8-hr TWA NIOSH recommended exposure limit (REL). The amount of chromium in air was based on fugitive dust which was calculated based on particulate emission factor (Appendix D).

The theoretical risk to the composite worker from air and soil exposure is $4 \times 10^{-3}$ and $1 \times 10^{-4}$ respectively, based on the assumption that chromium was all chromium (VI) and using the conservative default exposure conditions to assess worker risk (EPA, 2016) noted in Appendix C. Similarly, the occupational exposure was $0.64 \, \mu g/m^3$ which is above the limit for an 8-hr TWA noted above.

For hypothetical worker exposure, the major source of risk would be from exposure to fugitive dust during excavation, which may include extremely low levels of asbestos and biological waste. Health risk from the chromium waste is likely to be secondary to safety risks. For example, soil borings hazards generally associated with drilling operations can include the following:

- Exposure to vapors of volatile organics.

- Absorption of toxic chemicals from landfill leachate.

- Noise levels exceeding the Occupational Safety and Health Administration's permissible exposure limit of 90 dBA are both a hazard and a hindrance to communication.

- Fumes (carbon monoxide) from the drill rig.

- Overhead utility wires, i.e., electrical and telephone, can be hazardous when the drill rig boom is in the upright position.

- Underground pipelines and utility lines can be ruptured or damaged during active drilling operations.

- Moving parts, i.e., augers, on the drill rig may catch clothing.

- Transporting the drill rig over uneven terrain may cause the vehicle to roll over or get stuck in a rut or mud. Operator must use caution and be aware of hazards associated with moving heavy machinery and other associated injury.

- High pressure hydraulic lines and air lines used on drill rigs are hazardous when they are in ill repair or incorrectly assembled.

USAF1_00255

## 6.0    HISTORICAL PRECEDENTS FOR LEAVING WASTE IN PLACE

The LIP alternative is the preferred alternative for the MHAFB chromium waste currently residing in the IWS Landfill. Based upon the information/documents provided by the IDEQ through a public records request, there were four known historical LIP cases in the State of Idaho approved by the IDEQ. Three of the four cases also involved disposal of RCRA contaminated wastes at the same municipal landfill facility, the IWS Landfill. Table 3 summarizes the waste type and description of the non-compliance waste and the required actions taken to obtain LIP approval by the IDEQ. Detailed information regarding each case is provided in Appendix E.

One important overriding reason for implementing LIP among these historical cases, as well as the MHAFB waste, is that the challenge of isolating, identifying, and excavating a small amount of material. With all the potential obstacles, it becomes unviable with little benefit to the protection of the landfill and environment. The RCRA contaminated waste received, which generally represents less than 0.1% of the total volume of the respective landfill cell, would already have been placed and spread all over the cell area, and buried underneath other wastes and soil cover material. Since the small quantity of waste is now comingled with the other wastes, excavation would create larger volumes of waste to treat and stabilize. The affected landfills, including the IWS landfill, have operational controls established for monitoring the landfills and generated leachate.

## 7.0    CONCLUSIONS AND RECOMMENDATIONS

The MHAFB waste that was disposed of in the IWS Landfill by ProTech comprises approximately 0.014% of the volume of the Cell 2A, where it was deposited. The probability of locating the MHAFB waste is extremely low, since the waste has been diluted by operational and daily cover practices. In addition, background sources of chromium potentially including the ASR cover and municipal waste are present in the cell, further contributing to a low probability of locating the MHAFB waste.

The leachate analysis proved that the additional chromium concentration added from the MHAFB waste would not cause the leachate in Cell 2A to exceed the TCLP regulator limit for chromium.

All of the potential MHAFB waste removal, treatment and disposal remedies depend upon specifically locating the waste, which is very unlikely. The cost of these remedies ranges from approximately $250,000 to over $300,000, and based on this report will not provide any significant environmental benefits. The waste is currently institutionally controlled and presents no risks to human health and the environment.

Elevated worker risk due to long term inhalation of fugitive dust is attributed to assuming that all the chromium being chromium (IV), which is a very conservative assumption. It was also assumed that the waste was undiluted with other waste, also a very conservative assumption in an active landfill. Leaving the waste in place presents no real risks that would not be mitigated by routine operational practices.

There is historical precedence for leaving the waste in place (LIP). There are four historical cases in Idaho, where RCRA waste was place in a municipal landfill and was allowed to remain in place.

USAF1_00256

Final

**Table 3. Non-compliance Wastes Approved by the IDEQ to Remain in Landfills**

| Waste Type | Description of the Non-compliance waste | Required Actions for LIP Approval by IDEQ |
|---|---|---|
| Steel grit and dust, dry cell batteries; filter press cake-solid; soil, latex and polymer emulsion type products; and grease, oil and debris | Drums, representing 1,200 lbs of waste containing filter press cake carrying the following Hazardous Waste codes based on the 2010 profile:<br><br>■ F019 (wastewater treatment sludges from the chemical conversion coating of aluminum).<br>■ D007 (TCLP chromium equal greater than 5.0 mg/L).<br><br>Three samples of filter press cake indicate a TCLP of 9 – 14 mg/L.<br><br>Total cyanide was detected in the 2010 profile and March 30, 2011 sample but not for the January 13, 2011 sample.<br><br>The hazardous filter cake represent 2.7% of the total issue waste load (43,490 lbs) | Completed an evaluation of the hazardous waste constituents of concern (total chromium, total cyanides, and amenable cyanides) present in the hazardous waste in order to determine whether the waste as disposed poses an unacceptable risk to human health or the environment in its present location, and whether cleanup is needed and if so, what its scope and nature should be. The evaluation was conducted by a "qualified professional" as defined in the Idaho Solid Waste Facility Act, Idaho Code § 39-7403(43).<br><br>Institutional controls include:<br><br>■ Maintaining interim cover (11 feet of municipal solid waste and daily cover) over the issue waste until construction of final cover system. The objective of this institutional control is to maintain entombment of the issue waste such that no direct exposure occurs.<br>■ Construct a 6-ft closure cap over the issue waste are upon closure of Cell 1. The final cover system (cap) limits infiltration following closure of Cell 1<br>■ Leachate monitoring. Total cyanide, amenable cyanide, and total chromium are being sampled on a semi-annual basis for a period of 5 years for the Cell where the hazardous waste was disposed. The analytical data and the 5-yr evaluation are provided to the IDEQ |
| Soil (no particular distinguishing characteristics) | 5 roll-off containers, 15 tons/container; total weight: 75 tons. The soil contained 500-2,600 ppm tetrachloroethylene | Incident of non-compliance not requiring 24-hour reporting presented justifications to leave the material containing tetrachloroethylene in the landfill and leachate analyses to evaluate possible effects of tetrachloroethylene would have on the landfill liner and LCRS. |

14

USAF1_00257

MHAFB Chromium Waste Remedial Evaluation Report

Final

| Waste Type | Description of the Non-compliance waste | Required Actions for LIP Approval by IDEQ |
|---|---|---|
| One drum was described to contain "oily sludge." The content of the other five drums was unknown. | Six 55-gallon drums which were uncovered during excavation of a park. The drum containing oily sludge was characterized as a hazardous waste by exceeding the RCRA TCLP limit of 1 mg/L of cadmium with a result of 1.48 mg/L. The other five drum samples did not exceed RCRA limits for hazardous waste. However, IDEQ indicated that the two methods are not a complete list required by IDAPA 58.01.05.006 (incorporating 40 CFR 262.11) to properly characterize an unknown waste. Incomplete hazardous waste characterization is a RCRA violation. | Notice of Violation and Consent Order (CO) from IDEQ. The CO issued a civil penalty to the City of Boise and the shipper since all six drums had been disposed and are impracticable to retrieve. The civil penalty was paid and IDEQ allowed all six drums to remain in the landfill. |
| A damaged freight from a truck fire with paint waste | Classified as a large quantity generator (generates, in any calendar month, 1,000 kg/month [2,200 lbs/month] or more of hazardous waste; or generates, in any calendar month, or accumulates at any time, more than 1 kg/month [2.2 lbs/month] of acute hazardous waste; or generates, in any calendar month, or accumulate at any time, more than 100 kg/month [220 lbs/month] of acute hazardous spill cleanup material D001 [ignitability] and D007 [chromium]) | Not known. However, IDEQ allowed LIP since the paint waste has been interspersed with other waste and covered by other waste. |

15

USAF1_00258

In conclusion, based upon the expected low concentrations of Cr in the leachate, avoiding unsafe practices and non-protective measures associated with removal of the MHAFB waste, minimal risk assessment levels, and previous IDEQ cases of LIP, it is recommended that the MHAFB waste at the IWS Landfill be left in place.

## 8.0    REFERENCES

ALS, 2017. ALS Laboratory Analyses, Salt Lake City Utah. January 12, 2017 report and March 17, 2017 report.

Cheminfo Services Inc., 2014. *Background Study on the Content of Shredder Residue Final Report* (Public Version). January 10, 2014. Cheminfo Services Inc. 30 Centurian Drive, Suite 205 Markham, Ontario L3R 8B8.

Cal-EPA DTSC, 2011a. Human Health Risk Assessment (HHRA) Note. Office of Human and Ecological Risk (HERO) HHRA Note Number 1. Recommended DTSC Default Exposure Factors For Use In Risk Assessment At California Hazardous Waste Sites and Permitted Facilities. Issue Date: May 20, 2011.

Idaho Department of Environmental Quality, 2004. *Risk Evaluation Manual*, Appendix A. July 2004.

Olympus Technical Services, Inc., 2017. *Sampling and Analysis Plan, Chromium Assessment, Idaho Waste Systems, Elmore County, Idaho*. Boise, Idaho. April 15, 2017.

Project Delivery Group, 2015, *Simco Road Regional Landfill Operating Plan Update*. Prepared by Project Delivery Group, Salem, Oregon. December 2015.

Snoeyink and Jenkins, 1980. Water Chemistry. 1st Edition. John Wiley & Sons Inc.

SVL 2017 Analytical Report. Kellogg ID

The National Institute for Occupational Safety and Health (NIOSH), Centers for Disease Control and Prevention. https://www.cdc.gov/niosh/

EPA, 2016. User's Guide: Regional Screening Levels for Chemical Contaminants at Superfund Sites. May. URL: http://www.epa.gov/reg3hwmd/risk/human/rbconcentration_table/usersguide.htm

http://www.scielo.br/scielo.php?script=sci_arttext&pid=S1980-993X2015000200253#f2, website accessed July 7, 2017.

USAF1_00259

# Exhibit 11

STATE OF IDAHO
**DEPARTMENT OF
ENVIRONMENTAL QUALITY**

1445 North Orchard • Boise, Idaho 83706 • (208) 373-0550
www.deq.idaho.gov

C.L. "Butch" Otter, Governor
John H. Tippets, Director

July 20, 2017

**CERTIFIED MAIL: 7013 1710 0000 9752 4175**

Paula Jo Brown
Chief, Installation Management Flight
366 CES/CEI
1030 Liberator St., B1300
Mountain Home AFB, ID  83648

RE:    Mountain Home Air Force Base Chromium Waste Remedial Evaluation Report, July 7, 2017

Dear Ms. Brown:

On July 7, 2017, the Idaho Department of Environmental Quality (DEQ) received the revised   Mountain Home Air Force Base (MHAFB) Chromium Waste Remedial Evaluation Report (Report), submitted by AGEISS Inc. on behalf of MHAFB.  The revised Report was to update recommendations, following DEQ comments in a letter dated June 27, 2017, in handling of chromium hazardous waste disposed at the Idaho Waste Systems Subtitle D solid waste landfill (also known as the Simco Road Landfill), located at 16415 Northwest Waste Site Drive in Mayfield, Idaho on February 8, 2017.

DEQ reviewed the revised Report and has the following comments:

**Section 2.1, Page 2, second paragraph.**
Upon further review, the referenced EPA regulatory limit of 1200 ppm for lead appears to be incorrect in the sentence, "It was at that time, MHAFB found out that the elevated levels of 880 ug/g and 840 ug/g lead found in the Building 1335 samples warranted additional investigation, even though the upper level of 880 ug/g (or 880 ppm) lead is below the industrial EPA regulatory limit of 1200 ppm."  Please be advised the Hazardous Waste Management Act (HWMA)/Resource Conservation and Recovery Act (RCRA) Toxicity Characteristic Leaching Procedure (TCLP) regulatory limit is not 1,200 ppm but rather is 5.0 mg/L. Alternatively, the TCLP regulatory limit can be multiplied by a factor of 20 to allow for direct comparison to total results which takes into account the 20-to-1 ratio of extraction fluid to solid used in the TCLP. In the case of lead, using the 'Rule of 20' results in a totals analysis regulatory limit of 100 mg/kg. In this case, the paragraph does go on to state that samples were analyzed for lead via the TCLP and were non-detect, so DEQ will not require the report to be revised further.

**Attachment, Appendix C**
This appendix details the cost estimates associated with each proposed remedial option. The title and language contained in this appendix should indicate this document is an estimate.

DEQ understands the probability of locating the blast media waste, estimated at 4,000 pounds, is greatly unlikely, particularly because an estimated 10,000 tons of municipal solid waste was deposited on top of the initial deposited area.  Furthermore, Simco Road Landfill is constructed with a composite liner and leachate collection system meeting 40 CFR 258.40, which is designed to protect human health and the environment from the leachate generated. A potential investigation using geoprobe or other similar means could compromise the liner or integrity of the liner and result in leachate being released to the environment and contaminating ground water. Based upon DEQ's review of the available information and recommendation for approval by the Central District Health Department, DEQ hereby concurs with MHAFB's recommendation that the subject waste at the Simco Road Landfill be left in place.

PRINTED ON RECYCLED PAPER

USAF1_00190

Paula Jo Brown
July 20, 2017
Page 2

This is a one-time determination for the specific instance of waste disposal detailed in the Report only. DEQ exercises enforcement discretion in instances such as this on a case-by-case site-specific basis. The basis for this determination is: 1) the low probability of locating the dispersed waste; 2) the nature and quantity of the waste is not expected to adversely affect the integrity of the liner or leachate collection system if left in place; 3) the potential health and safety concerns posed by retrieval activities and the wastes with which the waste is now co-mingled; and 4) the potential compromise of the liner is a greater risk to human health and the environment than allowing the waste to remain in place based on landfill design and construction. This one-time determination in no way extends to or applies to hazardous waste generated in the future by MHAFB including, but not limited to, wastes generated from floor recoating processes. This letter does not mandate that the waste remain in place in the landfill, but concurs with MHAFB's recommendation contained in the revised Report. Further, this letter does not restrict Idaho Waste Systems, as the owner/operator of the landfill, from separately requesting that MHAFB take additional measures.

During the review of this incident, the DEQ Boise Regional Office identified deficiencies in your management of the hazardous waste in question. This information has been forwarded to the Hazardous Waste Program at the DEQ State Office for follow-up. DEQ may decide to institute an enforcement action if noted deficiencies justify further action. You will be notified within the next few weeks if this is the case. In the interim, it is in your best interest to ensure that your facility is in compliance with hazardous waste management regulations.

If you have any questions, please contact me at (208) 373-0469 or via email at albert.crawshaw@deq.idaho.gov.

Sincerely,

Albert Crawshaw
Waste and Remediation Manager

AC:dr

ec:     Aaron Scheff, DEQ Regional Administrator
        Kevin Ryan, P.E., DEQ Boise Regional Office
        Natalie Creed, DEQ State Office Waste & Remediation
        Hannah Young, DEQ Deputy Attorney General
        Dean Ehlert, DEQ State Office Waste & Remediation
        Mollie Mangerich, DEQ State Office Waste & Remediation
        Michael Reno, Central District Health Department
        Jack Yarbrough, Idaho Waste Systems
        Dewey Crane, Snake River Rubbish
        Chad Diamond, Protech Coatings
        TRIM 2017BCP2064

# Exhibit 12



STATE OF IDAHO
DEPARTMENT OF
ENVIRONMENTAL QUALITY

1410 North Hilton • Boise, Idaho 83706 • (208) 373-0502
www.deq.idaho.gov

C.L. "Butch" Otter, Governor
John H. Tippets, Director

August 20, 2018

**CERTIFIED MAIL # 7016 0750 0000 2170 4190**
**RETURN RECEIPT REQUESTED**

Paula Jo Brown
Chief, Installation Management Division
366 FW/A71
Mountain Home Air Force Base
1030 Liberator St.
Mountain Home Air Force Base, ID 83648

Chad Diamond
Vice President
ProTech Coatings, Inc.
1949 W. 2300 S.
Salt Lake City, UT 84119

Re:    Effective Consent Order, U.S. Air Force Mountain Home Air Force Base, EPA Identification Number
       ID3572124557, and ProTech Coatings, Inc.

Dear Ms. Brown and Mr. Diamond:

Enclosed is a signed copy of the Consent Order regarding violations resulting from management of floor coating
wastes at Mountain Home Air Force Base. We appreciate your cooperation in this matter.

If you have any questions, please contact me at (208) 373-0506.

Sincerely,

Natalie Creed
Hazardous Waste Unit Manager
Waste Management and Remediation Division

NC/er   c:\...\

Enclosure

cc:    Hannah Young, Deputy Attorney General
       Albert Crawshaw, DEQ Boise Regional Office
       2018BCV195
       COF

IDAHO DEPARTMENT OF ENVIRONMENTAL QUALITY

IN THE MATTER OF )
)
U.S. Air Force )
Mountain Home Air Force Base )
1100 Liberator St. )
Mountain Home, Idaho 83648 )          CONSENT ORDER
)                                     Idaho Code 39-108 and 4413
ProTech Coatings, Inc. )
1949 W. 2300 S. )
Salt Lake City, UT 84119 )
_____)

1.    Pursuant to Idaho Code 39-101 *et seq.*, (Idaho Environmental Protection and Health Act
      (EPHA)) and 39-4401 *et seq.*, (Idaho Hazardous Waste Management Act of 1983
      (HWMA)), the Idaho Department of Environmental Quality (DEQ) enters into this
      Consent Order (CO), enforceable under the EPHA, Idaho Code 39-108 and 39-109, and
      the HWMA, Idaho Code 39-4413 and 39-4414, with the United States Department of the
      Air Force, Mountain Home Air Force Base (MHAFB) located near the city of Mountain
      Home, Elmore County, Idaho, and ProTech Coatings, Inc. (ProTech) a Nevada
      corporation. The DEQ, MHAFB, and ProTech may be hereinafter collectively referred to
      as the "Parties" or singularly as "Party."

2.    MHAFB, as part of its operations, generates hazardous waste and is a holder of a
      HWMA Corrective Action Permit for MHAFB dated January 11, 2015.

3.    In 2016, MHAFB awarded ProTech two (2) contracts to install Chemical Resistant
      Urethane (CRU) floor coatings. One contract was for the Building 205 aircraft
      maintenance hangar; the other contract covered both the Building 206 fire department
      facility and the Building 1335 aircraft maintenance hangar. The Building 205 project is
      not the subject of this CO; only the Building 206/1335 project is the subject of this CO.
      The Building 206/1335 project shall hereinafter be referred to as the "Project" or the
      "Contract."

      The work under the Contract to remove any existing coatings and prepare the floors for
      the new CRU coatings took place November 30 – December 13, 2016. The floors were
      prepared by shot blasting and hand grinders, resulting in removed floor coating, concrete
      dust, and other debris, which was placed into heavy duty plastic bags that were sealed
      and deposited in an enclosed trailer moved once from Building 1335 to Building 206 and
      back to Building 1335 during the Project. These bags were deposited along with the
      other additional Project debris in the Project dumpster located near Building 1335.

Consent Order - 1

USAF1_00193

Approximately 10,900 pounds total of material from Buildings 206 and 1335 were accumulated together in the single Project dumpster near Building 1335. Two (2) grab samples of the bags of removed flooring material, one grab sample from a bag of removed Building 206 flooring material and the other from a bag of removed Building 1335 flooring material, were collected on December 7 and 9, 2016, and sent for analysis. The initial analyses were only for total levels of lead. On February 8, 2017, the Building 206/1335 Project dumpster was subsequently delivered to the Idaho Waste Systems (IWS) solid waste landfill (also known as the Simco Road Landfill), located in Elmore County, Idaho, for disposal, by Snake River Rubbish, LLC.

Later, Toxicity Characteristic Leaching Procedure (TCLP) analyses for both samples of flooring material found chromium at levels of 30 mg/L and 32 mg/L for the Building 1335 flooring material sample, while the Building 206 flooring material sample had TCLP chromium results of 0.20 and 0.21 mg/L. The chromium results for the Building 1335 flooring material sample were the only TCLP limit exceedances. Of the 10,900 pounds of total material in the Project dumpster, MHAFB originally reported that approximately 4,000 pounds of it was removed Building 1335 flooring material. ProTech later calculated the amount of removed flooring material from Building 1335 to have been approximately 371 pounds, while the amount of removed flooring material from Building 206 was calculated to be about 5,030 pounds. Other Project construction/demolition material and debris, in addition to the removed flooring material in bags, were also in the Project dumpster.

4.    On March 7, 2017, based on the TCLP analytical results for the Building 1335 removed flooring material sample, MHAFB notified DEQ of the disposal of 4,000 pounds of D007 hazardous waste from the Project at IWS. MHAFB provided DEQ documentation concerning the analytical results and the disposal.

5.    DEQ conducted a review of the waste characterization and disposal documentation received from MHAFB to ascertain compliance with HWMA and the Idaho Rules and Standards for Hazardous Waste, IDAPA 58.01.05. *et seq* (Rules).

6.    By Notice of Violation (NOV) dated March 23, 2018, DEQ notified MHAFB and ProTech of four (4) alleged violations of the HWMA and the Rules.

7.    The DEQ provided MHAFB and ProTech with the opportunity for a compliance conference to discuss correction of the alleged violations and entry into a CO with the DEQ. On May 7, 2018, the compliance conference was held with DEQ, MHAFB and ProTech representatives in attendance either in person or by telephone.

8.    In order to resolve the March 23, 2018 NOV without litigation or further controversy and without any admission of liability, any admission of the alleged violations or any admission of any facts, MHAFB and ProTech agree to the provisions of this CO and the following terms and actions:

    A.    Alleged Violation Number 1.

        i.    MHAFB has partially resolved alleged Violation Number 1 by submitting

USAF1_00194

to DEQ documentation of training provided to affected employees on proper characterization of hazardous waste and changes to their design and construction management operational procedures.

ii.   ProTech will partially resolve alleged Violation Number 1 by providing training to affected employees on proper characterization of hazardous waste within sixty (60) days of the effective date of this CO. ProTech will submit documentation of the employee training, including a copy of the written training material(s), the date(s) of training, and the list of attendees for review and approval in accordance with Paragraph 9 of this CO.

iii.  To fully resolve alleged Violation Number 1, MHAFB and ProTech will comply with Paragraph 10 of this CO.

B.   Alleged Violation Numbers 2 – 4. DEQ agrees to dismiss alleged Violation Numbers 2 – 4 and the associated penalties.

9   DEQ Review and Approval Submittal Review Process - Unless otherwise set forth specifically herein, the following document submittal and review process (Submittal Review Process) shall be followed regarding submittals required by this CO for which DEQ approval is required. This process shall be followed until the DEQ approves the document or the document review time frame has expired. Upon approval by the DEQ, documents shall be incorporated herein and enforceable as a part of this CO.

A.   All submittals required of ProTech pursuant to this CO shall be submitted to DEQ in both hard copy and electronic format with one (1) hard copy and one (1) electronic copy provided for each submittal.

B.   Within thirty (30) calendar days of receipt of ProTech's submittal, the DEQ shall do one of the following: 1) notify ProTech in writing the document is approved; 2) notify ProTech in writing of any deficiencies in the document; or, 3) notify ProTech in writing of the DEQ's extension of the DEQ's review and comment period for an additional thirty (30) calendar days. If the DEQ notifies ProTech of deficiencies in the document, ProTech shall submit a revised document to resolve those deficiencies within thirty (30) calendar days of receipt of the DEQ's notice.

C.   The Submittal Review Process shall be repeated until the DEQ notifies ProTech the document is approved. However, ProTech documents must meet the requirements of this CO, as determined by the DEQ, within one hundred twenty (120) calendar days from the due date for the first submittal of the document. If ProTech does not develop a DEQ approved document within such periods, DEQ may consider it a breach of this CO.

D.   If the DEQ extends its review and comment period beyond the initial thirty (30) day period described above, the time frames within which ProTech documents shall meet the requirements of this CO shall be extended an equivalent number

USAF1_00195

of days. Once the DEQ approves documents, they shall be incorporated herein and enforceable as a part of this CO.

E.    If the date on which a submittal or other communication is due falls on a Saturday, Sunday, or federal holiday, the deadline for such submission shall be the next business day.

10.    PENALTY – In the March 23, 2018 NOV, DEQ assessed MHAFB and ProTech a civil penalty of Fifteen Thousand Six Hundred Five Dollars ($15,605). The civil penalty has been reduced to Three Thousand Two Hundred Dollars ($3,200). MHAFB and ProTech each shall be responsible for payment of half of this penalty. Payment shall be made within one hundred twenty (120) days of the effective date of this CO.

11    Payments shall be made by check payable to the Idaho Department of Environmental Quality. These payments shall be deposited by the DEQ, or its representative, into the Hazardous Waste Emergency Account created by Idaho Code § 39-4417. Please send the penalty payments to the following address:

> Accounts Receivable
> Fiscal Office
> Idaho Department of Environmental Quality
> 1410 N. Hilton
> Boise, Idaho 83706-1255

12    All other communication required to be sent to the DEQ shall be addressed to:

> Albert Crawshaw
> Waste and Remediation Manager
> Boise Regional Office
> Department of Environmental Quality
> 1445 N. Orchard
> Boise, Idaho 83706
> (208) 373-0469
> Albert.Crawshaw@deq.idaho.gov

All communication required to be sent to MHAFB shall be addressed to:

> Paula Jo Brown
> Chief, Installation Management Flight
> 366 IFW/A71
> Mountain Home Air Force Base
> 1030 Liberator St.
> Mountain Home Air Force Base, ID 83648
> (208) 828-8541
> Paula.Brown.2@us.af.mil

All communication required to be sent to ProTech shall be addressed to:

Consent Order - 4

Chad Diamond
Vice President
ProTech Coatings, Inc.
1949 W. 2300 S.
Salt Lake City, UT 84119
(801) 563-9898

13. Except as specifically set forth in this CO, this CO shall not relieve MHAFB and ProTech from their obligation to comply with any of the applicable provisions of the EPHA, HWMA, or the Rules, including any permit, or other solid or hazardous waste requirement. This CO shall not relieve MHAFB or ProTech from their obligation to comply with any other applicable local, State or Federal law, or any interagency or other agreements between the Parties.

14. This CO shall bind MHAFB and ProTech and its successors and assigns until such time as the terms of the CO are met and the CO is terminated in writing by the DEQ. MHAFB and/or ProTech may each request termination of this CO with respect to itself upon its own independent completion of the applicable requirements of this CO.

15. MHAFB shall take all necessary steps to obtain sufficient funding to comply with the provisions of this CO and, once obtained, shall obligate those funds for the purpose of compliance with this CO.

   A. Nothing herein shall be interpreted to require obligation or payment of funds in violation of the Anti-Deficiency Act, 31 U.S.C. § 1341. Any requirement for payment or obligation of funds by a particular date established by the terms of this agreement shall be subject to the availability of funds, and no provision herein shall be interpreted to require obligation or payment of funds in violation of the Anti-deficiency Act, 31 U.S.C. § 1341. In cases where payment or obligation of funds would constitute a violation of the Anti-Deficiency Act, the dates established requiring the payment or obligation of such funds shall be appropriately adjusted.

   B. DEQ recognizes the provisions of the Anti-Deficiency Act but does not agree that failure to obtain adequate funds or appropriations to comply with the CO shall constitute a circumstance beyond the reasonable control of MHAFB or shall constitute a release from or defense to any administrative or judicial action which may be brought to enforce this CO. MHAFB and DEQ agree that it is premature to raise the validity of such a defense at this time. If, at any time, adequate funds or appropriations are not available to comply with this CO, MHAFB shall notify DEQ in writing and DEQ shall determine whether or not it is appropriate to adjust the deadlines set forth in this CO. MHAFB reserves the right to raise the Anti-Deficiency Act as a defense to any action brought to enforce this CO.

   C. The provisions of Paragraphs 15.A and 15.B apply exclusively to MHAFB and are not applicable to ProTech. ProTech expressly recognizes that they are independently responsible for performance of the terms and conditions of this CO.

Consent Order - 5

USAF1_00197

16. MHAFB and ProTech expressly recognize that failure to comply with the terms of this CO may result in a judicial court action for specific performance of the CO, civil penalties, assessment of costs, restraining orders, injunctions, and other relief available under Idaho Code §§ 39-4413 and 39-4414.

17. Except as specifically set forth herein, MHAFB and ProTech reserve and do not waive any rights, authority, claims, or defenses, including sovereign immunity, that they may have or wish to pursue in any administrative, judicial, or other proceeding with respect to any person.

18. This CO contains the entire agreement between the Parties. This CO may not be enlarged, modified, or altered, except in writing signed by all the Parties.

19. MHAFB and ProTech each recognize their independent responsibility to obtain all permits, licenses, certifications, and access rights to complete the terms and actions of this CO.

20. Each Party represents and warrants it has the authority to enter into this CO and to take all actions provided for herein and no further action or authorization is required.

21. In the event any provision or authority of this CO or the application of this CO to any Party or circumstances is held by any judicial or administrative authority to be invalid, the application of such provisions to other Parties or circumstances and the remainder of the CO shall remain in force and shall not be affected thereby.

22. The effective date of this CO shall be the date of the signature by the Director of the Idaho Department of Environmental Quality.

DATED THIS ____14____ day of ____AVG_____, 2018

_____

JOSEPH D. KUNKEL, COLONEL, USAF
COMMANDER, 366TH FIGHTER WING
UNITED STATES AIR FORCE, MOUNTAIN HOME AIR FORCE BASE

DATED THIS _____ day of _____, 2018

Consent Order - 6

USAF1_00198

_Jennifer Diamond_

JENNIFER DIAMOND, PRESIDENT
PROTECH COATINGS, INC.


DATED THIS ___1st___ day of ___August___, 2018


JOHN H. TIPPETS, DIRECTOR    8/17/2018
IDAHO DEPARTMENT OF ENVIRONMENTAL QUALITY


Consent Order - 7

# Exhibit 13



**U.S. Department of Justice**

Civil Division, Torts Branch
Environmental Torts

---

*Eric Rey, Trial Attorney*
*Telephone: (202) 616-4224*
*Facsimile: (202) 616-4989*
*Email: Eric.A.Rey@usdoj.gov*

<u>**VIA EMAIL**</u>                                                    June 12, 2019
William L. Ghiorso
Ghiorso Law Office
494 State Street, Suite 300
Salem, OR 97301

      Re: *Idaho Waste Systems, Inc. v. The United States Air Force et al.*, 18-cv-229-BLW
          **The United States' First Expert Disclosure**

Dear Bill:

      Pursuant to Federal Rule of Civil Procedure 26(a)(2)(A) & (B) and the Court's Revised
Case Management Order, as amended (Docket Entry 43), the United States hereby identifies Dr.
Remy J-C. Hennet as a testifying expert.  Please find enclosed Dr. Hennet's expert report.

      Best Regards,

      *Eric Rey*

      Eric Rey
      Trial Attorney
      U.S. Department of Justice
      Torts Branch, Environmental Torts

Enclosure

cc (with enclosure):

    Danielle Sgro (DOJ, ETL)
    Sheila Baynes (DOJ, ENRD)
    Richard Cummings (Counsel for Plaintiff)
    Tyler Anderson (Counsel for ProTech Coatings, Inc.)
    Tug Worst (Counsel for Snake River Rubbish, LLC)

# Expert Report of
# Remy J.-C. Hennet

## Case No. 1:18-cv-229-BLW

*Prepared for:*

**United States Department of Justice**

*Prepared by:*

**Remy J.-C. Hennet, PhD**

$\Sigma^2\Pi$ **S.S. PAPADOPULOS & ASSOCIATES, INC.**
**Environmental & Water-Resource Consultants**

**June 2019**

7944 Wisconsin Avenue, Bethesda, Maryland 20814-3620 • (301) 718-8900

# 1.0 Background and Experience

This expert report represents the opinions of Dr. Remy J-C. Hennet on the disposal of chromium-containing waste material at the Simco Road Regional Landfill in 2017.  I am a Senior Principal at S.S. Papadopulos & Associates, Inc. (SSP&A).  I hold a Ph.D. degree in geochemistry and a Master's degree in geology from Princeton University, and university degrees in hydrogeology and geology from the University of Neuchatel, Switzerland.  My expertise includes the application of geochemistry, hydrogeology and geology to evaluate the origins, fate and transport of contaminants in the environment. Over the course of my career, I have applied my expertise to evaluating the fate and transport of numerous chemicals in landfill environments and in groundwater in the surroundings of landfills. I have more than 29 years of professional experience.  My curriculum vitae and list of depositions and trial appearances are provided as Exhibit A.

I was retained by the United States Department of Justice in *Idaho Waste Systems, Inc. v. United States Air Force et al.*, No. 1:18-cv-229-BLW (D. Idaho) to perform an evaluation of the fate and transport of chromium that was disposed of as a waste material in the Simco Road Regional Landfill in 2017. I was asked to write an expert report that summarizes my findings and opinions.

To conduct my evaluation and render my expert opinions, I relied on my education, research, and professional experience.  The documents and information that I considered are of the type that can be reasonably relied upon to support my opinions.  The list of documents I have considered and/or relied upon is provided as Exhibit B. To conduct this evaluation, I was assisted by SSP&A staff.

The opinions presented in this report were reached by applying accepted methodology in the field of environmental sciences. The opinions expressed in the report are my own and are based on the data and facts available to me at the time of writing.  I hold these opinions to a reasonable degree of scientific certainty.   Should additional relevant or pertinent information become available, I reserve the right to supplement the discussion and findings presented in this report.

SSP&A is compensated for my time working on this project at an hourly rate of $330.

# 2.0 Introduction

### 2.1 – The Simco Road Regional Landfill

The 480-acre Simco Road Regional Landfill (SRRL) is located at 16415 NW Waste Site Drive, Boise, Elmore County, ID 83716. It is operated by Idaho Waste Systems Inc. (IWS) as a Resource Conservation and Recovery Act (RCRA) Subtitle D landfill.[1] The landfill is a large, regional landfill that receives municipal solid waste including household waste, as well as non-hazardous sludge, industrial waste, and construction and demolition debris. The landfill also accepts friable asbestos, non-friable asbestos, contaminated soil, ash, biosolids (including dead livestock), and tires (auto) (https://wastebits.com/locator/location/simco-road-regional-landfill). The SRRL receives about ten percent of Boise's municipal solid waste for disposal, as well as waste from other clients in Idaho, Washington, Oregon, Utah and Nevada. Waste is delivered to the site by transfer trailers and rail cars (https://www.cityofboise.org/city_clerk/112707/solid.pdf). The landfill commenced operations in 1999, and presently consists of two cells (Cell 1 and Cell 2). Cell 1 is substantially full and is only used for limited refuse classes. Operations are currently confined to Cell 2 (IDEQ016982 at page 7), and in particular to cell module 2A, the first of five cell modules anticipated to be used to fill Cell 2 over time (cell modules are also referred to as Cell 2A, 2B, 2C, 2D, and 2E; IDEQ016218 at pages 2-3). The SRRL reportedly uses an Alternative Daily Cover which consists primarily of Automobile Shredder Residue (ASR) (USAF1_00241 at

---

[1] There are seven criteria for RCRA Subtitle D municipal solid waste landfills such as the SRRL, including location restrictions, composite liner requirements, leachate collection and removal systems, operating practices such as compacting and covering waste frequently, groundwater monitoring requirements, closure and post-closure care requirements, corrective action provisions, and financial assurance (https://www.epa.gov/landfills/municipal-solid-waste-landfills). The landfill is required to have a composite liner which consists of two components; the upper component must consist of a minimum 30-mil flexible membrane liner (FML) at least 60-mil thick installed in direct and uniform contact with the compacted soil component. The lower liner component must consist of at least a two-foot layer of compacted soil with a hydraulic conductivity of no more than $1 \times 10^{-7}$cm/sec. The landfill must also have a leachate collection system that is designed and constructed to maintain less than a 30-cm depth of leachate over the liner. In addition, the design must ensure that the concentration values of various contaminants will not be exceeded in the uppermost aquifer at the relevant point of compliance (currently well MW-8 for the SRRL); for hexavalent chromium this concentration is 0.05 mg/L, which is below the MCL for total chromium of 0.1 mg/L (https://www.govinfo.gov/content/pkg/CFR-2012-title40-vol26/xml/CFR-2012-title40-vol26-part258.xml; https://www.epa.gov/dwstandardsregulations/chromium-drinking-water).

page 6). The location of the planned and existing landfill cells as represented by IWS' consultant in 2014 is shown in Exhibit C.

The SRRL is located in the Snake River plain physiographic province in the southeast portion of the Cinder Cone Butte Critical Groundwater Area established in 1981 and within the larger Mountain Home Groundwater Management Area established in 1982 by the Idaho Department of Water Resources (IDEQ016982 at page 8). The landfill site is underlain by between approximately 68 and 113 feet of interbedded layers of soil, sand, clay, gravel, cinders and fractured lava. The lithology below these unconsolidated units consists of lava and basalt; with layers of cinders, clay, sand, and siltstone (IDEQ016982 at page 8). A regional aquifer exists at approximately 480 feet below ground surface (bgs), and a perched aquifer is located within the basalt unit in the southeast corner of the site at a depth of approximately 400 feet bgs (IDEQ018942 at page 3); one site well (MW-4) is reportedly completed within this perched aquifer (IDEQ016982 at page 8). Regional groundwater flow in this area of the Mountain Home Plateau is toward the southwest, generally following the regional topography (IDEQ016982 at page 8). At the SRRL, groundwater flow is toward the west in the central and downgradient areas of the site, and toward the southwest further away downgradient of the site (e.g. IDEQ017683 at page 16). The area has been subject to declining water levels due to withdrawals for irrigation and domestic use. In the vicinity of SRRL, water-level declines of approximately 25 feet were documented during the period between 1976 through 2002 (IDEQ019069 at page 8). An overall steady decline in static water levels has been observed since monitoring began in the SRRL well network in 1999. Water-level declines range from a 13.2-foot decline in site well MW-2 to a 21.3-foot decline in site well MW-13 (IDEQ019965 at page 10).

## 2.2 – The 2017 Disposal at Issue

In 2016 ProTech Coatings, Inc. (ProTech) was awarded two contracts from Mountain Home Air Force Base (MHAFB) to renovate building floors. The renovation included the installation of Chemical Resistant Urethane floor coatings at buildings 205, 206, and 1335 (USAF1_00241 at page 4). Protech prepared the renovated floors by shot blasting and hand grinding (USAF1_00192 at page 2). The resulting waste powder from blasting and grinding was placed into heavy duty plastic bags which were eventually placed into a dumpster near Building 1335 with other

construction debris from the building renovation work (USAF1_00207 at page 1 & USAF1_00241 at page 4). On December 7 and 9, 2016, waste from the floor blasting and grinding was sampled from the bags for lead analysis. ProTech estimated the waste from Building 1335 to be 371 lb., while waste from Building 206 was 5,030 lb. (USAF1_00207 at pages 1-2). The total weight of the renovation waste in the dumpster (floor blasting and grinding and other renovation waste) was approximately 10,900 lb. (USAF1_00207 at page 1).

On February 8, 2017 Snake River Rubbish, LLC removed the dumpster and took it to the SRRL for waste disposal (USAF1_00192 at page 3). After doing so, ProTech submitted the two samples to a laboratory for Toxicity Characteristic Leaching Procedure (TCLP) analysis (8 RCRA metals)[2] that reported TCLP results for chromium of 30 and 32 mg/L. Under RCRA, the TCLP threshold for a solid waste to be considered hazardous for chromium is 5 mg/L. Therefore, based on the laboratory findings of 30 and 32 mg/L chromium, MHAFB notified the Idaho Department of Environmental Quality (IDEQ) that chromium hazardous waste was disposed of at the SRRL (USAF1_00192 at page 3). On March 8, 2017, IDEQ notified MHAFB that the waste "appears to be a regulated hazardous waste due to exceeding the TCLP regulatory limit for chromium;" and that it must be removed from the landfill because SRRL is not authorized or permitted for RCRA-regulated hazardous waste (USAF1_00241 at page 5).

Thereafter, both MHAFB and ProTech submitted technical analyses to IDEQ that the chromium-containing waste be left in place for a number of reasons, including so as not to compromise the integrity of the landfill liner (USAF1_00207 at pages 4-5 & USAF1_00241 at page 12).   In July 2017, the IDEQ agreed that the waste should be left in place (USAF1_00190 at page 1).  By an August 2018 Consent Order, IDEQ resolved all alleged violations against MHAFB and ProTech related to the February 2017 disposal of chromium-containing waste with a civil penalty of $15,605 and the requirement of additional training to employees on proper characterization of hazardous waste (USAF1_00192).

---

[2] In the documents reviewed, there is no available information as to where the samples had been stored between December 2016 and March 2, 2017.

**2.3 – Other Known Cases Where RCRA Hazardous Waste Was Disposed of at the Simco Road Regional Landfill**

Since operations started at the SRRL in 1999, there have been at least three other cases where RCRA hazardous waste was placed in the SRRL by other parties and IDEQ allowed it to remain in place (Appendix E of doc USAF1_00241 at pages 38-43). In one such case similar to the 2017 disposal at issue here, drums from Metal Finishing, Inc. containing filter press cake above the RCRA hazardous waste threshold for chromium (>5 mg/L TCLP) were mistakenly disposed in the landfill in early 2012 (USAF1_00241, Appendix E at pages 38-43; IDEQ011066; IDEQ011827). The material was estimated to be about 1,200 lb. out of a total of 43,490 lb. of waste shipped (Appendix E of doc USAF1_00241 at page 39). Based on an evaluation by its consultant, IWS recommended that the waste be left in place and to implement institutional and monitoring controls, including leachate monitoring on a semi-annual basis for a period of 5 years for Cell 1 Module 1E where the hazardous waste was disposed. The IDEQ concurred with the recommendation (Appendix E of doc USAF1_00241 at page 40).

# 3.0 Site Monitoring

Groundwater monitoring at the SRRL occurs on a semi-annual basis. SRRL's original groundwater monitoring well network consisted of seven monitoring wells drilled to a depth of 495 to 530 feet bgs. The aquifer beneath the landfill is part of the Mountain Home plateau groundwater flow system. The regional groundwater flow direction is generally to the southwest (IDEQ014346 at page IDEQ014618). The local groundwater flow direction is more variable likely due to local anomalies and nearby irrigation pumping. The location of the landfill cells and monitoring wells, and the interpretation of the local groundwater flow by IWS' consultant in 2014 is shown in Exhibit C.

IWS installed monitoring wells MW-1, MW-2, MW-3, and MW-4 in 1995; and MW-5, MW-6, MW-7, and MW-13 in 1999. The present monitoring network consists of wells MW-1, MW-2, MW-3, MW- 4, MW-6, MW-8 and MW-13. IWS abandoned monitoring well MW-5 in 2014 because it was damaged and because it was within the footprint of a landfill expansion cell

(IDEQ019355 at page 20; IDEQ017683 at page 26). MW-7 went dry in late 2017 and was replaced by well MW-8 (IDEQ016218 at page 1; IDEQ015796). MW-6 is located upgradient of the landfill. MW-1 and MW-13 are located downgradient of the landfill. Wells MW-2 and MW-3 are also located downgradient of the landfill but are outside the landfill's point of compliance. These two wells are only used to measure static groundwater levels for calculating groundwater flow characteristics.

The SRRL collects and monitors the leachate generated as part of landfill operations. Chromium, cyanide and amenable cyanide monitoring in the landfill leachate was required by IDEQ following the above-mentioned 2012 disposal of chromium-containing waste in Cell 1. The new monitoring requirements were described in the Concept Leachate Monitoring Plan that was requested and approved by IDEQ in 2012 as part of a Voluntary Consent Order (IDEQ015868 at page 15 & USAF1_00690 at pages 3-5).

Chromium concentration data for landfill leachate is available for Cell 1 leachate starting in February 2012. By the fall of 2017, Cell 2 (module Cell 2A) had been put into operation and the leachate collection system was expanded to recover leachate from Cell 1 and Cell 2 (IDEQ019965 at page 13). The leachate collection drainage pipe and the sloped bottom of the primary liner direct the leachate to two collection sumps, one recovering leachate from Cell 1 and one from Cell 2 (Sump 1 in Cell 1 and Sump 2 in Cell 2). Leachate from the collection sumps is removed via submersible pumps whose riser pipes daylight on the north sides of Cells 1 and 2. The leachate from the sumps is pumped into storage tanks located on the north side of the Facility (IDEQ019965 at page 13).

# 4.0 Opinions

**Opinion 1.** Chromium in the landfill leachate from Cell 2 is substantially lower than both the Maximum Contaminant Level (MCL) for drinking water and the RCRA limit for hazardous waste.

**Opinion 2.** Chromium concentration in the landfill leachate from Cell 2 is too low to threaten or harm groundwater quality beneath the landfill.

6

**Opinion 3.** Chromium from the waste material has no measurable effect on the chemical composition of the landfill leachate from Cell 2.

**Opinion 4.** The decision by IDEQ to allow the chromium-containing waste to remain in Cell 2 is reasonable.

# 5.0 Bases for Opinions

**Opinion 1. Chromium in the landfill leachate from Cell 2 is substantially lower than both the MCL for drinking water and the RCRA limit for hazardous waste.**

The federal Safe Drinking Water Act MCL and the Idaho Drinking Water Standard for total chromium (which includes hexavalent and trivalent chromium) is 0.1 mg/L (https://www.epa.gov/dwstandardsregulations/chromium-drinking-water; https:// www.deq.idaho.gov/media/967298-risk_evaluation_manual_2004.pdf). The chromium MCL is the highest level (with an adequate margin of safety) at which someone could consume chromium in drinking water with no "appreciable risk of deleterious health effects during a lifetime." (EPA, National Primary Drinking Water Regulations—Synthetic Organic Chemicals and Inorganic Chemicals; Monitoring for Unregulated Contaminants; National Primary Drinking Water Regulations Implementation; National Secondary Drinking Water Regulations, 56 FR 3526 (Jan. 30, 1991)).

Under RCRA (40 C.F.R. Parts 264 and 265), the threshold for a solid waste to be considered hazardous for chromium is 5 mg/L as measured by the TCLP (40 C.F.R. § 261.24).

Table 1 is a summary of the chromium concentrations that were measured in landfill leachate samples at the SRRL based on the data and information reviewed. As noted in Table 1, leachate monitoring for chromium in Cell 1 began in 2012 and in Cell 2 in 2017. The laboratory reporting limit (detection limit)[3] for total chromium in leachate samples over time was much lower than the

---

[3] The reporting limit or detection limit is the smallest chromium concentration that the laboratory could reliably detect for the samples analyzed.

MCL and RCRA limits. The laboratory reporting limit was 0.03 mg/L or 0.006 mg/L.[4] The 0.03 mg/L reporting limit is more than 3 times lower than the MCL and more than 160 times lower than the RCRA limit for chromium (the 0.006 mg/L reporting limit it more than 16 times and 800 times lower than the chromium MCL and RCRA limit, respectively).  Leachate chromium was occasionally reported above the reporting limit but at all times and for all the available leachate sample results, the chromium concentrations have remained below both the MCL and the RCRA limit.

After the disposal of the chromium-containing waste in February 2017, leachate sample results for chromium continued to be below both the MCL and the RCRA limit.  The chromium results of an October 10, 2017 sampling event of both Cell 1 and Cell 2 were reported as not detected (IDEQ019965 at page 64). An August 1, 2018 leachate sampling event found that Cell 2 leachate could not be sampled because it was dry (IDEQ017284 at page 15). Finally, a January 21, 2019 leachate sampling event found that total chromium was not detected in leachate from either Cell 1 or Cell 2 (USAF1_00541 at pages 15 and 19).

In October 2018, IWS's own consultant, Project Delivery Group, concluded that:

 "leachate sampling over the last 5-year period has shown… concentrations of total chromium have been negligible to non-detectable" (IDEQ017284 at page 9).

Consequently, IWS requested of IDEQ that:

"… due to the generally consistent water quality nature of the leachate samples analyzed, we would propose a reduction in leachate sampling frequency to annually (occurring during the spring [assumed higher groundwater] semi-annual water quality sampling event). The leachate sampling frequency would be reviewed as part of the sampling event report, and if a significant change in leachate quality is noted, then the sampling frequency could be modified accordingly" (IDEQ017284 at page 9).

---

[4] The 0.006 mg/L reporting limit applies to four sampling events (April 2012, Nov. 2013, Nov. 2014, and August 2018) other sampling events reported at 0.03 mg/L.

In conclusion, chromium in the landfill leachate from Cell 2 is substantially lower than both the MCL for drinking water and the RCRA limit for hazardous waste.

**Opinion 2. Chromium concentration in the landfill leachate from Cell 2 is too low to threaten or harm groundwater quality beneath the landfill.**

The reported chromium concentrations in landfill leachate samples from Cell 2 (and Cell 1) are below the drinking water MCL and the RCRA limit for chromium. *See* Opinion 1.

Similarly, the reported chromium concentrations in groundwater beneath and downgradient from the landfill are well below the drinking water MCL and RCRA limit. Table 2 is a summary of the reported concentrations in groundwater samples from the landfill monitoring wells over the period 1999 to the present. Groundwater samples taken upgradient (MW-6) and downgradient (MW-7) from the landfill (*see* Exhibit C for locations) have reported chromium concentrations ranging from <0.006 to 0.041 mg/L and 0.0137 to 0.0372 mg/L, respectively. Based on the available data it can be concluded that groundwater is not impacted by chromium from the landfill cells.

IWS' consultants have reached a similar conclusion and consistently stated in groundwater monitoring reports from 2008 through 2019 that the landfill is not impacting groundwater (e.g. IDEQ018942 at page 8; IDEQ017961 at page 10; IDEQ019069 at page 16; IDEQ015868 at page 19; IDEQ019355 at page 21; IDEQ019657 at page 21; IDEQ017353 at page 27; IDEQ017683 at page 26; IDEQ016982 at page 19; IDEQ019965 at page 19; USAF1_00283 at page 23). IWS' consultants relied on geochemical fingerprints (Piper diagrams) and concentration trends to support their conclusion of no impact from landfill operations to groundwater (e.g. IDEQ019965 at pages 18-19 and Appendix E at page 117). IWS and its consultants are therefore in agreement with my opinion that chromium from the MHAFB waste disposed of in Cell 2 has not impacted groundwater quality beneath the landfill and downgradient from the landfill.

Comparing the groundwater and leachate chromium concentration data (*see* Tables 1 and 2) shows that chromium concentrations in the leachate and groundwater are below the MCL and RCRA limit and in the same range for both the groundwater and leachate media. Under this factual

circumstance, the landfill leachate cannot be a threat to groundwater quality with regards to chromium, even if the landfill liner system somehow were to be breached.

For the reasons stated above, I conclude that chromium concentration in the landfill leachate from Cell 2 is too low to threaten or harm groundwater quality.


**Opinion 3. Chromium from the waste material has no measurable effect on the chemical composition of the landfill leachate from Cell 2.**

Opinions 1 and 2 addressed chromium from any source in the SRRL's leachate. With regard to the 371 lb. (or 0.145 cubic yards) of Building 1335 floor material disposed of in Cell 2A at issue in this case, three lines of evidence show that it cannot be expected to have a measurable impact on landfill leachate chromium concentrations.

The first line of evidence is based on the total volume of the waste relative to the total volume of solid waste in Cell 2A. The total waste volume in Cell 2A is reportedly 10,743 cubic yards (USAF1_00241 at page 6). The chromium-containing waste at issue amounted to approximately only 371 lb., or 0.145 cubic yards, (USAF1_00207 at pages 1-2), which represents only 0.0013% of the total volume of Cell 2A. The chromium-containing waste from Building 1335 floor material is therefore a de minimis amount in Cell 2A relative to the rest of the disposed waste in that cell.

The second line of evidence is a comparison of the concentrations of chromium in the waste relative to typical concentrations of chromium in soil materials that are used for daily landfill cover.[5] Summit Environmental, on behalf of ProTech Coatings, Inc., calculated that the 371 lb. of Building 1335 floor waste contained approximately 0.3 lb. of chromium based on an average chromium concentration of 800 mg/kg in the waste material (USAF1_00207 at page 5). By

---

[5] IWS also reportedly uses an Alternative Daily Cover which consists primarily of Automobile Shredder Residue (USAF1_00241 at page 6). This type of cover material typically contains chromium at concentrations higher than in typical soils (*i.e.*, *Patent* US5468291A at page 6). IWS conducted TCLP testing of the shredder residue used for daily cover and reported a leached chromium concentration of 0.083 mg/L (IDEQ014346 at pages IDEQ014582-014591). This concentration is higher than the range observed in landfill leachate from Cell 1 and Cell 2. The shredder residue used at the landfill for cover is therefore a potential source of chromium in the landfill.

comparison, the amount of chromium in the soil cover used at the landfill was estimated by Summit Environmental to be more than 800 lb. based on the following assumptions: a) average U.S. soil concentration of 37 mg/kg; and b) daily landfill cover amounting to 5 feet of soil over 60,000 square feet for Cell 2A. I concur that 37 mg/kg chromium in average soil is a reasonable value that is supported by the literature (USAF1_00700).[6] An increase of 0.3 lb. of chromium in landfill soil cover that contains more than 800 lb. of chromium would not measurably change the concentration of the soil material in Cell 2A.

A third line of evidence is from a comparison with the history of disposal of chromium-containing waste in Cell 1 in 2012 that further supports the opinions presented in this expert report. In 2012, some 1,200 lb. of chromium-containing filter cake waste—3.5 times the amount of the Building 1335 floor material at issue here—was disposed of at the SRRL in Cell 1E (Appendix E of doc USAF1_00241 at page 39). The chromium concentrations in Cell 1 leachate and in groundwater were not affected by this disposal event based on 7 years of leachate and groundwater monitoring. Based on the monitoring data, IWS has proposed a reduction of the frequency of leachate sampling to one time per year due to the lack of exceedances for chromium in leachate and groundwater, and the generally consistent water quality of the leachate (IDEQ017284 at page 9).

Based on the above, I conclude that the 371 lb. (or 0.145 cubic yards) of Building 1335 floor material disposed of in Cell 2A cannot be expected to have a measurable impact on landfill leachate chromium concentrations.

**Opinion 4.  The decision by IDEQ to allow the chromium-containing waste to remain in Cell 2 is reasonable.**

After the disposal of the building floor waste materials that were shown to contain chromium, the MHAFB provided a report to IDEQ detailing an analysis of alternatives to address the

---

[6] The 800 lb. of chromium in the soil cover is likely underestimated because the SRRL uses primarily Automobile Shredder Residue as soil cover. Automobile Shredder Residue contains more chromium than regular soil. (*see* footnote 5).

chromium waste at the landfill. The report discussed the respective advantages and disadvantages of the alternatives as well as the cost to implement those alternatives. The MHAFB report recommended that the chromium-containing waste in Cell 2 be left in place "based upon the expected low concentrations of chromium in the leachate, avoiding unsafe practices and non-protective measures associated with removal of the MHAFB waste, minimal risk assessment levels, and previous IDEQ cases of LIP" (USAF1_00241 at page 19).

After review of the data, information, and the MHAFB report, the IDEQ concluded that the chromium-containing waste material should be left in place in Cell 2.

The basis for this determination by IDEQ was (USAF1_00190 at page 2):

- the low probability of locating the dispersed waste;
- the nature and quantity of the waste is not expected to adversely affect the integrity of the liner or leachate collection system if left in place;
- the potential health and safety concerns posed by retrieval activities and the wastes with which the waste is now comingled; and
- the potential compromise of the liner is a greater risk to human health and the environment than allowing the waste to remain in place based on landfill design and construction.

This decision was similar to the one taken by IDEQ in 2012 for the chromium-containing filter cake materials that were disposed of in Cell 1 (USAF1_00241 at page 40).

Based on my review of the data and information made available for this report, I concur with IDEQ's decision to leave the waste in place. I also concur with IDEQ's conclusion that the risks to the landfill workers and of potential damage to the landfill liner would have been significantly greater than the risk of leaving in place a relatively small amount of chromium-containing waste in Cell 2.

# Exhibit 14

**William L. Ghiorso,** *Pro Hac Vice*
**Richard A. Cummings, ISB No. 1815**
494 State Street, Suite 300
Salem, Oregon 97301
Phone: (503) 362-8966
Fax: (503) 362-1158
Email: Bill@Ghiorsolaw.com
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| **IDAHO WASTE SYSTEMS, INC.,** | **Case No.** 1:18-cv-229-BLW |
| Plaintiff, | |
| v. | **PLAINTIFF'S RESPONSES TO DEFENDANT UNITED STATES AIRFORCE'S FIRST SET OF REQUESTS FOR ADMISSION** |
| **THE UNITED STATES AIRFORCE; PROTECH COATINGS, INC.;** and **SNAKE RIVER RUBBISH, LLC,** | |
| Defendants. | |

## RESPONSES TO REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:** You, the Plaintiff, Idaho Waste Systems, Inc., own the Property known as the Simco Road Landfill ("IWS Landfill Property") located at 16415 Northwest Waste Site Drive, Boise, Idaho 83716, a commercially licensed federal Subtitle D landfill that opened in 1999, and is permitted and regulated by the Idaho Department of Environmental Quality and the Central District Health Department.

**RESPONSE:** Admitted as to the time of the events that gave rise to this action.

**REQUEST FOR ADMISSION NO. 2**: All of the contamination, trespass, or other conduct that you aver caused damage to the IWS Landfill Property in this lawsuit, occurred on February 8, 2017.

**RESPONSE:** Denied.

**REQUEST FOR ADMISSION NO. 3**: The document bates-stamped USAF1_00190 through 00191 that was produced to you on September 6, 2018, with the United States Air Force's Initial Disclosure is an authentic copy of a letter submitted on July 20, 2017, from The Idaho Department of Environmental Quality ("DEQ") to an employee at Mountain Home Air Force Base ("MHAFB"), copying Jack Yarbrough of Idaho Waste Systems, Inc. ("IWS"), stating that "DEQ hereby concurs with MHAFB's recommendation that the subject waste at the Simco Road Landfill be left in place."

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 4**: Chromium was present on the IWS Landfill Property prior to February 8, 2017.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 5**: Sources of chromium at the IWS Landfill Property have included Automobile Shredder Residue ("ASR") cover.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 6**: Sources of chromium at the IWS Landfill Property have come from waste generated from Metal Finishings, Inc., transported by Burlington Environmental, LLC, a subsidiary of Phillips Services Corporation (Burlington/PSC), as described in the 2012 Voluntary Consent Order issued by the Idaho Department of Environmental Quality.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 7:** Sources of chromium at the IWS Landfill Property have included filter press cake.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 8**: Sources of chromium at the IWS Landfill Property have included paint waste.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 9**: Sources of chromium at the IWS Landfill Property have included other wastes not specified above.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 10:** Prior to February 8, 2017, the Idaho Department of Environmental Quality issued a Notice of Violation to Idaho Waste Systems, Inc., for accepting 1200 pounds of waste containing chromium, in 2012.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 11**: As part of a 2012 Voluntary Consent Order, Idaho Waste Systems, Inc., was permitted to leave chromium contaminated waste in place.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 12**: As part of a 2012 Voluntary Consent Order, Idaho Waste Systems, Inc., was required to do bi-annual groundwater monitoring and was cited in 2016 for a failure to do such monitoring.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 13:** Prior to February 8, 2017, chromium was detected in the groundwater on, under, or around the IWS Landfill Property.

**RESPONSE:** Admit.

**REQUEST FOR ADMISSION NO. 14**: The Idaho Department of Environmental Quality has not required Idaho Waste Systems, Inc., to remove the waste material referenced in Paragraph 11 of the First Amended Complaint (the "Waste") from the IWS Landfill Property.

**RESPONSE:** Admit.

1    **REQUEST FOR ADMISSION NO. 15**: The Idaho Department of Environmental Quality has
2    not required Idaho Waste Systems, Inc. to investigate contamination in, on, or around the IWS
3    Landfill Property, resulting from the Waste disposed of at the IWS Landfill Property on
4    February 8, 2017.

5

6    **RESPONSE:** Denied.

7

8    **REQUEST FOR ADMISSION NO. 16**: The Idaho Department of Environmental Quality has
9    not required Idaho Waste Systems, Inc. to remediate contamination in, on, or around the IWS
10    Landfill Property, resulting from the waste disposed of at the IWS Landfill Property on
11    February 8, 2017.

12

13    **RESPONSE:** Admit.

14

15    **REQUEST FOR ADMISSION NO. 17**: The Idaho Department of Environmental Quality has
16    not required Idaho Waste Systems, Inc. to pay a fine, penalty, or any sum of money to the
17    Idaho Department of Environmental Quality as a result of the Waste disposed of at the IWS
18    Landfill Property on February 8, 2017.

19

20    **RESPONSE:** Admit.


DATED JUNE 18, 2019.

                                    *s/ William L. Ghiorso*
                                    **William L. Ghiorso, *Pro Hac Vice***
                                    **Richard A. Cummings, ISB No. 1815**
                                    494 State Street, Suite 300
                                    Salem, Oregon 97301
                                    Phone: (503) 362-8966
                                    Email: Bill@Ghiorsolaw.com
                                    Attorneys for Plaintiff

# Exhibit 15

Dana L. Hofstetter, ISB No. 3867
Tyler J. Anderson, ISB No. 6632
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone: 208.344.6000
Facsimile: 208.954.5275
Email: dhofstetter@hawleytroxell.com
        tanderson@hawleytroxell.com

Attorneys for Defendant ProTech Coatings, Inc.

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO WASTE SYSTEMS, INC., an Idaho corporation,<br><br>Plaintiff,<br><br>vs.<br><br>THE UNITED STATES AIR FORCE; PROTECH COATINGS, INC., a Nevada corporation; and SNAKE RIVER RUBBISH, LLC, an Idaho limited liability company,<br><br>Defendants. | Case No. 1:18-cv-00229-BLW<br><br>DEFENDANT PROTECH COATINGS, INC.'S RESPONSES TO DEFENDANT SNAKE RIVER RUBBISH, LLC'S FIRST SET OF INTERROGATORIES |
| SNAKE RIVER RUBBISH, LLC, an Idaho limited liability company,<br><br>Crossclaimant,<br><br>vs.<br><br>PROTECH COATINGS, INC., a Nevada corporation,<br><br>Crossdefendant. | |

DEFENDANT PROTECH COATINGS, INC.'S RESPONSES TO
DEFENDANT SNAKE RIVER RUBBISH, LLC'S FIRST SET OF
INTERROGATORIES - 1

reserving the right to reassert the same, ProTech responds as follows: MHAFB employee Shawn

C. Young (GS-08 USAF ACC 366 CES/CENM, Construction Inspector). Snake River Rubbish

personnel (names unknown).

INTERROGATORY NO. 12: For each Interrogatory, and each Request for Admission

and Request for Production served on June 19, 2019 by SRR, identify every person who supplied

any information or records that you used in answering such Interrogatory, Request for

Admission, or Request for Production.

ANSWER TO INTERROGATORY NO. 12: Objection. Unduly burdensome. Without

waiving this objection and reserving the right to reassert the same, ProTech responds as follows:

Brad Harr, Stephen Crosson, and Chad Diamond.

INTERROGATORY NO. 13: State how the Subject Waste came to be in the SRR rolloff

container at MHAFB, including, but not limited to, the SRR rolloff container at MHAFB on or

about February 8, 2017.

ANSWER TO INTERROGATORY NO. 13: Objection. Ambiguous in that the terms

"came to be" and "SRR's rolloff container at MHAFB" are not defined. The term "Subject

Waste," although defined, is overbroadly and ambiguously defined to include "any and all loads

… delivered by SRR from MHAFB to the IWS Landfill…." Without waiving these objections

and reserving the right to reassert the same, ProTech responds as follows: All floor blast dust

from MHAFB Buildings 1335 and 206 was placed in plastic garbage sacks and stored in

ProTech's DOT approved trailer prior to being placed in the SRR dumpster along with other

construction and demolition debris.

DEFENDANT PROTECH COATINGS, INC.'S RESPONSES TO
DEFENDANT SNAKE RIVER RUBBISH, LLC'S FIRST SET OF
INTERROGATORIES - 8

INTERROGATORY NO. 14: Describe with particularity how ProTech selected SRR to provide rolloff containers at MHAFB.

ANSWER TO INTERROGATORY NO. 14: Objection. Ambiguous in that the term "SRR's rolloff containers at MHAFB" is not defined. Without waiving this objection and reserving the right to reassert the same, ProTech responds as follows: It is believed likely that Kim Nel of ProTech did an online search for local companies providing such services. Likely, SRR was selected after one or more estimates for these services were obtained.

INTERROGATORY NO. 15: Describe the decision to place the subject waste in bags in the SRR rolloff containers at MHAFB.

 (a) Describe the nature of the bags that contained the Subject Waste.

 (b) Identify the party or parties who made the decision to place the Subject Waste in bags.

 (c) Identify the party or parties who made the decision to place the Subject Waste in the SRR rolloff containers at MHAFB.

ANSWER TO INTERROGATORY NO. 15: Objection. Ambiguous in that the term "SRR's rolloff containers at MHAFB" is not defined. The term "Subject Waste," although defined, is overbroadly and ambiguously defined to include "any and all loads … delivered by SRR from MHAFB to the IWS Landfill…." Without waiving these objections and reserving the right to reassert the same, ProTech responds as follows:

 (a) The floor blast dust from MHAFB Buildings 1335 and 206 was placed in heavy duty plastic garbage bags from Home Depot.

 (b) Scott Carey and Greg Lewis of ProTech.

 (c) Scott Carey and Greg Lewis of ProTech.

DEFENDANT PROTECH COATINGS, INC.'S RESPONSES TO
DEFENDANT SNAKE RIVER RUBBISH, LLC'S FIRST SET OF
INTERROGATORIES - 9

# Exhibit 16

# Simco Road Regional Landfill Operating Plan Update

*Prepared for*

**Idaho Waste Systems, Inc.**
P.O. Box 1386
Mountain Home, Idaho 83647

*Prepared by*

**Project Delivery Group**
3150 22nd Street SE
Salem, Oregon 97302
T. 503.364.4004



Exb. No. 5
Date
Name 3-6-9
M & M Court Reporting

IDEQ013675

*Simco Road Regional Landfill*
*Operating Plan Update*
*Idaho Waste Systems, Inc.*

# CITATION

Project Delivery Group. 2015.
Simco Road Regional Landfill
Operating Plan Update. Prepared by
Project Delivery Group, Salem Oregon.
December 2015.

IDEQ013676

*Simco Road Regional Landfill*
*Operating Plan Update*
*Idaho Waste Systems, Inc.*

## CERTIFICATION

I hereby certify that this Operating Plan was prepared by me, or
under my direct supervision and that I am a duly licensed
Professional Engineer under the laws of the State of Idaho.



## CHAPTER I – GENERAL INFORMATION

### INTRODUCTION

The original Operating Plan for Idaho Waste Systems, Inc.'s Simco Road Regional Landfill was prepared by J-U-B ENGINEERS, Inc. dated June 1995. Since beginning operations in 1999, there have been a number of changes in the landfill design and operations. This document updates the February 2012 adjusted Operating Plan, approved March, 2012, by incorporating the various changes approved over the years by the Department of Environmental Quality and the Central District Health Department as well as reflecting current operating practices.

### PROJECT

Idaho Waste Systems, Inc., Simco Road Regional Landfill

### SITE ADDRESS

Four miles south of I–84 from the Simco Road Interchange and 2 miles due east of Simco Road railroad crossing, along the railroad right-of-way.

The physical address is:
16415 NW Waste Site Drive
Mayfield, Idaho 83716

### LEGAL ADDRESS

Idaho Waste Systems, Inc.
P.O. Box 1386
Mountain Home, ID 83647

### DESCRIPTION

A full description of the Simco Road Regional Landfill is provided in the Siting Application information submitted on October 5, 1994 and completed on December 28, 1994. The Site Certification was issued on January 24, 1995. Both the Siting Application and Site Certification can be found in Appendix A – Site Certification and Application.

### PROPERTY OWNER OF RECORD

Idaho Waste Systems, Inc.

### OPERATOR OF THE SITE

Idaho Waste Systems, Inc.

### CONTACT PERSON IN REGARD TO APPLICATION, INCLUDING ADDRESS AND TELEPHONE NUMBER

Jack Yarbrough, President
Idaho Waste Systems, Inc.
P.O. Box 1386
Mountain Home, Idaho 83647
(208) 796-2727

### DATE OF ORIGINAL LANDFILL APPLICATION

May 1, 1995

Page | 8

P:\2015 Projects\15093 Idaho Waste Management - Simco Site\Docs & Calcs In Progress\Owner's Rep\Ops Plan Update\15093 20151127 Proposed Ops Plan Narrative.docx




IDEQ013689

*Simco Road Regional Landfill*
*Operating Plan Update*
*Idaho Waste Systems, Inc.*

completed. The truck then leaves the working face and is re-weighed at the scale house to determine the amount of waste deposited.

Contractors and franchised haulers, who do not utilize transfer stations with pre-screening operations and instead deliver solid waste directly to the landfill, will stop at the gate house where the attendant questions the driver as to the content and origin of the waste. The vehicle is then weighed and directed to the working face of the landfill. The waste loads are screened at the working face. When the screening process is completed, a screening report is completed by the operator and returned to the field office at the end of the operating day. When unloading is completed, the vehicle exits the working face and returns to the gate house where it is weighed again and the tipping fee is calculated and collected. Forms for these actions are presented in Appendix N.

## SITE MANAGEMENT
The Simco Road Regional Landfill is managed by Idaho Waste Systems, Inc. The Manager of the Simco Road Regional Landfill supervises all operations of the landfill, including overseeing any contractors engaged in cell preparation and solid waste disposal. The Manager also oversees landfill operations personnel, including the operations supervisor, account clerks, maintenance mechanics, hazardous waste screeners, and cashier/gate attendants.

## METHODS OF OPERATION
Operation of the landfill includes waste placement and compaction, disposal procedures for special waste, waste cover systems, and cell development. Each operational phase is described below.

## WASTE PLACEMENT
Refuse disposal is done using the area-fill method. Refuse is unloaded as close to the working face of the landfill as possible, then spread into a thin layer and compacted into cells. A cell consists of the volume of solid waste placed in the landfill during a given time. For example, a daily cell consists of one day's volume of solid waste that is compacted and covered with daily cover or alternative cover as approved by the health district. A set of cells constructed at one elevation represents a landfill lift. The lift of solid waste then becomes the base for the next set of daily cells. When the last lift is filled, its surface becomes the subgrade for the final cover.

As waste materials are received at the landfill, they are deposited at the landfill active working face, spread into a thin layer, and compacted into the daily cells. Length and thickness of the cells depends on the daily volume of waste received. As waste streams increase or decrease, the working face will expand or contract to meet operational, health, and safety needs. As work begins on each daily cell area, the underlying daily or intermediate cover will be removed to provide connection between landfill lifts and maximize airspace usage.

## DISPOSAL PROCEDURES FOR SPECIAL WASTE
The form and content of wastes received in the landfill active area will be "solid." The landfill has implemented the following procedures for handling authorized categories of waste received:

1. **Bulk items**. Large, non-uniform waste types such as construction debris, appliances, and furniture will be deposited in the same cell as the municipal solid waste; with the exception that these large items will not be used in the lowest lift of any cell or near the edge of cells. Bulk items will be incorporated into the municipal waste to minimize differential subsidence of the landfill. Uniform bulk items, such as demolition debris, may be proposed for alternative daily cover if it meets the requirements of 40 Code of Federal Regulations (CFR) 258.21 and Idaho Code 397412(2), or it will be incorporated into the waste stream.

P:\2015 Projects\15093 Idaho Waste Management - Simco Site\Docs & Calcs In Progress\Owner's Rep\Ops Plan Update\15093 20151127 Proposed Ops Plan Narrative.docx



IDEQ013689

IDEQ013707

*Simco Road Regional Landfill*
*Operating Plan Update*
*Idaho Waste Systems, Inc.*

# CHAPTER XIV – LEACHATE COLLECTION AND RECOVERY

This chapter addresses leachate collection and recovery requirements in 40 CFR 258.28.

Leachate is produced in a landfill when water comes into contact with solid waste. The water can originate from water contained within the solid waste, decomposition of the solid waste, and/or precipitation. Design criteria for municipal solid waste landfills require the design and construction of a leachate collection and removal system to maintain less than a 30-cm depth of leachate over the liner. Appendix T-1 provides the Interim Plan of Operations – Leachate Collection and Recovery System for the Simco Road Regional Landfill, dated September 12, 2008, prepared by Centra Consulting Inc. This plan addresses leachate removal from Cell 1 and pumping leachate from the storage tanks when needed. Appendix T-2 provides a narrative of the Cell 2A Leachate Collection System.

The existing leachate collection system was approved by the Department of Environmental Quality (DEQ) on April 24, 2008. On May 11, 2010, DEQ approved the Modification to the Design (March 23, 2010), which also addressed the leachate collection system (Reference Appendix M-2).

Each landfill cell is equipped with a leachate collection and removal system. Leachate that is produced in the waste fill will percolate downward through the waste into several geo-composite drainage layers. The leachate collection and removal system includes a series of perforated pipes that supplement the flow capacity of the geo-composite drainage layer for the leachate flowing to the leachate sumps.

Leachate is pumped to a series of three storage tanks with a combined volume of 54,611 gallons. The tanks are located within a lined secondary containment basin with a storage capacity greater than the combined tank volume. A Hydromatic SPD 100 H submersible pump, in Tank #1, automatically transfers the leachate to Tank #2. Tank #2 overflows by gravity into the top of Tank #3. The top-to-top configuration for the overflow prevents both tanks from spilling into secondary containment in the event of a leak.

Leachate from Cell 2A is pumped to Tank #1 via a 4-inch diameter, dual wall containment pipe.

As a result of the additional leachate caused by this change, the landfill application of leachate from the tanks will be performed twice weekly. Additionally, when significant rainfall is forecast landfill staff will confirm there are 8,300-gallons of capacity in the tank system.

The capacity of the leachate storage system will be reviewed periodically and modified as needed to maintain sufficient capacity to store leachate until weather conditions are appropriate for landfill application. Leachate is reapplied to the landfill site within the active area. This application of leachate to the active area is performed during periods without precipitation.

Page | 34

P:\2015 Projects\15093 Idaho Waste Management - Simco Site\Docs & Calcs In Progress\Owner's Rep\Ops Plan Update\15093 20151127 Proposed Ops Plan Narrative.docx



IDEQ013707

# Exhibit 17

**William L. Ghiorso,** *Pro Hac Vice*
**Richard A. Cummings, ISB No. 1815**
494 State Street, Suite 300
Salem, Oregon 97301
Phone: (503) 362-8966
Fax: (503) 362-1158
Email: Bill@Ghiorsolaw.com
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **IDAHO WASTE SYSTEMS, INC.,** | **Case No.** 1:18-cv-229-BLW |
| Plaintiff, | |
| v. | **PLAINTIFF'S RESPONSES TO DEFENDANT UNITED STATES AIRFORCE'S FIRST SET OF INTERROGATORIES** |
| **THE UNITED STATES AIRFORCE; PROTECH COATINGS, INC.;** and **SNAKE RIVER RUBBISH, LLC,** | |
| Defendants. | |

**INTERROGATORY NO. 8:** Describe with particularity the tort damages you allege Idaho Waste Systems, Inc. has incurred or will incur, in paragraphs 18-40 of your First Amended Complaint. For each type of damage claimed, describe (a) the basis for these alleged damages, including identifying any persons or documents consulted or relied upon to make this determination; and (b) any steps you took to mitigate these damages.

**RESPONSE:** Plaintiff objects to this interrogatory to the extent that it seeks facts known or opinions held by an expert. *See Gorrell v. Sneath*, 292 F.R.D. 629, 633 (E.D. Cal. 2013) ("[A] party may not, by interrogatories or deposition, discover facts known or opinions held by an expert."). Without waiving that objection, plaintiff provides the following response:

       **a.**      Olympus Technical Services, Inc.
            **i.**      Environmental consulting - $27,806.08.
       **b.**      Project Delivery Group LLC.
            **i.**      Mitigation and environmental risk evaluation - $5,300.00
       **c.**      Reduction of value of property.
            **i.**      TBD upon review by expert witness.
       **d.**      For a detailed description of expenses incurred by plaintiff and steps taken by plaintiff to mitigate its damages, see IWS000426 – IWS000435.

**INTERROGATORY NO. 9:** Describe all sources of chromium at the IWS Landfill Property, including:

       **(a)**      the volume and chromium concentration of each source of chromium;

       **(b)**      where such material was placed, disposed of, or otherwise used at the IWS Landfill Property;

       **(c)**      the date or date range in which such material was placed, disposed of, or used;

       **(d)**      the source of such material;

       **(e)**      the effect such chromium-containing material had on the concentration of chromium in and around the IWS Landfill Property, including in leachate, groundwater, storm- water, soil, air, and any other environmental media; and

       **(f)**      the effect such chromium-containing material has had on the value of the property, or any property repairs you believe are necessary.

**RESPONSE:** Plaintiff objects to this interrogatory as overbroad. The information required to respond would cover a period of nearly three decades and would be impossible for plaintiff to produce. *See Gorrell v. Sneath*, 292 F.R.D. 629, 632 (E.D. Cal. 2013) ("[A] responding party is not required to conduct extensive research in order to answer an interrogatory.").

Page 8 – **Plaintiff's Responses to Defendant United States Air Force's First Set of Interrogatories**

# Exhibit 18



1  Jack R. Yarbrough
   Pro Se
2  P.O. Box 20756
   Keizer, Oregon 97307                    2016 JUN -6 PM 3:41
3  (503) 393-3930 Telephone
   (503) 393-0768 Fax
4  Jry_icu@comcast.net                              COURT

5

6              IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

7              OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ELMORE

8  JACK R. YARBROUGH,                    )
9                                        )   Case No. CV-2016-558
                                         )
10                  Plaintiff,           )
                                         )   COMPLAINT FOR:
11        v.                             )   JUDICIAL FORECLOSURE OF
                                         )   TRUST DEED AND SUIT
12  IDAHO WASTE SYSTEMS, INC.,  An Idaho )   UPON PERSONAL AND
13  Corporation; ROBERT and LORENE       )   COMMERCIAL GUARANTEE
    RIEMENSCHNEIDER, individuals; ARLAND )
14  and Ima Jean Keeton, individuals; FIRST )
    AMERICAN TITLE INSURANCE COMPANY, )
15  A corporation of the State of California; PACIFIC )
    HIDE & FUR DEPOT, dba PACIFIC STEEL & )
16  RECYCLING, a Montana corporation; and HIGH )
17  COUNTRY FUSION COMPANY, An Idaho     )
    Corporation,                         )
18                                       )
                                         )
19                  Defendants.          )
                                         )

20        Plaintiff alleges as follows:

21

22

Page 1 – COMPLAINT

Exhibit 18 - Page 1

## PARTIES
## JURISDICTION AND VENUE

1.     Jack R. Yarbrough (hereinafter "Yarbrough") was at all material times herein a resident of the City of Keizer, State of Oregon.

2.     Idaho Waste Systems, Inc. (Hereinafter "IWS") is an Idaho corporation, organized and existing under the laws of the State of Idaho with a principal place of business in Elmore County, Idaho.

3.     Defendant Robert Riemenschneider, (hereinafter "Mr. Riemenschneider") was at all times herein mentioned, and now is a resident of the State of Oregon.

4.     Defendant Arland Keeton, (hereinafter "Mr. Keeton") was at all times herein mentioned, and now is a resident of the State of Oregon.

5.     Defendant Lorene Riemenschneider, (hereinafter "Mrs. Riemenschneider") was at all times herein mentioned, and now is a resident of the State of Oregon.

6.     Defendant Ima Jean Keeton, (hereinafter "Mrs. Keeton") was at all times herein mentioned, and now is a resident of the State of Oregon.

7.     First American Title Insurance Company ("FATIC") is a corporation organized and existing under the laws of the State of California, transacting business in the State of Idaho. FATIC is the named trustee under a Deed of Trust recorded in the Elmore County Recorder's Office as Instrument No. 390558, attached as Exhibit "A."

8.     Pacific Hide & Fur Depot, dba Pacific Steel & Recycling ("Pacific") is a corporation organized and existing under the laws of the State of Montana, transacting business in the State of Idaho. On or about February 28, 2013, Pacific recorded a "Memorandum of ASR

Page 2 – COMPLAINT

Exhibit 18 - Page 2

1  Acceptance Agreement" creating a cloud on real property owned by IWS, recorded as Instrument

2  Number 433616 in the Official Records of Elmore County, Idaho.

3      9.      High Country Fusion Company ("High Country Fusion") is a corporation

4  organized and existing under the laws of the State of Idaho.  On or about February 23, 2016,

5  High Country Fusion, recorded a Mechanic's Lien, creating an encumbrance on the real property

6  owned by IWS, recorded as Instrument Number 452143 in the Official Records Elmore County,

7  Idaho.

8      10.      Jurisdiction is proper in this district, since the Court has subject matter

9  jurisdiction over this action pursuant to Idaho Code 5-401, and personal jurisdiction over

10  defendants Robert and Lorene Riemenschneider, Arland and Ima Jean Keeton, and First

11  American pursuant to Idaho Code 5-514.

12      11.      Venue is proper in Elmore County pursuant to Idaho Code 5-401 and 5-404.

13                **FACTS COMMON TO ALL CAUSES OF ACTION**

14      12.      Plaintiff incorporates the allegations contained in paragraphs 1 -11 as if set forth

15  verbatim.

16      13.      Beginning and on or about August 14, 2007  Defendants became Borrowers

17  evidenced by a certain Promissory Note with Premier West Bank as holder dated August 14,

18  2007, September 26, 2008, December 22, 2008 and January 26, 2010.  As part of the transaction,

19  Defendants executed the following agreements and other loan and/or security documents,

20  including but not limited to the following:

21

22

Page 3 – COMPLAINT

Exhibit 18 - Page 3

1       a.    That *certain Deed of Trust* dated August 14, 2007, recorded on August 24, 2007

2   as Instrument #390558 in the official records of Elmore County, Idaho securing the Promissory

3   Note, pursuant to which IWS is the Trustor and the Premier West Bank was the Beneficiary;

4       b.    A *Business Loan Agreement*;

    c.    A *Commercial Guarantee*, Executed by Robert Riemenschneider;

5       d.    A *Commercial Guarantee*, Executed by Lorene Riemenschneider;

    e.    A *Commercial Guarantee*, Executed by Arland Keeton;

6       f.    A *Commercial Guarantee*, Executed by Ima Jean Keeton

7   All documents are attached as Exhibits "A, " "B," "C," "D," "E" and "F."

8       14.    On or about April 16, 2010, the parties entered into an agreement whereby

9   Plaintiff paid off the loan amount owed to Premier West Bank through a duly executed Loan and

10   Sale Agreement between Premier West Bank and Plaintiff, whereby Plaintiff was assigned all

11   rights and benefits of the above loan and security documents. Following the Loan Purchase, the

12   parties then and contemporaneously with Plaintiff's acquisition and procurement of the Bank's

13   loan, modified the contracts as evidenced by the following document:

14       a.    That *Loan Modification Agreement* dated April 16, 2010, is attached as Exhibit

15   "G. "

16       15.    On or about May 22, 2015, the parties entered into a "Loan Modification

17   Agreement" whereby the principal balance owing on the loan was increased to $6,100,000.00.

18   As part of the Loan Modification Agreement, Yarbrough agreed to provide IWS with a separate

19   $1,000,000.00 "Operating Line of Credit." The *Loan Modification Agreement* dated May 22,

20   2015 together with the *Operating Line of Credit* are attached as Exhibits "H," and "I."

21

22

Page 4 – COMPLAINT

Exhibit 18 - Page 4

1    16.    Plaintiff is now the owner and holder of the Note and Trust Deed and all

2  corresponding Loan Agreements evidenced by Exhibits "A" through "I"  All loan documents are

3  collectively referred to as the "Loan Agreements."

4    17.    Plaintiff perfected and has maintained his security interests as follows:

5  A Deed of Trust to secure indebtedness in the amount show below.
   Trustor/Grantor:  Idaho Waste Systems, Inc.

6  Trustee:  First American Title Company
   Beneficiary:  Premier West Bank

7  Dated:  August 14, 2007
   Instrument No.: 390558

8
   The beneficial interest under the Deed of Trust was assigned of record to Jack R.

9  Yarbrough, by assignment recorded as Instrument No.: 415543

10
   18.    Defendants named herein, and each of them, claim or may claim an interest in and

11
   to the real property, and improvements thereon, commonly known as the Simco Road Regional

12
   Landfill in Elmore County, Idaho and more particularly described in the Deed of Trust attached

13
   hereto as Exhibit "A."  The real property described on Exhibit "A" and all improvements

14
   thereon, are referred to as the "real Property."

15
   19.    Plaintiff is entitled to retain the services of an attorney to bring this suit and is

16
   entitled to an award of reasonable attorneys' fees incurred in bringing this suit, pursuant to the

17
   2007 loan documents, subsequent modifications and Idaho Code 12-120 and 12-121, and Rule

18
   54(e) of the Idaho Rules of Civil Procedure.

19
                        **FIRST CAUSE OF ACTION**
20            **(BREACH OF CONTRACT AGAINST DEFENDANT IWS)**

21    20.    Plaintiff incorporates paragraphs 1 – 19 as if set forth verbatim.

22

Page 5 – COMPLAINT

Exhibit 18 - Page 5

21.    Plaintiff has performed all conditions, covenants and promises under the loan agreements. All amounts under the loan documents including the note, trust deed, and operating line of credit are due and payable as a result of Defendants contractual breach(s) which include, but is not limited to the following:

a.    Failing to pay the note and loan obligations or otherwise extend the maturity date on or before May 20, 2016;

b.    Failing to comply with or perform when due certain obligations required by applicable governmental regulations for environmental compliance;

c.    Failing to prevent the company from falling below minimum working capital requirements;

d,    Failing to avoid the company from being named as a defendant in litigation; and

e.    Guarantors have failed to pay certain of Guarantors' debts when these debts have become due.

22.    The balances due are as follows:

a.    **LOAN:**    As of May 31, 2016, after application of all just credits, there remains due and owing on the Notes not less than the sum of $6,703,071.44 as set forth on attached Exhibit "J."

b.    **OPERATING LINE OF CREDIT:**    As of May 31, 2016, after application of all just credits, there remains due and owing on the Line of Credit the sum of $1,264,525.34 as set forth on attached Exhibit "J."

Page 6 – COMPLAINT

Exhibit 18 - Page 6

## SECOND CAUSE OF ACTION
### (JUDICIAL FORECLOSURE OF PLAINTIFF'S MORTGAGE)

23.    Plaintiff realleges paragraphs 1 through 22 as if set forth verbatim.

24.    The terms of the Deed of Trust, and other loan documents as evidenced by attached Exhibits "A" through "J" constitute the terms of the mortgage granted by IWS against the Real property in favor of Plaintff.

25.    The Defendants alleged claim(s) of right, title or interest in and to the Real Property are inferior to Plaintiff's claim of right, title and interest by virtue of the Plaintiff's Mortgage.

26.    Plaintiff is entitled to judgment foreclosing Plaintiff's Mortgage and adjudicating Plaintiff's Mortgage to be superior to and prior in right, title and interest to any right, title or interest claimed by all Defendants, and each of them.

27.    It will be necessary to sell all of the Real Property in order to satisfy Plaintiff's claim for breach of contract set forth hereinabove, a deficiency judgment should be entered in favor of Plaintiff and against Defendants for the amount of the judgment not satisfied by the sale.

## THIRD CAUSE OF ACTION
### (BREACH OF PERSONAL GUARANTEES)

28.    Plaintiff realleges paragraphs 1 through 27 as if set forth verbatim.

29.    Defendants  Mr. and Mrs. Riemenschneider and Mr. and Mrs. Keeton, each personally guaranteed all obligations of the corporate defendant under the terms of the loan documents and promissory note, and therefore are personally liable for all obligations financial and otherwise pursuant to the loan documents.

Page 7 – COMPLAINT

Exhibit 18 - Page 7

1    30.    Plaintiff has made demand upon each said Defendant for payment of the

2    personally guaranteed amounts now due and owing Plaintiff.

3    31.    Defendants have each materially breached their respective personal guaranty by

4    their refusal and/or failure to pay Plaintiff the personally guaranteed amounts now due and

5    owing.

6    32.    The balances due are as follows:

7    a.    **LOAN:**    As of May 31, 2016, after application of all just credits, there

8    remains due and owing on the Notes not less than the sum of $6,703,071.44 as set forth on

9    attached Exhibit "k."

10    b.    **OPERATING LINE OF CREDIT:** As of May 31, 2016, after application of all

11    just credits, there remains due and owing on the Line of Credit the sum of $ 1,264,525.34 as set

12    forth on attached Exhibit "K."

13    **PRAYER FOR RELIEF**

14    WHEREFORE, Plaintiff prays for judgment awarding as follows:

15    I. As to the First Cause of Action, the entry of Judgment in favor of the Plaintiff against the

16    Defendants as follows:

17    a.    For the sum of $7,967,597.78 with accruing interest at the maximum rate allowed
         by law;

18    b.    For attorney fees if any, and costs in the an amount to be determined and as the
         court may find reasonable  following judgment; and

19    c.    For such other and further relief as the court may deem proper.

20    II. As to the Second Cause of Action, the entry of Judgment in favor of the Plaintiff against

21    the Defendants, as follows:

22    a.    That Plaintiff have a judgment against Defendants for the principal sum of

Page 8 – COMPLAINT

Exhibit 18 - Page 8

$7,967,597.78 with accruing interest ,reasonable attorney fees, the further sum of $250.00 for foreclosure title report to search records, and for Plaintiff's costs and disbursements incurred herein;

b.   That Plaintiff's real property trust deed set forth in the first cause of suit be declared a valid and existing lien upon the subject real property for the amount of the judgment prayed for in said cause of suit;

c.   Declaring the interest of the Defendants to be inferior to the lien of Plaintiff; That Plaintiff's trust deed upon the subject real property be foreclosed; that the title, claim, interest or demand of Defendants in said property, and every part thereof, saving and excepting the right of redemption, if any, be foreclosed;

d.   That the above described real property with all its appurtenances, rights, privileges and easements shall be sold by the Sherriff on execution after giving notice required by law; that any party to this suit may be a purchaser at said sale; and that said purchaser be let into the immediate possession of said real property and every part thereof; that said Sheriff give to any such purchaser of the real property a Certificate of Sale and after the time allowed for redemption of said real property, unless said real property be redeemed, a deed;

e.   That the proceeds of said sale be applied as follows:
  a.   First, to pay costs and expenses of sale;
  b.   Second, to pay the judgment of plaintiff on its cause of suit;
  c.   Third, any overplus to be paid to the Clerk of this Court, subject to the further order of this Court;

f.   That if the proceeds of sale are insufficient to satisfy the judgment of Plaintiff awarded against Defendants, order that such deficiency may be enforced by execution as provided by law;

g.   For such other and further relief as this Court deems just and proper.

III. As to the Third Cause of Action, the entry of Judgment in favor of the Plaintiff against

Defendants, as follows:

a.   For the sum of $7,967,597.78 with interest thereon at the maximum rate allowed by law;

b.   For attorney fees if any, and costs in the an amount to be determined and as the court may find reasonable following judgment; and

c.   For such other and further relief as the court may deem proper.

DATED this _6th_ day of _June_, 2016.

Respectfully Submitted,

Jack R. Yarbrough
Pro se

State of Idaho      )
                    )   S.S.
County of Elmore    )

On this _6_ day of _June_, in the year of 20_16_, before me _Kristina Miller_, personally appeared _Jack Yarbrough_, proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is are) subscribed to the within instrument, and acknowledged that he (she) (they) executed the same.

_Kristina Miller_
Notary Public

My Commission Expires _12-15-17_

Page 9 – COMPLAINT

KRISTINA L. MILLER
Notary Public
State of Idaho

Exhibit 18 - Page 9

Jack R. Yarbrough
P.O. Box 20756
Keizer, OR 97307
(503) 393-3930



FILED

2018 FEB 27  AM 9: 11

CLERK ... ... COURT
DEPUT...

IN THE DISTRICT COURT FOR THE FOURTH JUDICIAL DISTRICT

FOR THE STATE OF IDAHO, IN AND FOR THE

COUNTY OF ELMORE

|  |  |
|---|---|
| JACK R. YARBROUGH, | Case No.: CV-2016-558 |
| Plaintiff, | MOTION FOR ENTRY OF FINAL JUDGMENT OF FORECLOSURE |
| v. | |
| IDAHO WASTE SYSTEMS, INC., an Idaho Corporation; ROBERT and LORENE RIEMENSCHNEIDER, individuals; ARLAND and IMA JEAN KEETON, individuals; FIRST AMERICAN TITLE INSURANCE COMPANY, a corporation of the State of California; PACIFIC HIDE & FIR DEPOT, dba PACIFIC STEEL & RECYCLING, a Montana corporation; and HIGH COUNTRY FUSION COMPANY, an Idaho Corporation, | |
| Defendants. | |

Plaintiff moves this Court for Entry of Final Judgment of Foreclosure in the

above-entitled matter. This motion is made pursuant to Rule 55(a)(1) and Rule 58(a) of

the Idaho Rules of Civil Procedure and the pleadings filed herein.

**PAGE 1 – MOTION**

Exhibit 18 - Page 10

I certify:

1. I am the Plaintiff in this action.

2. Proof of service upon all Defendants is on file in this case.

3. Certain Defendants have failed to answer or defend the above-entitled matter as required by law within twenty-one (21) days of the date of service. Those Defendants are: (a) Idaho waste Systems, Inc. ("IWS"); (b) Robert and Lorene Riemenschneider; and (c) Arland and Ima Jean Keeton. With respect to Defendants IWS and Arland and Ima Jean Keeton, Plaintiff has filed Motions and Orders of Default for these Defendants. With respect to Robert and Lorene Riemenschneider, Plaintiff has filed a Motion and Order to dismiss these Defendants from the action.

4. With respect to Defendant First American Title Insurance Company ("First American") said Defendant has Stipulated to the Entry of a Non-Monetary Default which Stipulation is being filed with the Court contemporaneously with this Motion.

5. With respect to Defendant Pacific Hide & Fir Depot, dba Pacific Steel & Recycling, Plaintiff and this Defendant have settled and a stipulated Motion and Order dismissing this Defendant from the case has been filed with the Court.

6. With respect to Defendant High Country Fusion Company, Plaintiff and this Defendant have settled and a stipulated Motion and Order dismissing this Defendant from the case has been filed with the Court.

Accordingly, upon the Court's signing of any outstanding motions previously filed and as set forth above, this matter is now procedurally ready for entry of Final Judgment of

**PAGE 2 – MOTION**

Exhibit 18 - Page 11

Foreclosure.

## CERTIFICATION UNDER PENALTY OF PERJURY

I certify under penalty of perjury pursuant to the law of the State of Idaho that the

foregoing is true and correct.

Date: _2/23/18_

_JACK R. Yarbrough_
Typed/printed

_(signature)_
Signature

**PAGE 3 – MOTION**

Exhibit 18 - Page 12

1

*CERTIFICATE OF SERVICE*

2

     I hereby certify that I served the foregoing MOTION FOR FINAL JUDGMENT on the

3

following persons on February 23, 2018, by hand-delivering, faxing, or mailing (as indicated

below) to each a true copy thereof, certified by me as such, and if mailed, contained in a sealed

4

envelope, with postage paid, addressed to said attorneys at the last known address of each shown

below and deposited in the post office on said day at Boise, Idaho:

5

Richard A. Cummings

        □ by hand-delivery

Richard A. Cummings Law Office

        ☒ by facsimile

6

960 South Broadway, Ste. 315

        □ by first class

Boise, ID 83706

        mail

7

Ph: (208) 367-0722

        □ by e-mail

Fax: (208) 367-0892

        □ by electronic

8

E-mail: rcummings@cummingslawidaho.com

  service

Attorney for Defendant Idaho Waste Systems, Inc.

9

Arland and Ima Jean Keeton

        □ by hand-delivery

KEETON RIEMENSCHNEIDER LLC

        ☒ by facsimile

10

18159 W. Highway 126

        ☒ by first class

Sisters, OR 97759

        mail

11

Arlandk@keetonking.com

        □ by e-mail

        □ by electronic

12

        service

Robert and Lorene Riemenschneider

        □ by hand-delivery

13

895 SW 23rd Street

        ☒ by facsimile

Redmond, OR 97756

        ☒ by first class

14

Ph: (208) 887-3444

        mail

E-mail: rener14@bendcable.com

        □ by e-mail

Defendant, Pro Se

        □ by electronic

15

        service

16

17

18

19

20

21

22

Page 1 – CERTIFICATE OF SERVICE

Exhibit 18 - Page 13

1

Lynette M. Davis
Hawley Troxell Ennis & Hawley LLP
877 W. Main St. Suite 1000
P.O. Box 1617
Boise ID 83701 – 1617
LDavis@hawleytroxell.com

☐ by hand-delivery
☒ by facsimile
☐ by first class mail
☐ by e-mail
x by electronic service

2

3

4

5

DATED: February 23, 2018.

6

7

8

JACK YARBROUGH, Pro se

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 2 – CERTIFICATE OF SERVICE

Exhibit 18 - Page 14

Filed: 05/25/2018 14:05:01
Fourth Judicial District, Elmore County
Barbara Steele, Clerk of the Court
By: Deputy Clerk - Furst, Heather

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF

THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ELMORE

| | |
|---|---|
| JACK R. YARBROUGH,<br><br>    Plaintiff,<br><br>vs.<br><br>IDAHO WASTE SYSTEMS, INC., an Idaho corporation; ROBERT and LORENE RIEMENSCHNEIDER, individuals; ARLAND and IMA JEAN KEETON, individuals; FIRST AMERICAN TITLE INSURANCE COMPANY, a corporation of the State of California; PACIFIC HIDE & FUR DEPOT, dba PACIFIC STEEL & RECYCLING, a Montana corporation; and HIGH COUNTRY FUSION COMPANY, an Idaho corporation,<br><br>    Defendants. | Case No. CV-2016-558<br><br>**JUDGMENT** |

JUDGMENT IS ENTERED AS FOLLOWS:

1.    Plaintiff's claims against Defendants High Country Fusion Company; Pacific Hide & Fur Depot, dba Pacific Steel & Recycling; and Robert and Lorene Riemenschneider are hereby dismissed with prejudice and Plaintiff shall take nothing thereby;

2.    Plaintiff is hereby granted judgment against Defendants Idaho Waste Systems, Inc., Arland Keeton, and Ima Jean Keeton, jointly and severally, on Plaintiff's claim for breach of contract against Idaho Waste Systems, Inc. in Count One of Plaintiff's complaint, and on Plaintiff's claim for breach of personal guarantees against Arland

JUDGMENT - 1

Exhibit 18 - Page 15

IWS000498

Keeton and Ima Jean Keeton in Count Three of Plaintiff's complaint, in the amount of $7,967,597.78, plus post-judgment interest on that amount, accruing at the legal rate, until paid in full;

3.      As to Plaintiff's claim for judicial foreclosure of a deed of trust in Count Two of Plaintiff's complaint, that the real property described as:

> Township 2 South, Range 5 East, Boise Meridian, Elmore County, Idaho
> Section 7: Southeast ¼
> Section 18: Northeast ¼ and Northwest ¼
> Township 2 South, Range 4 East, Boise Meridian, Elmore County, Idaho
> Section 12: Northeast ¼

commonly known as 4014 Simco Road, Mountain Home, Idaho 83647, shall be sold by the Sheriff of Elmore County, Idaho, by levy and execution according to the law and practice of this Court; and that the proceeds of that sale shall be first applied to the costs of said sale, then to the total amount due to Plaintiff as indicated above; and that any surplus shall be deposited with the Clerk of this Court, subject to further order of this Court; and that the Sheriff shall make a report of such sale and file it with the Clerk of this Court within the time required by law;

That the mortgage and security interest affecting the real property shall be deemed foreclosed, and that Defendants Idaho Waste Systems, Inc., Arland Keeton, Ima Jean Keeton, and First American Title Insurance Company, or any person claiming through said Defendants, shall be barred and foreclosed of all right, title, and interest in and to the property described above except as to any redemption rights provided by any state or federal law, if any are applicable;

That Plaintiff may bid by credit bid against the sums found owing to him, and any other person may become a purchaser for cash. The Sheriff shall execute and deliver to the purchaser with the highest bid a certificate of sale, and, after the expiration of the period of redemption allowed by law, shall execute and deliver to the purchaser a Sheriff's deed to the property described above; and

That the purchaser or purchasers of the premises above described at such sale be let into possession thereof, and that any of the parties to this action who may be in possession of said premises or any part thereof, or any persons who, since the commencement of this

JUDGMENT - 2

Exhibit 18 - Page 16

IWS000499

action, have come into possession thereof shall deliver possession to said purchaser or purchasers upon the production of a Sheriff's certificate of sale therefor.

Jurisdiction of this cause is hereby expressly reserved and retained for the purpose of making such further orders as may be necessary in order to carry this judgment, decree of foreclosure, and order of sale into effect, and to correct any mathematical error, grant any accrued credits, or make such further orders as may be necessary or desirable.

Signed: 5/24/2018 11:49 AM

JONATHAN MEDEMA
District Judge

JUDGMENT - 3

Exhibit 18 - Page 17

IWS000500

## CLERK'S CERTIFICATE OF MAILING

I certify that a true and correct copy of the foregoing document was sent to the following via:

Jack Yarbrough
jry_icu@comcast.net

Richard A. Cummings
rcummings@cummingslawidaho.com

Arland and Ima Jean Keeton
Arlandk@keetonking.com

Robert and Lorene Riemenschneider
rener14@bendable.com

Lynette M. Davis
LDavis@hawleytroxell.com

Dated this _____ day of ___Signed: 5/25/2018 02 03 PM___ , 2018.

BARBARA STEELE

Clerk of the District Court

By_____H. Furst_____

Deputy Clerk

JUDGMENT - 4

Exhibit 18 - Page 18

IWS000501

Electronically Filed
11/14/2018 8:32 AM
Fourth Judicial District, Elmore County
Barbara Steele, Clerk of the Court
By: Hope Ruiz, Deputy Clerk

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ELMORE

| | |
|---|---|
| JACK R. YARBROUGH, | Case No. CV-2016-558 |
| Plaintiff, | Sheriff# 18-0002269 |
| v. | SHERIFF'S RETURN ON SALE OF REAL PROPERTY |
| IDAHO WASTE SYSTEMS, INC., an Idaho Corporation; ROBERT and LORENE RIEMENSCHNEIDER, individuals; ARLAND and IMA JEAN KEETON, individuals; FIRST AMERICAN TITLE INSURANCE COMPANY, a Corporation of the State of California; PACIFIC HIDE & FUR DEPOT, d/b/a PACIFIC STEEL & RECYCLING, a Montana Corporation; and HIGH COUNTRY FUSION COMPANY, an Idaho Corporation, | |
| Defendants. | |

## SHERIFF'S RETURN ON SALE OF REAL PROPERTY

1

2     I, Mike Hollinshead, Sheriff of Elmore County, Idaho, do hereby certify and return that I

3    received the Writ of Execution on Judgment and Judgment on the 4th day of September, 2018, and in

4    compliance therewith and instructions of Plaintiff, on the 26th day of September, 2018, I served a copy

5    of this Writ of Execution on Judgment and Notice of Levy and Exhibit A on the Elmore County

6    Recorder in Elmore County, State of Idaho, and that I noticed the property so directed to be sold at

7    public auction, according to law, by posting written notices particularly describing the real property

8    to be sold

9          To Wit:

### LEGAL DESCRIPTION

Township 2 South, Range 5 East, Boise Meridian, Elmore County, Idaho

SHERIFF'S RETURN ON SALE OF REAL PROPERTY



1

Exhibit 18 - Page 19

Section 7: Southeast ¼

Section 18: Northeast ¼ and Northwest ¼

Township 2 South Range 4 East, Boise Meridian, Elmore County, Idaho

Section 12: Northeast ¼

1
2    And commonly known as: **16415 NW WASTE SITE DRIVE, BOISE, IDAHO 83716**
3
4    and setting forth the time and place of sale and the monetary and other terms thereof, for twenty (20)

5    consecutive days before the time set for the sale, in three public places in

6    precinct # 2 the precinct where said property is located to wit:

7        1.   Jim's Lumber, 1390 W. 6th S., Mtn. Home, Id

8        2.   City Animal Shelter, 295 NW Elmcrest, Mtn. Home, Id 83647

9        3.   Red Barn, 335 W. Jackson, Mtn. Home, Id

10   And in precinct # 4 the precinct where said property was to be sold, to-wit:

11       1.   Mountain Home City Hall, 1150South Main St., Mountain Home, Idaho

12       2.   Elmore County Sheriff's Driver's License Office, Mountain Home, Idaho

13       3.   Colortyme, 270 East Jackson St, Mountain Home, Idaho

14   at the location of Elmore County Sheriff's Office and Elmore County Courthouse in Mountain Home,

15   Idaho and by publishing a copy of said notice once each week for three consecutive weeks

16   on October 10th, 17th, 24th, 2018, for the same period, before the time set for the sale in the *Mountain*

17   *Home News* a newspaper published in Elmore County, Idaho, and qualified to publish said legal

18   notice.

19       I further certify that on the 30th day of October, 2018 at the hour of 10:00 o'clock a.m. of

20   that day, I attended at the time and place so named in said notices, as aforesaid, and duly offered

21   for sale, and sold, at public auction, for cash lawful money of the United States, all and singular

SHERIFF'S RETURN ON SALE OF REAL PROPERTY                                                    2

Exhibit 18 - Page 20

1  the above-described property, or the right, claim and interest of the within-named Defendants

2  thereto, according to the direction and order of the said annexed writ and the statutes in such cases

3  made and provided, in the manner as follows, to-wit: I offered to sell said real property, according

4  to law, and sold the same in one parcel, there being no requests that it be sold in any other way,

5  except: sold in one known parcel, and that the highest and best bid was made by

6  Jack Yarbough, for Idaho Waste Services, Inc., P. O. Box 20756, Keizer, Or. 97307 who placed a

7  credit bid in the sum of $8,215,210,76 and that the property, according to the aforesaid, was sold

8  to said highest bidder; that I issued a Sheriff's Certificate of Sale therefore, according to the law,

9  copy of said Certificate of Sale, annexed, self-evidence and self-explanatory, and filed a copy

10 thereof for record, and render the following statement:

| | |
|---|---|
| Writ of Execution on Judgment: | $ 8,228,764.32 |
| Sheriff's fees and costs: | $      494.62 |
| Credit Bid: | $ 8,215,210.76 |
| Remaining Balance Due | $    13,553.56 |

16    I return the attached Writ of Execution on Judgment satisfied and have assessed my fees

17 and costs at $ 494.62, that were paid in advanced fees, and will submit final billing to Plaintiff.

18    Given under my hand This 8th day of November, 2018.

By: _____

Wendy Robison, Civil Deputy
Sheriff of Elmore County, Idaho

SHERIFF'S RETURN ON SALE OF REAL PROPERTY                                3

Exhibit 18 - Page 21

## EXHIBIT A

## LEGAL DESCRIPTION

Township 2 South, Range 5 East, Boise Meridian, Elmore County, Idaho

Section 7: Southeast ¼

Section 18: Northeast ¼ and Northwest ¼

Township 2 South Range 4 East, Boise Meridian, Elmore County, Idaho

Section 12: Northeast ¼

1

2

3

SHERIFF'S RETURN ON SALE OF REAL PROPERTY                4

Exhibit 18 - Page 22

# Exhibit 19

# In The Matter Of:

*Idaho Waste Systems v.*
*The United States Air Force*

---

*Jack R. Yarbrough - 30(b)(6)*
*August 6, 2019*

---

*M & M Court Reporting Service*

Original File 52481B4.txt

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

IDAHO WASTE SYSTEMS, INC.,          )

       Plaintiff,                   ) Civil No.

          vs.                    ) 1:18-cv-229-BLW

THE UNITED STATES AIR FORCE;        )

PROTECH COATINGS, INC.; and SNAKE )

RIVER RUBBISH, LLC,                 )

       Defendants.                  )

_____ )

30(b)(6) DEPOSITION OF IDAHO WASTE SYSTEMS, INC.,

TESTIMONY OF JACK R. YARBROUGH

August 6, 2019

REPORTED BY:

COLLEEN P. DOHERTY, CSR 345

Notary Public

1           THE 30(b)(6) DEPOSITION OF IDAHO WASTE SYSTEMS,

2    INC., TESTIMONY OF JACK R. YARBROUGH was taken on behalf

3    of the Defendants, The United States Air Force, at the

4    offices of Hawley Troxell, located at 877 W. Main

5    Street, 10th Floor, Boise, Idaho, commencing at 10:02

6    a.m., on August 6, 2019 before Colleen P. Doherty,

7    Certified Shorthand Reporter and Notary Public within

8    and for the State of Idaho, in the above-entitled

9    matter.

10                        APPEARANCES:

11   For the Plaintiff:

12           GHIORSO LAW

13           BY MR. WILLIAM L. GHIORSO

14           494 State Street, Suite 300

15           Salem, Oregon  97301

16           Bill@Ghiorsolaw.com

17   For the United States Air Force:

18           UNITED STATES DEPARTMENT OF JUSTICE

19           Environmental Tort Litigation

20           BY MS. DANIELLE L. SGRO

21           BY MR. ERIC REY

22           BY MS. SHERI LEWIS (via telephonic)

23           175 N Street NE, Suite 11-210

24           Washington, D.C.  20002

25           eric.a.rey@usdoj.gov; danielle.l.sgro@usdoj.gov

```
 1   For the United States Air Force:
 2            UNITED STATES DEPARTMENT OF JUSTICE
 3            Environmental Defense Section
 4            BY MS. SHEILA BAYNES
 5            P.O. Box 7611
 6            Washington, D.C.  20004
 7            sheila.baynes@usdoj.gov
 8   For the Defendant ProTech Coatings, Inc.:
 9            HAWLEY TROXELL ENNIS & HAWLEY, LLP
10            BY MR. TYLER J. ANDERSON
11            BY MS. DANA L. HOFSTETTER
12            877 Main Street, Suite 1000
13            Boise, Idaho  83701-1617
14            tanderson@hawleytroxell.com
15            ckirkpatrick@hawleytroxell.com
16            dana@hawleytroxell.com
17   For the Defendant Snake River Rubbish, LLC:
18            WORST, STOVER, GADD & SPIKER, PLLC
19            BY MR. LOUIS V. SPIKER
20            3858 North Garden Center Way, Suite 200
21            Boise, Idaho  83701-1544
22            lvs@magicvalleylaw.com
23
24
25
```

1                          I N D E X

2    TESTIMONY OF 30(b)(6) DEPOSITION OF IDAHO        PAGE

3    WASTE SYSTEMS, INC., JACK R. YARBROUGH

4    Examination by Mr. Rey                              6

5    Examination by Ms. Baynes                         192

6    Examination by Mr. Anderson                       248

7    Examination by Mr. Spiker                         262

8

9                        E X H I B I T S

10   DESCRIPTION                                      PAGE

11   Exh 1 - Copy of First Amended Notice of            22

12   30(b)(6) Deposition of Idaho Waste Systems,

13   Inc.

14   Exh 2 - Copy of Sheriff's Return on Sale of        26

15   Real Property

16   Exh 3 - Copy of Confidential G&A Valuation,        39

17   Inc., Summary Appraisal Report, 01/12/2015,

18   IWS 000001-58

19   Exh 4 - Copy of IWS, Snake River Rubbish,          50

20   ProTech Ticket, IWS 000414

21   Exh 5 - Copy of Simco Road Regional Landfill       66

22   Operating Plan Update, Project Delivery

23   Group, IDEQ 013674-14575

24

25

1                        I N D E X

2                E X H I B I T S (Continued)

3       DESCRIPTION                                      PAGE

4       Exh 6 - Copy of Plaintiff's Responses to          91

5       Defendant United States Airforce's First Set

6       of Interrogatories

7       Exh 7 - Copy of Sampling and Analysis Plan        94

8       Chromium Assessment, Olympus Technical

9       Services, Prepared for IWS, 04/05/2017,

10      IWS 000366-413

11      Exh 8 - Copy of Olympus Technical Services,       97

12      Statement to IWS, 08/18/2017, IWS 000497

13      Exh 9 - Copy of MHAFB Chromium Response          104

14      Costs, IWS 000426-435

15      Exh 10 - Copy of IDEQ Letter to Paula Jo         174

16      Brown, July 20, 2017, Re:  MHAFB Chromium

17      Waste Remedial Evaluation Report, July 7,

18      2017, USAF1 00190-191

19

20

21

22

23

24

25

1  your counsel, and then also the other codefendants

2  counsel who are present.  Sir, do you recognize

3  Exhibit 2?

4        A.  Yes.

5        Q.  What's Exhibit 2?

6        A.  It's the "Sheriff's Return on Sale of Real

7  Property."

8        Q.  And when did you first see this document?

9        A.  You know, I'm not really sure.  It was sent to

10 us by the sheriff after the sale.  After the sale, let's

11 say between 20 and 45 days, they just sent us a copy.

12       Q.  And is Exhibit 2 a fair and accurate copy of

13 the version that you received previously?

14       A.  Yes.

15       Q.  And so I would like to direct your attention

16 to page 3 of the document.

17       A.  Yes.

18       Q.  Starting on line 3, it states, "I offered to

19 sell said real property, according to law, and sold the

20 same in one parcel, there being no requests that it be

21 sold in any other way, and except; sold in one known

22 parcel, and that the highest and best bid was made by

23 Jack Yarbrough, for Idaho Waste Systems, Inc., Keizer,

24 Oregon 97307, who placed a credit bid in the sum of

25 $8,215,210.76."  Do you see that there, sir?

```
1              A.   Yes, I do.

2              Q.   And does that statement accurately reflect the

3    fact of how much you bid for the landfill?

4              A.   Yes.

5              Q.   And where did you bid this much for the

6    landfill?

7              A.   The Elmore County courthouse steps.

8              Q.   And this was the foreclosure you discussed

9    previously?

10             A.   Yes.

11             Q.   And so I would like you to walk me through

12   that foreclosure.  So what date did it happen?

13             A.   I don't know.  It was all through the court

14   process.  Let's see.  I don't know the exact date.

15             Q.   So if you look on page 2, down at the bottom

16   starting on line 19 of Exhibit 2.  If you read line 19

17   and 20, does that refresh your memory on when the

18   foreclosure occurred?

19             A.   Well, I believe -- no, it doesn't, because

20   this is the date of the sheriff's sale.  And the

21   foreclosure would have been -- it's two separate

22   processes.  So the foreclosure could have taken place 60

23   days prior to that.

24             Q.   Yes, I'm trying to understand when exactly you

25   placed the bid, what day was that that you placed --
```

1        A.   Oh, it was on October 30th, 2018.

2        Q.   And who else was on the "courthouse steps" as

3   you say?

4        A.   The sheriff, Shelly one of the -- I think

5   she's the secretary, Elmore County secretary.  No.  What

6   do you call her?

7             MR. GHIORSO:  Clerk.

8             THE WITNESS:  Clerk.  I'm sorry.  The clerk,

9   yeah, a real nice gal.  And just the sheriff, and then

10  some other people standing around.  I don't know who

11  that was.

12       Q.   (BY MR. REY)  So other than the sheriff,

13  Shelly, and yourself, you don't know the names of

14  anybody else that were at the sheriff's sale?

15       A.   As I sit here, I can't remember anybody.  We

16  were there just to, you know, just -- we didn't even

17  have to be there.  I just showed up.  Actually, I

18  believe Tom Knight was there.  I think he might have

19  rode over with me.

20       Q.   Anybody else that you remember?

21       A.   It might have been somebody from Republic

22  there, but I don't know.

23       Q.   Anybody else?

24       A.   Not that I know.

25       Q.   You mentioned Republic just a second ago.  Is

1    that the name of a business?

2        A.   Republic is one of the larger garbage

3    companies.  It's Republic, Recology, Waste Management,

4    those three are the big guns.

5        Q.   And do you know the name of the individual who

6    was there on behalf of Republic?

7        A.   I'm not even sure it was.  I don't know, and I

8    don't know even know who it was.  I was just maybe

9    thinking they might have showed up.

10       Q.   So referring you back to page 3 of Exhibit 2,

11   on line 7 it lists the amount of your bid.  Do you see

12   the precise figure, the precise number there.  Just to

13   be clear, that's an accurate description on how much you

14   bid on the landfill?

15       A.   Yes.

16       Q.   How did you come up with that specific figure?

17       A.   Give me just a moment.  I want to make sure

18   this math here is correct here.  How did I come up with

19   that number?  I believe that was pretty much what I was

20   allowed by the court.  They said that was my judgment,

21   even though we disagreed with them.

22       Q.   Were any other bids placed, other than I'll

23   call it 8.215 million just for the sake of brevity, what

24   I'm referring to on line 7?

25       A.   No, sir, one bid.  Nobody else bid.

1          Q.   Why didn't you bid $1?

2          A.   I don't know.

3          Q.   So what factors went into your decision to --

4          A.   If I could have bid $1, and still these guys

5    paid some more money, I would have done that.  But I

6    think this was what we were required to do.  I'm not

7    positive of that, but I'm just sitting here thinking, I

8    was required to bid that.

9          Q.   Understood.  Any other factors, other than

10   what you thought the court required you to do, that went

11   into why you decided to bid that specific amount?

12         A.   I'm not sure.  Right now, I'm not sure.  It

13   might have been.  I don't think so, but it might have

14   been.

15         Q.   So sitting here today, you can't remember any

16   other factors that influenced your decision to give that

17   specific bid?

18         A.   No, I think I relied a lot on my attorney,

19   took attorney's advice.

20         Q.   So Exhibit 3 mentions that you made the bid on

21   behalf of Idaho Waste Services, Inc.; correct?

22         A.   I'm sorry?

23         Q.   Exhibit 2 states that you made the bid on

24   behalf of Idaho Waste Services; is that correct?

25         A.   Yes, I assigned the debt to, I believe, I

1   assigned the debt to Idaho Waste Services and had them

2   bid that price.

3       Q.  And what's your position, if any, in Idaho

4   Waste Services?

5       A.  I'm the major stockholder, secretary,

6   president, you know.

7       Q.  How much of Idaho Waste Services do you own?

8       A.  All.

9       Q.  100 percent?

10      A.  Yes.

11      Q.  So you mentioned you are the secretary,

12  president, any other positions?

13      A.  No, it's a single asset corporation, so...

14      Q.  Does it have a board of directors?

15      A.  No.

16      Q.  So I understand the landfill was sold in

17  October of 2018 under the sheriff's sale.  Between your

18  time starting to work with IWS in June 2015, until that

19  sheriff's sale, did you work to try to get the landfill

20  sold to anybody else?

21      A.  Yes, I think, the answer is, yes.

22      Q.  And who were those entities that you tried to

23  sell it to?

24      A.  Well, I'm not allowed.  We signed a

25  nondisclosure agreement, so unless I guess you force me

1    to tell you, I'm not supposed to.

2         Q.   How --

3         A.   But they were two major players in the garbage

4    business.

5         Q.   And what were the time frames in which you

6    were in negotiations with those two major companies?

7         A.   I think it was probably towards the end of the

8    first part of 2018.

9         Q.   I'm sorry.  Could you say that again?

10        A.   It's been five, or six, seven months, I think,

11   something like that, end of 2018 or --

12        Q.   So it's been five or six months from today

13   since you last had the discussions with these other

14   entities to sell the landfill?

15        A.   Not last discussions, there is ongoing

16   discussions.  You know, you get a call, you know, these

17   guys always have feelers out.  So we might have had some

18   discussions.  This particular landfill has been up for

19   sale to Republic, to Waste Management, Recology in the

20   past before I ever got involved in it, and it always

21   fell through for some reason.  So they would

22   occasionally call back.  I am just trying to give you

23   all the background information.  So I guess you could

24   say, it's always been for sale.

25        Q.   I appreciate the background.  So you just

 1        Q.   How much is Company B willing to pay for the
 2   landfill?
 3        A.   Less, I think 8.2.  Excuse me, 8,200,000.
 4        Q.   And would that also include the real property,
 5   the landfill, and the assets that the landfill uses to
 6   operate?
 7        A.   I think you might add another -- we're not to
 8   that point yet.  So right now the offer is about 8.2, I
 9   think.  I'm not going to sell it for that, because of
10   the personal equipment.  So that may come up, or they
11   won't buy it.
12        Q.   So for Company B, did they explain to you why
13   they are offering 8.2 million for the landfill?
14        A.   I'm not sure I understand your question.
15        Q.   Did they explain to you how they arrived at an
16   offer of 8.2 million?
17        A.   They always have some story.  Buyers are
18   liars, they tell you everything you want to hear that
19   sets their sight.  Both of them have used the diminished
20   value, the chromium hexavalent C6 in there to lower the
21   price about approximately 2,000,000; a minimum of
22   1,000,000 to $2,000,000.
23        Q.   Any other explanation they gave for their
24   offer of 8.2 million?
25        A.   You know, I think so, but I just don't have

1    at Exhibit 4, is it fair to say, to your knowledge, The

2    United States Air Force wasn't involved in transporting

3    the waste to the landfill on February 8th, 2017?

4              MR. GHIORSO:  I'm going to object to the form

5    of the question.

6              Go ahead and answer the question, if you know.

7              THE WITNESS:  Well, here's what I know.  I

8    know we gave them a ticket.  I don't know who directed

9    them to bring it.  But Snake River brought it to our

10   facility, saying it came from Mountain Home Air Force

11   Base.  So that's all I know.

12        Q.  (BY MR. REY)  But to IWS's knowledge, The

13   United States Air Force didn't physically transport the

14   waste to the landfill; is that correct?

15        A.  That's correct, yes.

16        Q.  And to IWS's knowledge, IWS did not charge The

17   United States Air Force the costs of the disposal of the

18   waste on February 8th, 2017?

19        A.  That's correct.

20        Q.  So I want to go back to your testimony when we

21   started this topic, when you mentioned how IWS was

22   notified of the waste might contain chromium.  You say

23   that Tom Knight received a phone call; is that right?

24        A.  That's my understanding.  I believe he

25   received a call from Mountain Home Air Force Base.  I'm

1    high.  So I was trying to -- I don't remember exactly

2    how it ended up.  But I know it might have been -- and I

3    might have paid that, too.  I don't remember.  You can

4    only argue over small amounts like that for so long.  It

5    just doesn't become practical.

6            Q.  So sitting here today, it's fair to say, that

7    IWS paid less than $27,806.08?

8            A.  I think so.  It is very possible, yes, maybe

9    within a thousand dollars maybe, or something like that.

10           Q.  So you mentioned Olympus conducted water well

11   and leachate testing for you?

12           A.  Yes.

13           Q.  And when did they do that testing?

14           A.  After this incident, so I'm not sure exactly

15   what period of time.  So if we have those invoices maybe

16   point that out.

17           Q.  And did Olympus provide you the results of

18   those sampling events?

19           A.  I'm pretty sure they would have, yes.

20           Q.  Does IWS still have that sampling data?

21           A.  We should.

22           Q.  Do you recall what the sampling data showed?

23           A.  Yeah.  Oh, it shows a lot on there.  But are

24   you specifically relating it to the chromium hexavalent

25   C6?

 1         Q.  Yes.

 2         A.  It did not show any chromium hexavalent C6.

 3         Q.  So go back to the interrogatories that is

 4  Exhibit 6, back to that same list.  The next one on the

 5  list that IWS provided "Project Delivery Group, LLC,

 6  Mitigation and environmental risk evaluation - 5,300."

 7  Do you see that there?

 8         A.  Where are we?  Give me a page.

 9         Q.  Page 8?

10         A.  Got it.  Number B, yes, I see that.

11         Q.  So what work specifically did Project Delivery

12  Group do for IWS related to the incident?

13         A.  You know, I'm not sure as I sit here.  But I

14  just know that I had them involved to a small degree.

15  That's the company that I used do cell, to the build

16  cell A to oversee that.

17         Q.  Just so I'm clear, you don't recall

18  specifically what work they did for you?

19         A.  I don't sitting here.  It's been a long time.

20         Q.  Do you know where the figure $5,300 came from

21  in Exhibit 6?

22         A.  I don't know exactly what that represents, but

23  it's work that I had them do.

24         Q.  So the next item on that list in Exhibit 6 is

25  a reduction of value in the property.  We'll circle back

1        A.   You asked me a question.   I'm going to answer
2    it the way I --
3        Q.   Sir, I asked you, what does this sentence
4    mean?
5        A.   I'm going to tell you what that means to me.
6    It means to me that -- and I think highly of DEQ, but I
7    don't think highly of this Albert Crawshaw, because we
8    were going to file a complaint against him with his
9    supervisor.   This guy, your employee immediately went to
10   work for him.   And this letter was written after that
11   fact.   So if you don't call that a conflict?   So that's
12   what this letter means to me.
13            There is no way, they could call us up, and
14   told us to immediately remove it, immediately get it all
15   removed.   I started the process.   Your guy goes to work
16   for them.   And then all of a sudden, we get this sweet
17   little letter saying, we comply -- we can agree with
18   your expert, who never visited the landfill, just took
19   our report from our expert, and cherry picked it.
20   That's what that means to me.
21       Q.   So this sentence states that DEQ concurs with
22   the recommendation to leave the subject waste in place?
23       A.   That's what the letter says.
24       Q.   Has the waste been removed since you received
25   Exhibit 10?

1          A.   No.

2          Q.   Has DEQ asked IWS to remove the waste at issue

3     in this case?

4          A.   No.

5          Q.   Has DEQ charged IWS a fine related to this

6     incident?

7          A.   Indirectly, yes, I think they have.

8          Q.   How about has DEQ levied a penalty against IWS

9     related to the incident?

10         A.   Specifically to this, no, but indirectly, yes,

11    I think they have.

12         Q.   And indirectly how, what do you mean by that?

13         A.   You guys put 4,000 pounds of chromium

14    hexavalent C6 in my landfill.  You got a 13, or $15,000

15    fine.  We spill a little bit of water, we didn't get it

16    solidified, and we get a $20,000 fine.  And that comes

17    from Crawshaw or Crenshaw, however you pronounce his

18    last name.  So, yeah, I think you guys got preferential

19    treatment.  We got shafted.

20         Q.   So just to be clear, though, IWS didn't send a

21    check to DEQ paying money to them related to this

22    incident; correct?

23         A.   You already asked that, and I already answered

24    that, I said, indirectly.

25         Q.   So I'm trying to figure out directly.  Did IWS

1    send DEQ any money related to this incident?
2            MR. GHIORSO:  I'm going to object to the form
3    of the question.
4            You can answer it one more time.  And then
5    we're done with that question.
6            THE WITNESS:  I already answered that, no,
7    indirectly we have.  $20,000 for un-solidified liquid
8    compared to 4,000 pounds of hexavalent C6.
9        Q.  (BY MR. REY)  And I've been referring to DEQ.
10   Do you understand that to mean the Idaho Department of
11   Environmental Quality?
12       A.  Yes.
13       Q.  Okay.  Thank you.  Did DEQ send IWS a notice
14   of violation related to the incident?
15       A.  Send it to -- we did not receive any
16   violation.
17       Q.  Was IWS a party to any --
18       A.  But again --
19       Q.  -- consent --
20       A.  Okay.  Let me back up --
21       Q.  -- to agree --
22       A.  Let me finish my answer.
23       Q.  Excuse me.  You'll have a chance to clarify
24   --
25       A.  I won't --

1          Q.  -- it later.

2          A.  I'm not clarifying.  I'm going to finish it.

3     No, but not because -- only because the other people

4     that we respect there rule appropriately.  But at the

5     urging of Crawshaw or Crenshaw, who hired your employee,

6     he wanted us to be fined.

7          Q.  Thank you.  But that wasn't my question.  My

8     question --

9          A.  It was -- that was my answer that --

10         Q.  -- whether IWS was --

11         A.  That was my answer.

12             MR. GHIORSO:  Let him ask the --

13             THE WITNESS:  I'm going to answer --

14             MR. GHIORSO:  -- next.

15             THE WITNESS:  That was my answer to your

16    question.

17             MR. GHIORSO:  Let him ask the next question.

18             THE WITNESS:  I'll answer the question the

19    best I know how, period.

20         Q.  (BY MR. REY)  So that's a, no, IWS didn't

21    receive a notice of violation related to the incident?

22         A.  No.

23         Q.  Is IWS a party to any consent decree related

24    to the incident?

25         A.  No.  But not at the urging of Crawshaw.

1          Q.  So I want to direct your attention now to

2    Topic V, that's on page 6 of 7.  And that has to do with

3    the decrease in value of the landfill due to the

4    incident.  What is IWS's opinion as to how much the has

5    decreased the value of the landfill?

6          A.  Where are you at now?

7          Q.  Under Topic V.

8          A.  I'm saying it's a minimum of $2,000,000.

9          Q.  And why do you say that?

10         A.  Well, the appraisal, we know we had an

11   appraisal several years ago of $13,000,000.  I've

12   already told you the offer price that's coming in.  And

13   that's a considerable drop from the appraisal.

14   Landfills are unique and hard to find, the privately

15   owned landfills, very few exist.  Especially one of this

16   size that could go on for 200 plus years.

17         Q.  Anything else that factors into IWS's opinion

18   that the incident decreased the value of the landfill by

19   one or $2,000,000?

20         A.  Just in the negotiation of potential buyers,

21   and the fact that it's definitely a problem.  The county

22   commissioner has talked about it.  They are concerned

23   about it.  So, I mean, it's a concern.  I mean, nobody

24   seems to care about anything else, other than hexavalent

25   C6, because of how dangerous it is compared to all the

1    others that's in there.

2         Q.  So in your discussions with these potential

3    buyers, these are the Company A and Company B that we

4    talked about this morning?

5         A.  Yes.

6         Q.  Did you give Company A, what has been marked

7    Exhibit 10, which is the July 20th, 2017, letter from

8    IDEQ?

9         A.  I'm not sure I did, but I directed them, so

10   there would be no confusion, I directed them to IDEQ.

11   And I understand they did that.  They got a request for

12   public information request.

13        Q.  So Company A is aware that IDEQ says, you may

14   leave this waste in place?

15        A.  Yes, and I believe I've had that conversation

16   with them, and the same with Company B.

17        Q.  Has Company A explained why, notwithstanding

18   IDEQ's July 20th, 2017, letter, which is Exhibit 10,

19   they still think the incident affected the value of the

20   landfill?

21        A.  Well, it did affect the value of the landfill.

22   Because the problem with this is that it might not show

23   up now, but five, to ten, to 20 years from now, when we

24   get past that limit, who is going to take care of it?

25   Is the government going to step in.  My experience with

1    the fact that you put it there, you are responsible.

2    But you guys haven't participated yet.  So why should I

3    expect you to come back ten years from now, when it

4    gets -- or if we ever spring a leak, God forbid in one

5    of those liners.  And it happens.  All landfills leak

6    whether they are lined or not.  And when that happens,

7    and it gets into the drinking water, who's going to be

8    responsible?  So that's the potential liability that's

9    been explained to me.

10        Q.  And Company A told you that?

11        A.  Yeah, pretty much, A and B, yeah, it's always

12   a problem.  And, obviously, and I put the value of that

13   on it, not them.  They are coming down from the

14   appraisal price down to 8.2.  I am saying, they are

15   using that, rightfully so I think, and you are using it

16   to hammer me with it a little bit.

17        Q.  Have you shared with Company A the leachate

18   value of the landfill?

19        A.  They have it.  Both of them have it -- both

20   companies -- well, Company B has done their own testing

21   and all that, so they are pretty familiar with that.

22   And they've got all the reports from -- all that is

23   reported to IDEQ.  And they did a public information

24   request to get all those documents.

25        Q.  So that's a, yes, you've given that to

1    Company A?

2         A.  I'm just telling you what they did.  So if

3    somehow they didn't pick that up, I would be surprised

4    that the state didn't get them all the documentation

5    that they asked for.

6         Q.  Did you give Company A the Olympus sampling

7    data that they collected that you mentioned earlier

8    today?

9              MR. GHIORSO:  You are talking about leachate

10   sampling data?

11             MR. REY:  Yes.

12             THE WITNESS:  I think so.

13        Q.  (BY MR. REY)  Did you give Company A the

14   Olympus ground water data that you mentioned earlier

15   today?

16        A.  You know, if they asked for it, we would have

17   gave it to them.  But again, that's part of IDEQ.  That

18   goes directly to IDEQ.  So that would be part of the

19   public information request.  So they would have got that

20   through that request.  If we didn't give it to them,

21   they would have got it anyway.

22        Q.  So you testified earlier that those data from

23   Olympus didn't show any upticks in hexavalent chromium;

24   right?

25        A.  That's correct.

1    Q.  And did you explain that to Company A?

2    A.  Well, I think they are probably -- I don't

3  think I have to explain anything to them.  I think they

4  know the landfills better than I do.  So, you know, I

5  don't think I could explain it to them, or make them

6  think any differently.

7    Q.  I forget.  Is Company A the company that you

8  heard reportedly had an appraisal of the landfill of 18

9  million?

10    A.  Yes.

11    Q.  Did that factor into the incident?

12    A.  Whether they -- I don't know.  They hired

13  their own appraisal.  I don't even know who it was.  Oh,

14  actually, I may know that.  I may know the company,

15  because I happened to be there at the landfill when the

16  guy showed up.  So I don't know whether that does or

17  not.  But I'm sure that an appraisal, if he's worth his

18  salt, would want that information from IDEQ.  He would

19  probably require it.

20    Q.  So other than your discussions with Company A

21  and Company B, is there any other reasons why you think

22  the incident decreased the value of the landfill by one

23  to two million?

24    A.  Now, say that again, please.

25    Q.  Other than your discussions with Company A and

1    Company B, is there any other reason why you think the
2    incident decreased the value of the landfill by one to
3    two million dollars?

4         A.  Well, I'm not sure about the exact specific
5    dollar amount.  But it's common sense -- you know, I buy
6    and sell lots of properties, whether it's commercial, or
7    industrial, or not.  I'm not going to buy a problem with
8    a piece of property that has a potential for a Level
9    III, you know, spending millions of dollars to clean it
10   up.  And that's what these guys are looking at.  They
11   are not looking at the costs right now.  They are
12   looking at that, plus any potential costs.  And that's
13   got to have a negative impact on the landfill.

14            So I think common sense tells you that.  I've
15   talked to numerous people.  I've talked to engineers,
16   and the engineers says, it is.  But again, here's what
17   the property is worth.  I'm on the board of property tax
18   bills in Oregon.  The property is worth what you can
19   sell it for.  And if it's got any negative to it, that's
20   a detriment.  And that didn't get there, because I put
21   it there.  It got there, because you guys didn't do your
22   job properly.  I'm talking about, when I say, "you
23   guys," I meant, your client, should have done a much
24   better job, whether it was with ProTech.  I don't blame
25   the driver as much.  But you get too sophisticated

1    companies like the Mountain Home Air Force Base and

2    ProTech, you know, it should have never got to us.  And

3    now, who's paying the price.  I'm here wasting my time

4    talking to you, and getting pissed off.  That's

5    just -- I'm not trying to be rude to you, but I'm

6    telling you, Jesus, I mean, why am I responsible for

7    your problems?  Now, come on.

8         Q.  So you mentioned you spoke with engineers to

9    come up with that one to two million dollar figure; is

10   that right?

11        A.  No.  No.  I said I talked to them about

12   potential liability, how they would think if they

13   were -- you know, did they know people who had problems

14   like -- and I talk to engineers all the time about

15   subdivisions, industrial.  And we come in -- and one of

16   them down there at -- it was just south of Albany.  It's

17   a steel paper plant.  I was thinking about buying that,

18   but it's got so much potential liability.  It just isn't

19   worth it.  You know, I started out at a reasonable

20   price, and I could have bought it for nothing when I was

21   done, just so they would be released from the potential

22   liability.  So that's what I'm saying, I've talked to

23   those people.  They all have -- it's just good common

24   sense if somebody -- if you've got potential liability,

25   it's going to lower the price.

1      Q.  So to clarify, you've never spoken to an

2    engineer, who said, it is my opinion that the value of

3    this landfill has decreased one to two million dollars

4    as a result of this incident?

5      A.  No.  And the reason they wouldn't do that is

6    they would have to do quite a bit of research.  It would

7    cost quite a bit of money.  And you sent us a letter

8    saying, hey, let's resolve this problem before we

9    get -- settle this before we get too much money and time

10   interested in it.  Because if I have to do that,

11   because, you know, I'm a pretty easy guy.  But I am not

12   going to get pushed around anymore.  I can afford to

13   fight this out for 20 years.  And if that's what it

14   takes, I'll do it.  I would rather leave

15   everybody -- I'm not upset at the Mountain Home Air

16   Force Base.  I'm not upset with ProTech.  But I'm the

17   one getting crapped on.  And here we are.  Where are

18   those other people?  You don't see them sitting here

19   suffering through this.  I mean, they didn't even have

20   enough courtesy to show up -- for their own clients to

21   show up.

22            MR. REY:  I think it's time for a break.  Go

23   off the record.

24            (Recess from 3:34 to 3:47 p.m.)

25            MS. BAYNES:  We'll go back on the record.

1    Force Base and IDEQ, where everybody is on the line, and

2    doing conference calls.

3         Q.  I'll ask you more about the communications

4    that you referenced.  But I'll point you back to Exhibit

5    9.  That's the chart you prepared about the -- I'm going

6    to call the activities on the chart, the "remobilization

7    activities."  Does that make sense to you, if I use that

8    term?

9         A.  I think so.  I can live with that.

10        Q.  So on Exhibit 9, before you begin documenting

11   the remobilization activities on March 9th, there is a

12   heading under March 8th.  Do you see that heading in all

13   capital letters.  It says, "IDEQ Notification of

14   hexavalent chromium Delivery."  So this appears to

15   represent that IWS was notified that hexavalent chromium

16   had been delivered to the landfill about a month earlier

17   on March 8th.  Do you agree with that?  And by "you," I

18   mean, as representative of IWS.

19        A.  It's close, yeah, I think you are correct on

20   that.  I think that was -- I think this was the date

21   that we got a call, possibly got a call.  I think that's

22   the day we got a call from the Mountain Home Air Force

23   Base.  DEQ didn't directly call us, and talk to us.  We

24   received notification from the Mountain Home Air Force

25   Base.

1      Q.  So should this correctly read, Mountain Home
2  Air Force Base notification?
3      A.  Well, I think they probably already
4  see -- where is the -- that letter, what's the date of
5  that letter that they had sent?  370.
6      Q.  The letter at 370 is represented to be March
7  8th, 2017 in that report, and that was an email.
8      A.  I think this references the notification from
9  the Mountain Home Air Force Base that we got that.  And
10 then later, and they may have faxed us a copy over.  I'm
11 not sure exactly how we got it.  But I don't think we
12 got -- or maybe we got the letter the same day they did.
13 As I sit here, I just don't remember.  But I know we
14 first learned about it, because you guys called -- you
15 guys, Mountain Home Air Force Base called us and told us
16 about it.
17     Q.  Well, I see that you began the remobilization
18 activities on March 9th.  So do you think that March 8th
19 is the date you received that notification?
20     A.  I think so, yes.
21     Q.  So before we talk more about the
22 communications that took place with IDEQ, Mountain Home
23 Air Force Base, and other parties over the subsequent
24 months, I would like to first focus on the process of
25 IWS's decision-making between the moment you received

1    that notification on March 8th, and when you commenced

2    the remobilization activities on March 9th.  So that's a

3    fairly short period.  I'm guessing that is under than 24

4    hours.  I would like to understand the process by which

5    under that day long period, IWS decided to start those

6    remobilization activities?

7        A.  Well, I think we had that conversation on

8    either that day or the very next day, and we were told

9    not to put any additional waste in the location where it

10   was dumped, even though it is already covered up by a

11   month's worth of tonnage.

12       Q.  You said, "we had that conversation."  Who is

13   "we"?

14       A.  Well, IDEQ, and I don't know if the Mountain

15   Home Air Force Base was involved.  I remember it was a

16   conversation with Mountain Home Air Force Base, your

17   civil environmental guy, and the three of us had that

18   conversation.  Because I remember specifically them

19   saying, do not add any more trash on top of the

20   contaminated area.  So that's why we immediately had to

21   switch to the opposite side.

22       Q.  When you said, "them," you said they told us.

23   Who is them?

24       A.  Well, I think it would have been -- I remember

25   it to be IDEQ would have given us that direction.  So I

1  think IDEQ and --

2          Bill, can you find that guy's name?  I keep

3  referring to --

4          MR. GHIORSO:  I will look for it while you are

5  testifying.

6          THE WITNESS:  The environmental guy out there.

7  I think he was part of it, IDEQ, and myself, and Tom.

8      Q.  (BY MS. BAYNES)  Is there any documentation of

9  that conversation that IWS has provided?

10     A.  Well, no, we didn't put it down on the bill.

11  There is a lot of things we didn't put down as time that

12  we expended put on there, so...  But I know for a fact

13  that we immediately started that time frame.  And they

14  may not have called us until this date, on the 9th, and

15  that's when we -- let's see.  It would have been the

16  9th.  That's when we started.  Because we wouldn't have

17  changed our location without them telling us to do that,

18  giving us the direction to do that.

19     Q.  I'll direct you back to Exhibit 7, to the last

20  15 or so pages.  Starting on IWS 000398.  And the range

21  between 398 and IWS 000413, that set of pages contains a

22  number of email communications between yourself and

23  Albert Crawshaw at Idaho DEQ.  And if you would like to

24  take some time to review these to answer my question,

25  that's fine.  But my question is whether the

1   conversation that you just referenced, that you claim

2   took place between the notification on March 8th, and

3   the commencement of the remobilization activities on

4   March 9th, if there is any reference to that

5   conversation in these set of communications that have

6   been produced by IWS?

7        A.  Well, first of all, I don't know if the

8   conversation took place on the 8th or the 9th.  But we

9   would not have started the mobilization without getting

10  a directive to do that.  So we started on the 9th, so we

11  got some directive on the 9th, not to put the waste on

12  the contaminated -- any more future waste on the

13  contaminated area.  That's when we started

14  remobilization.  So let me read this to see if I can

15  glean anything from this.  (Witness reading.)

16           Curt Olson is the gentleman I keep referring

17  to, who now works for Albert Crawshaw at IDEQ.

18        Q.  So my question is whether these pages show any

19  documentation that the call that you alleged occurred on

20  March 8th or March 9th, that directed you to perform the

21  remobilization activities, if that call took place, and

22  what the contents of that call were?

23        A.  Let me finish reading.  I have two or three

24  more pages here.  Okay.  I've looked at those.  What was

25  your question, again, please?

1      Q.   My question is, is there any documentation in
2  the Bates numbers between IWS 000398 to IWS 000413 of
3  the phone call that you are claiming occurred on either
4  March 8th or March 9th, in which was discussed that you
5  should commence these activities?
6      A.   I quickly looked at that, and I didn't see
7  that in just a very brief review.
8      Q.   I've looked at those documents in detail a
9  number of times, and I have not been able to find any
10  documentation of any communication that took place
11  during that time period.
12          So my next question is, who decided that IWS
13  should begin these remobilization activities on May 9th,
14  2017?  Who made that decision?
15      A.   That would have been my decision, after we
16  were told not to put any more waste by either, I
17  believe, IDEQ and this Curt Olson, do not -- it would
18  have been IDEQ, but he was on the phone, I believe, not
19  to put any more waste on top of what's in place there.
20      Q.   Do you recall who told you not to do that?
21      A.   No, but I'm going to go back, and see if I can
22  determine who that is.
23      Q.   Do you receive an order from IDEQ that ordered
24  you to not put any more waste on top of that area?
25      A.   You are referring to a consent order?

1      Q.  Any sort of order that would be -- I would

2   assume that something that would be consequential of

3   this nature, they would have required this amount of

4   work, would be something that they would have documented

5   in writing.  Did you receive anything documented

6   ordering you to do that?

7      A.  I don't recall that, but we would have never

8   started that without them telling.  They told us to not

9   put any more waste over what was already placed there.

10  Because that's where we started right there.

11     Q.  And did you understand that to be a

12  recommendation, or a formal order that you were

13  receiving from IDEQ?

14     A.  When IDEQ makes a suggestion, it's the same as

15  an order.  If you don't do what they suggest, they don't

16  take it lightly.

17     Q.  But you didn't receive any sort of anything in

18  writing, or any formal order, requests, or suggestion

19  that you undertake these activities?

20     A.  I didn't receive anything in writing --

21     Q.  And there is no documentation --

22     A.  -- to my knowledge.

23     Q.  And there is no documentation of a phone call

24  where that was mentioned?

25     A.  Say that again, please.

```
 1                    REPORTER'S CERTIFICATE

 2              I, COLLEEN P. DOHERTY, CSR No. 345, Certified

 3     Shorthand Reporter, certify:

 4              That the foregoing proceedings were taken

 5     before me at the time and place therein set forth, at

 6     which time the witness was put under oath by me;

 7              That the testimony and all objections made were

 8     recorded stenographically by me and transcribed by me or

 9     under my direction;

10              That the foregoing is a true and correct record

11     of all testimony given, to the best of my ability;

12              I further certify that I am not a relative or

13     employee of any attorney or party, nor am I financially

14     interested in the action.

15              IN WITNESS WHEREOF, I set my hand and seal this

16     20th day of August, 2019.

17

18

19

20     _____

21              COLLEEN P. DOHERTY, CSR 345

22              Notary Public

23              P.O. Box 2636

24              Boise, Idaho  83701-2636

25     My commission expires September 7, 2023.
```

# Exhibit 20

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


IDAHO WASTE SYSTEMS, INC.,          )

       Plaintiff,                   ) Civil No.

           vs.                    ) 1:18-cv-229-BLW

THE UNITED STATES AIR FORCE;        )

PROTECH COATINGS, INC.; and SNAKE )

RIVER RUBBISH, LLC,                 )

       Defendants.                  )

_____ )


THE DEPOSITION OF THOMAS WILSON KNIGHT

August 7, 2019



REPORTED BY:

COLLEEN P. DOHERTY, CSR 345

Notary Public

1            THE DEPOSITION OF THOMAS WILSON KNIGHT was

2    taken on behalf of the Defendants, The United States Air

3    Force, at the offices of Hawley Troxell, located at 877

4    W. Main Street, 10th Floor, Boise, Idaho, commencing at

5    10:18 a.m., on August 7, 2019 before Colleen P. Doherty,

6    Certified Shorthand Reporter and Notary Public within

7    and for the State of Idaho, in the above-entitled

8    matter.

9                          APPEARANCES:

10   For the Plaintiff:

11            GHIORSO LAW

12            BY MR. WILLIAM L. GHIORSO

13            494 State Street, Suite 300

14            Salem, Oregon  97301

15            Bill@Ghiorsolaw.com

16   For the United States Air Force:

17            UNITED STATES DEPARTMENT OF JUSTICE

18            Environmental Tort Litigation

19            BY MS. DANIELLE L. SGRO

20            BY MR. ERIC REY

21            BY MS. SHERI LEWIS (via telephonic)

22            175 N Street NE, Suite 11-210

23            Washington, D.C.  20002

24            danielle.l.sgro@usdoj.gov

25            eric.a.rey@usdoj.gov;

```
 1   For the United States Air Force:

 2            UNITED STATES DEPARTMENT OF JUSTICE

 3            Environmental Defense Section

 4            BY MS. SHEILA BAYNES

 5            P.O. Box 7611

 6            Washington, D.C.  20004

 7            sheila.baynes@usdoj.gov

 8   For the Defendant ProTech Coatings, Inc.:

 9            HAWLEY TROXELL ENNIS & HAWLEY, LLP

10            BY MR. TYLER J. ANDERSON

11            BY MS. DANA L. HOFSTETTER

12            877 Main Street, Suite 1000

13            Boise, Idaho  83701-1617

14            tanderson@hawleytroxell.com

15            dana@hawleytroxell.com

16   For the Defendant Snake River Rubbish, LLC:

17            WORST, STOVER, GADD & SPIKER, PLLC

18            BY MR. LOUIS V. SPIKER

19            3858 North Garden Center Way, Suite 200

20            Boise, Idaho  83701-1544

21            lvs@magicvalleylaw.com

22   ALSO PRESENT:  Jack Yarbrough

23

24

25
```

1                              I N D E X

2       TESTIMONY OF THOMAS WILSON KNIGHT               PAGE

3       Examination by Ms. Sgro                            5

4       Examination by Ms. Baynes                        101

5       Examination by Mr. Anderson                      105

6

7

8                            E X H I B I T S

9       DESCRIPTION                                     PAGE

10      (None)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    THOMAS WILSON KNIGHT,
 2    first duly sworn to tell the truth relating to said
 3    cause, testified as follows:
 4                         EXAMINATION
 5    QUESTIONS BY MS. SGRO:
 6         Q.  Can you state your full name for the record.
 7         A.  With middle?
 8         Q.  Yes.
 9         A.  Thomas Wilson Knight.
10         Q.  And can you spell that?
11         A.  T-h-o-m-a-s, W-i-l-s-o-n, K-n-i-g-h-t.
12         Q.  Mr. Knight, my name is Danielle Sgro.  And I
13    represent The United States in the case you are here for
14    today, the Idaho Waste Systems, Incorporated versus The
15    United States Air Force, ProTech Coatings, Incorporated,
16    and Snake River Rubbish, LLC.  Do you understand that
17    you are here today to give deposition testimony in the
18    matter I just spoke of?
19         A.  Yes.
20         Q.  And as you may be aware, during the
21    deposition, I'm going to ask you questions.  And these
22    questions and your answers are going to be recorded by
23    the court reporter to my left.  Do you understand that?
24         A.  Yes.
25         Q.  So because we have a court reporter taking
```

1  how they are organized?

2      A.  Don't know.

3      Q.  You don't.  Okay.  That's fine.  Sorry I'm

4  jumping around on you here.  If you want to refer back

5  to the dump ticket, it's right in front of you still.

6  So that's convenient.

7      A.  Okay.

8      Q.  Is it fair to say that the U.S. Air Force did

9  not transport the load that was delivered to the

10  landfill on February 8th of 2017?

11      A.  As in they had Snake River transport it for

12  them.

13      Q.  Is it fair to say, that the Air Force did not

14  transport it, was my question?

15      A.  Correct.

16      Q.  And the Air Force didn't sign the dump ticket;

17  correct?

18      A.  Correct.

19      Q.  And the Air Force didn't dump the load there;

20  correct?

21      A.  Correct.

22      Q.  And the Air Force didn't pay for disposal;

23  correct?

24      A.  Correct.

25      Q.  Thank you.  All right.  Jump around again.  So

1   I am going to talk to you a little bit about more

2   specifically why we're here, the incident on February

3   8th of 2017.  First, on that day, February 8th of 2017,

4   were you working at the landfill?

5        A.   I believe so.

6        Q.   Did you see the waste get delivered by Snake

7   River Rubbish?

8        A.   Not directly, no.

9        Q.   How did you come to find out -- well, I'll

10  back up.  You said, "not directly, no."  What do you

11  mean there?

12       A.   Well, I was there that day.  I watch trucks

13  all the time and stuff.  This particular load, I didn't

14  know -- you know, I know they come in, but I don't know

15  which load is which, where they come from, put it that

16  way.

17       Q.   Okay.

18       A.   I'm not at the scale house.

19       Q.   Do you know if this was one of the loads you

20  would have inspected or looked at closer?

21       A.   No, I don't.

22       Q.   Do you have personal knowledge that the

23  landfill's hazardous waste screening procedures were

24  followed on this, February 8th of 2017?

25       A.   I believe they are followed the same as they

1          A.   Any sampling that we're having done by a
2    consultant, engineering firm.
3          Q.   So where would invoices from Project Delivery
4    Group be kept?
5          A.   I believe in Jack's office, because they went
6    direct to him.
7          Q.   Okay.
8          A.   I've never seen anything from those.
9          Q.   What about reports from Project Delivery
10   Group?
11         A.   The same, they go to Jack.
12         Q.   Okay.  Do you recall Project Delivery Group
13   performing any work for the landfill regarding the
14   incident that took place on February 8th of 2017?
15         A.   I don't recall any, but it's possible they
16   have worked on it.
17         Q.   Okay.  But you don't work directly with the
18   engineer and consultants?
19         A.   Only when they ask me questions.
20         Q.   Okay.  And what types of questions would they
21   ask you?
22         A.   You know, just where the location would be.
23   Just my neck is hurting a little bit that's all.
24         Q.   That's okay.
25         A.   Just if they had a question where the records

1                    REPORTER'S CERTIFICATE

2              I, COLLEEN P. DOHERTY, CSR No. 345, Certified

3       Shorthand Reporter, certify:

4              That the foregoing proceedings were taken

5       before me at the time and place therein set forth, at

6       which time the witness was put under oath by me;

7              That the testimony and all objections made were

8       recorded stenographically by me and transcribed by me or

9       under my direction;

10             That the foregoing is a true and correct record

11      of all testimony given, to the best of my ability;

12             I further certify that I am not a relative or

13      employee of any attorney or party, nor am I financially

14      interested in the action.

15             IN WITNESS WHEREOF, I set my hand and seal this

16      20th day of August, 2019.

17

18

19

20      _____

21             COLLEEN P. DOHERTY, CSR 345

22             Notary Public

23             P.O. Box 2636

24             Boise, Idaho  83701-2636

25      My commission expires September 7, 2023.

# Exhibit 21

# January 2019 Leachate Quality Monitoring Event Report
# Simco Road Regional Landfill

Prepared for:



Idaho Waste Services, Inc.
16415 NW Waste Site Drive
Mayfield, ID 83716

Prepared by:



**Project Delivery Group, LLC**
200 Hawthorne Ave. SE, Suite A-100
Salem, Oregon 97301



USAF1_00541

Citation

January 2019 Leachate Quality Monitoring Report
Simco Road Regional Landfill
Prepared by Project Delivery Group, Salem, Oregon
March 2019


USAF1_00542

- The sample containers were placed in a cooler chilled with ice immediately following collection.

The leachate sample collected from Cell 1 was labelled IWS-L-1-20190121; the leachate sample collected from Cell 2 was labelled IWS-L-2-20190121. A copy of the field sampling data sheets is provided in Appendix B.

## Laboratory Analysis and Results

### Leachate Analyses

The leachate sample containers were initially shipped on January 21, 2019 overnight to SVL Analytical in Kellogg, Idaho (SVL), who received the samples on January 22, 2019.  The sample was analyzed for the inorganic compounds in Appendix I of Title 40 of The Code of Federal Regulations, Part 258; the samples were also analyzed by SVL for common inorganic constituents as per the SRRL Final Design Report (Pacific Waste Services, Inc. 2000). The leachate samples were also analyzed for cyanide and amenable cyanide.  Cyanide, amenable cyanide, and total chromium constituents are being tested in accordance with the Concept Leachate Monitoring Plan (Parametrix 2012) that has been approved by IDEQ (IDEQ 2012).  This additional testing is in response to a Voluntary Consent Order related to the receipt of a shipment of hazardous waste in Cell 1E. The Voluntary Consent Order sampling was initially required for the five-year period between July 2012 and July 2017.

SVL shipped the VOC samples overnight to Anatek Labs Inc., in Moscow, Idaho (Anatek) on January 22, 2019 for the analysis of organic compounds listed in Appendix I of Title 40 of The Code of Federal Regulations, Part 258; the samples were received by Anatek on January 23, 2019.

The leachate quality results for the January 2019 leachate monitoring event are summarized in Appendix A.  A copy of the laboratory analytical reports is provided in Appendix B.  A review of the laboratory data was conducted, including a check of holding times and method blanks.   No exceptions to sample shipment, care, or holding times, or in the method blank analyses were noted.  There was an error in the chain-of-custody documentation, with the samples being misidentified on the chain-of-custody form.  PDG notified the laboratory and the chain-of-custody was revised as needed.  The two samples were collected on January 21, 2018, not January 22, 2019, as inadvertently identified on the chain-of-custody form.

## Evaluation of Leachate Quality Data

### Geochemical Evaluation

Geochemical evaluations consisted of calculating cation/anion balances.  A trilinear diagram of the January 2019 and past sampling events; trilinear diagram of Cell 1 and Cell 2 leachate samples for the January 21, 2019 sampling event; and the cation/anion balance calculations for the January 2019 sampling event are presented in Appendix C.

#### Trilinear Diagrams

The trilinear diagrams present the major ion geochemistry of leachate samples collected from Cell 1 and Cell 2. The trilinear diagram illustrates that the leachate chemistry has remained fairly consistent, having high total dissolved solids and being dominated by the cation sodium and the anion chloride.  These are typical for municipal solid waste landfill leachate.

#### Cation/Anion Balance Calculations

Cation/anion balance calculations provide a measure of the accuracy of major ion constituent values. When all the major anions and cations have been determined, the sum of the cations in milliequivalents per liter (meq/L) should equal the sum of the anions expressed in the same units (Hem 1985).  Charge-balance difference of greater than 5 to



USAF1_00548

10 percent could possibly indicate error in the laboratory measurements, and/or that significant concentrations of additional ions are present that were not included in the testing programs. Cation/anion balance calculations are presented in Table C-1 of Appendix C. The charge-balance differences for the total metals sample from leachate Cell 1 had a calculated difference of 6.52 percent. This imbalance appears to be related to the significant amount of suspended solids in the sample and the relatively higher concentration levels of chloride and sulfate present in the sample. The charge-balance differences for the total metals sample from leachate Cell 2 had a calculated difference of 3.88 percent.

## Statistical Evaluation

### *Time Series Plots*
Time-series plots showing concentrations of metals and common ions measured in the leachate samples collected over time are presented in Appendix D. Overall the time-series plots do not indicate any clear significant upward or downward trend in the data.

## Leachate Quality Analysis - Cyanide, Amenable Cyanide, and Total Chromium
Amenable cyanide and total cyanide were not detected in the leachate samples at or above the respective method reporting limits of 0.01 mg/L.

57 FR 31776-31849 Chemical Phase Rule V (Vol. 57, No. 138, July 17, 1992) – states the following: Total cyanide methods are allowed for screening; the MCL/Maximum Contaminant Level Goal (MCLG) applies to free cyanide; the EPA's definition of "free" is amenable to chlorination, and the MCL and MCLG is 0.2 ppm (mg/L). Cyanide is regulated as Free Cyanide (Table in 40 CFR 141.62(b) defines an MCL of 0.2 mg/L for Cyanide (as free cyanide)), but Total Cyanide methods are allowed for screening. The Total Cyanide screening methods are easier, faster and cheaper than the Free Cyanide methods. The EPA has regulated "Free Cyanide" as cyanides amenable to chlorination and set the MCL based on Free Cyanide. Cyanides amenable to chlorination provides a conservative estimate of toxicity because, in addition to free cyanide, it recovers some weak acid dissociable metal cyanide complexes that may or may not actually release free cyanide in the environment.

There were no detections of total chromium above the method reporting limit 0.03 mg/L in the leachate samples collected from Cell 1 and Cell 2, with the method reporting limit being below the Federal and Idaho maximum contaminant level (MCL) in drinking water (which leachate is not) of 0.1 mg/L.

# Conclusions and Recommendations
The time series graphs and the tri-linear diagrams of historical leachate quality data for Cell 1 and Cell 2 continue to illustrate no significant change in leachate quality or chemistry, as noted during the January 2019 sampling event. There continues to be no detection of amenable or total cyanide above the respective method reporting limits

As per item 10 of the Concept Leachate Monitoring Plan in Conjunction with Simco Regional Landfill Voluntary Consent Order, Section 3.D., leachate sampling over the last 5-year period has shown concentrations of amenable cyanide and total cyanide at or below the method reporting limits; concentration of total chromium have been negligible to non-detectable. As discussed with IDEQ, two leachate monitoring events will be conducted in 2019, tentatively scheduled for April and October 2019.



USAF1_00549