UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO WASTE SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> U.S. AIR FORCE, et al., <br><br> Defendants. | Case No. 18-cv-0229-SRB-WJE <br><br> **REPORT AND RECOMMENDATIONS** |

    Pending before the Court are five related motions: Defendant U.S. Air Force's (USAF) combined Motion to Dismiss and Motion for Summary Judgment (Doc. 53), Plaintiff Idaho Waste Systems, Inc.'s (Idaho Waste) Motion for Partial Summary Judgment (Doc. 54), Defendant Snake River Rubbish, L.L.C.'s (Snake River) Motion for Summary Judgment (Doc. 57), Defendant ProTech Coatings, Inc.'s (ProTech) combined Motion for Summary Judgment and Joinder (Doc. 71), and Snake River's Motion for Summary Judgment on ProTech's Cross Claim (Doc. 74). All of the above motions are now ripe for consideration as the parties have fully briefed each respective motion.[1] The Court recommends dismissing all state law claims against the USAF and dismissing the continuing nuisance claim against Snake River and ProTech. It is further recommended that Plaintiff's motion for summary judgment be denied (Doc. 54) and Snake River's motion for summary judgment seeking indemnity and contribution be denied. (Doc. 74).

## I. BACKGROUND

    The following facts are undisputed for the purposes of this summary judgment motion.[2] This case arises from the disposal of allegedly hazardous material. The USAF contracted ProTech to remove and resurface flooring within a U.S. Air Force base. (Docs. 53-2; 55; 57-2; 70-1). The terms of the contract apparently required ProTech to test all waste generated during the USAF

---

[1] Local Rule 7.1(d)(1)(B) states "[i]f the presiding judge determines that oral argument will not be necessary, the matter will be decided on the briefs." The Court does not believe a hearing on these matters is necessary.

[2] The Court examined each of the parties' respective statement of material facts, as well as the whole record, to determine whether a genuine dispute existed.

project. (Doc. 53-2). Snake River was thereafter contracted to transport waste generated from the USAF project site for disposal. (Docs. 57-2; 70-1). In December 2016, ProTech collected samples from the waste generated during the project. (Docs. 53-2; 57-2; 70-1). ProTech did not send these samples to be tested for chromium until later and received the results in March 2017. (Docs. 57-2; 70-1). Meanwhile, ProTech loaded the waste from which it took samples along with other construction debris into "plastic garbage sacks," and placed them into a roll-off container for Snake River to transport for disposal (Subject Waste). *Id.* In February 2017, Snake River delivered the Subject Waste to Plaintiff's landfill. *Id.*

In March 2017, ProTech's test results from sampled construction debris allegedly indicated chromium concentrations qualifying as hazardous waste. *Id.* Plaintiff's landfill was not capable of receiving hazardous waste. (Doc. 53-2). ProTech notified the USAF, which in turn notified the Idaho Department of Environmental Quality (IDEQ). *Id.* In either March or April 2017, the IDEQ informed Plaintiff's President, Jack Yarborough, that the Subject Waste needed to be removed. (Doc. 57-2). While the IDEQ would change its mind a few months later regarding removal, in the meantime Plaintiff hired at least one contractor to begin addressing the Subject Waste. *Id.*

Sometime in March or April 2017, Plaintiff retained Olympus Technical Services, Inc. (Olympus) to complete work related to the Subject Waste. (Docs. 53-2; 57-2; 61-2). Olympus apparently completed some type of testing for chromium within the landfill around that same timeframe. *Id.* According to Mr. Yarborough, such testing found no hexavalent chromium. (Doc. 61-2). Olympus may have also created a plan to address the Subject Waste, but competent, supportive evidence is sparse. The record does not otherwise show what type of work this contractor completed. In May 2017, Plaintiff halted remedial efforts and resumed normal business operations. (Doc. 57-2). Later in 2019, Plaintiff hired Project Delivery Group (PDG) to complete a leachate[3] monitoring report. (Doc. 53-2, p. 164). The report, issued in March 2019, ultimately found chromium levels to be "negligible to non-detect." *Id.* at 167.

Defendants have retained a total of three experts to examine and analyze the Subject Waste. (Doc. 53-2). The USAF hired the first expert after prodding from the IDEQ, employing AGEISS, Inc. to determine the best means of handling the Subject Waste. *Id.* On July 7, 2017, AGEISS determined the waste constituted .014% of the total volume of Cell 2A of Plaintiff's landfill. *Id.*

---

[3] The Court uses the term "leachate" to describe liquid passing through waste as it filters down through the layers of a landfill.

Based on a finding that Subject Waste posed "no unacceptable risk to human health and the environment," AGEISS recommended leaving it in place. *Id.* The IDEQ reviewed AGEISS's findings and concurred that the Subject Waste should not be removed. *Id.* In a July 20, 2017, letter, the IDEQ cited four reasons for leaving the waste undisturbed:

> 1) the low probability of locating the dispersed waste; 2) the nature and quantity of the waste is not expected to adversely affect the integrity of the liner or leachate collection system if left in place; 3) the potential health and safety concerns posed by retrieval activities and the wastes with which the waste is now co-mingled; and 4) the potential compromise of the liner is a greater risk to human health and the environment than allowing the waste to remain in place based on landfill design and construction.

*Id.*

Subsequently, the USAF hired Dr. Remy J.-C. Hennet, an expert in geochemistry and hydrogeology, to review the facts and data surrounding the chromium disposal. *Id.* In a June 2019 expert report, Dr. Hennet concluded that the chromium levels found in leachate were substantially lower than limits set by federal law. *Id.* He further opined that the concentration of chromium was too low to threaten groundwater quality, and the Subject Waste had "no measurable effect on the chemical composition" of Plaintiff's landfill. *Id.* He went on to state that the IDEQ's decision to keep the Subject Waste in place was reasonable. *Id.* ProTech retained expert Bradley D. Harr, who prepared a July 8, 2019, report concurring with Dr. Hennet's conclusions. (Docs. 57-2; 58-7, pp. 53, 56; 70-1). Lastly, an appraisal prepared for the USAF and ProTech concluded the Subject Waste's disposal did not reduce the valuation of Plaintiff's landfill. (Doc. 58-7, p. 27).

In May 2018, Idaho Waste brought suit against all Defendants and subsequently filed an amended complaint alleging six total counts: (1) Continuing Nuisance; (2) Continuing Trespass; (3) Equitable Indemnity and Contribution; (4) Negligence and Negligence Per Se; (5) Cost Recovery under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA); and (6) Contribution under CERCLA. The instant motions were thereafter brought by Plaintiff and Defendants. (Docs. 53, 54, 57, 71, 74). Sixteen months later, in September 2019, the Court sanctioned Plaintiff monetarily for discovery violations, explaining Idaho Waste had repeatedly missed discovery deadlines, including failing to file initial disclosures, failing to disclose specific damages, failing to answer interrogatories, and failing to produce any emails or other internal communications. (Doc. 65). Idaho Waste now seeks the following costs and damages: $5,300 for "[m]itigation and environmental risk evaluation," purportedly paid to PDG;

approximately $27,000 purportedly paid to Olympus for "[e]nvironmental consulting"; and diminution in property value, which Mr. Yarborough later estimated to be at minimum $2,000,000. (Doc. 53-3, p. 91).

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact occurs when "there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015) (quoting *Thomas v. Ponder,* 611 F.3d 1144, 1150 (9th Cir. 2010)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat [a] . . . motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis omitted). Moreover, while "all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, the Court is not required to adopt unreasonable inferences from circumstantial evidence." *Oldcastle Precast, Inc. v. Concrete Accessories of Ga., Inc.*, No. 4:17-CV-00164-BLW, 2019 WL 403865, at *6 (D. Idaho Jan. 31, 2019). When reviewing cross-motions for summary judgment, the Court is required to consider each motion on its own merits. *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *IP Glob. Invs. Am., Inc. v. Body Glove IP Holdings, LP*, No. 2:17-CV-06189-ODW (AGR), 2018 WL 5983550, at *8 (C.D. Cal. Nov. 14, 2018), *amended*, No. 2:17-CV-06189-ODW (AGR), 2019 WL 121191 (C.D. Cal. Jan. 7, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Similarly, "[s]ummary judgment is appropriate where [Plaintiff] offers no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages." *Weinberg v. Whatcom Cty.*, 241 F.3d 746, 751 (9th Cir. 2001) (quoting *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988)); *see also Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1143 (E.D. Cal. 2017).

## III. DISCUSSION

Idaho Waste seeks summary judgment on its CERCLA and trespass claims. Defendants seek summary judgment on or dismissal of each of Plaintiff's claims. The Court begins by examining Plaintiff's CERCLA claim related to all Defendants. The Court then analyzes the USAF's sovereign immunity for all tort claims under state law. Thereafter, the Court turns to Plaintiff's tort claims under state law directed towards ProTech and Snake River. Lastly, the Court discusses Snake River's request for indemnity from ProTech.[4]

### (1) CERCLA Claim Against All Defendants

The Court first examines Plaintiff's CERCLA claim against all Defendants. CERCLA was enacted to "provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." *3550 Stevens Creek Assocs. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1357 (9th Cir. 1990) (citation omitted); 42 U.S.C. § 9607. A private party may recover certain costs associated with the cleanup of hazardous substances from a liable party under Section 107(a) of CERCLA. 42 U.S.C. § 9607(a). To recover, Idaho Waste must establish (a) its landfill amounts to a "facility" containing hazardous waste (as defined by CERCLA); (b) the release or threatened release of hazardous waste from Plaintiff's landfill occurred; (c) Idaho Waste incurred costs that were "necessary and consistent with the national contingency plan" due to the release or threatened release of hazardous waste; and (d) Defendants fall within the class of persons liable under CERCLA. *3550 Stevens Creek Assocs.*, 915 F.2d at 1358. The Court analyzes each element in turn.

#### (a) Definition of "Facility"

It is undisputed that Plaintiff's landfill amounts to a "facility" under CERCLA. The only dispute tangentially relevant to this element is whether the Subject Waste, which is currently deposited in the landfill, contained hazardous substances in violation of federal law. The Court accordingly examines whether the Subject Waste was hazardous below.

#### (b) Release or Threatened Release of a Hazardous Substance

Defendants ProTech and Snake River argue they did not cause the release or threatened release of a hazardous substance. The USAF does not appear to contest this element. Specifically,

---

[4] The Court has reorganized Plaintiff's claims for the purposes of this Report and Recommendations.

ProTech claims the Subject Waste was never hazardous because the tested samples were not representative of the waste's entire composition. Snake River similarly argues "no expert testimony" shows "the Subject Waste is hazardous or . . . has had any measurable effect on the landfill." (Doc. 75, p. 5).

CERCLA defines the release of a hazardous substance as any "spilling leaking, pumping, pouring, emitting, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22). "[P]roof of . . . disposal violations do[] not hinge on accurately describing the condition or quality of some larger body." *United States v. Elias*, 269 F.3d 1003, 1013–14 (9th Cir. 2001) (finding a hazardous sample taken from discharge outside of a storage tank was enough to prove the defendant disposed of hazardous waste, regardless of whether the sample was representative of the tank's contents); *In re Electric Service Co.*, 1 E.A.D. 947 (EAB 1985) *available at* 1985 WL 57155, at *5., ("So long as the samples contained concentrations of [hazardous substances] over the regulatory limit, they are evidence which, if unrebutted, is sufficient to establish improper disposal."). To prove the Subject Waste contained chromium, "it's not necessary to go to every inch" of the debris. *Elias*, 269 F.3d at 1014.

Here, a genuine dispute exists whether the Subject Waste was hazardous according to CERCLA. Reports and data from IDEQ, AGEISS, and Dr. Hennet all considered the Subject Waste to be hazardous, but not worth the risk of removing. (Doc. 53-3). According to a study performed by AGEISS, the chromium concentration in the waste was 32 mg/L, well in excess of the 5 mg/L limit set by federal law. *Id.* at p. 40. Moreover, Dr. Hennet concluded leaving the Subject Waste undisturbed was a safer alternative than cleaning up the site. (Doc. 53-2). Similarly, the IDEQ consent order acknowledged chromium concentrations well in excess of allowable limits under federal law. (Doc. 53, p. 52). The IDEQ allowed the Subject Waste to remain because removal could have increased the risk of discharge. *Id.* The Court consequently believes whether the Subject Waste was hazardous is genuinely disputed.

ProTech claims the tested samples were not representative of the larger body of Subject Waste. ProTech relies on Mr. Harr's opinion that, based on the volume of total floor debris, a representative sample would not have exceeded federally-mandated standards. (Doc. 70-2). However, when compared to the evidence to the contrary outlined above, Mr. Harr's opinions

appear to confirm a dispute of fact exists for a jury to consider. Moreover, the Court notes that ProTech took the samples at issue. The idea that ProTech might elude CERCLA liability at the summary judgment stage because it purportedly took "grab samples" rather than "representative samples" is unpersuasive to the Court. *See Elias*, 269 F.3d at 1014.

It therefore follows that the plastic bags holding the Subject Waste could amount to a "closed receptacle[] containing any hazardous substance" that was "abandon[ed] or discard[ed]" at Plaintiff's landfill. 42 U.S.C. § 9601(22). Snake River's argument that no evidence shows any environmental contamination misses the mark. Whether hazardous waste escaped its container does not appear dispositive to a release or threatened release under CERCLA. Instead, the act of discarding bags of hazardous waste, without evidence of further contamination, could indeed violate CERCLA. The Court thus recommends finding a genuine dispute exists on this element.

### (c) Recoverable Costs

Next, all Defendants argue they should not be liable for remedial costs primarily because Plaintiff has not proven its expenses to be necessary. At issue here is whether Plaintiff has demonstrated it incurred necessary costs in response to the Subject Waste.[5] 42 U.S.C. § 9607(B). Idaho Waste appears to allege the following costs are recoverable under CERCLA: $5,300 for "[m]itigation and environmental risk evaluation," paid to PDG; and approximately $27,000 purportedly paid to Olympus for "[e]nvironmental consulting." (Doc. 53-3, p. 91).

Under CERCLA, the term "response" encompasses the terms "remove" or "removal," which are defined in part as "the cleanup or removal of released hazardous substances . . . [including] such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601. CERCLA does not distinguish "between

---

[5] Only Snake River challenged Plaintiff's costs as noncompliant with the National Contingency Plan, a requirement for cost recovery under CERCLA. "Response costs are considered consistent with the [National Contingency Plan] 'if the action, when evaluated as a whole, is in substantial compliance' with it." *City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1003 (9th Cir. 2010) (quoting 40 C.F.R. § 300.700(c)(3)(i)). "Any response action carried out in compliance with . . . a consent decree entered into pursuant to section 122 of CERCLA, will be considered 'consistent with the NCP.'" 40 C.F.R. § 300.700. Snake River argues in its motion for summary judgment that Plaintiff's alleged responsive costs were not in line with the National Contingency Plan, arguing the choice of cleanup method was within the discretion of the Environmental Protection Agency (EPA). (Doc. 57, pp. 15-17). Plaintiff's responsive briefing pointed out that it was not required to wait for the EPA or other governmental action before taking remedial steps. (Doc. 68, pp. 4-5); *Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 840 F.2d 691, 694 (9th Cir. 1988). In reply, Snake River shifted its argument to claim broadly that Plaintiff has not shown its compliance and did not even know of the National Contingency Plan's existence. (Doc. 75, pp. 6-8). The Court believes a triable issue exists whether Plaintiff substantially complied with the National Contingency Plan and may recover certain costs.

cleanup and investigatory costs." *Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 581 (9th Cir. 2018) (citations and internal marks omitted) (hiring expert consultants to "investigate[] the presence and movement of toxic wastes" were recoverable costs), *cert. denied sub nom. Teck Metals Ltd. v. Confederated Tribes of the Colville Reservation*, 139 S. Ct. 2693 (2019). The Ninth Circuit has found acts that qualify as "removal" activities to be so permissive as to "reach all acts that 'are not an unreasonable means' of furthering section 101(23)'s enumerated ends." *Id.* (citation omitted). Removal activities "need not be performed with the intent of achieving the statutory goals [of threat assessment and abatement]; need not be absolutely necessary to achieve those goals; and need not actually achieve those goals." *Id.*

The Ninth Circuit also has found costs that are "necessary" require a showing of "an actual and real threat to human health and the environment." *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 961 (9th Cir. 2013) (citation and internal marks omitted). The existence of an "actual and real threat" is a factual question. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 872 (9th Cir. 2001) (citing *Cadillac Fairview/Cal., Inc. v. Dow Chem. Co.*, 840 F.2d 691, 695 (9th Cir. 1988)).

Here, Idaho Waste has raised a genuine issue whether it incurred necessary responsive costs by hiring PDG for $5,300. First, the Court finds material evidence in the record that a reasonable jury could use to find Plaintiff in fact incurred these costs. Plaintiff's response to an interrogatory seeks costs paid to PDG for "[m]itigation and environmental risk evaluation." Moreover, the record contains PDG's June 2019 report on chromium testing.[6] (Doc. 53-2, p. 164). Taken together, it appears a reasonable jury could find Idaho Waste did indeed incur these expenses. Second, PDG's report on its chromium tests at least raise a dispute whether such costs were "responsive" to the Subject Waste, which purportedly contained chromium. A jury could find this testing qualified as "monitor[ing], assess[ing], and evaluat[ing] the" Subject Waste. 42 U.S.C. § 9601. Third, a triable issue exists as to whether costs incurred when Plaintiff hired PDG were necessary. A reasonable juror could find such action advanced certain "threat assessment or abatement goals" by seeking to investigate whether the environment had been detectably contaminated by chromium. *Id.* (noting such remedial acts "need not actually achieve" the "goals"

---

[6] Deposition testimony by Mr. Yarborough and another senior Idaho Waste employee reflect both individuals were unsure why PDG was paid $5,300. (Doc. 53-3, pp. 132, 161). However, it nonetheless appears Plaintiff has raised at least a genuine dispute on this matter.

of "threat assessment or abatement"). A juror could similarly find the Subject Waste represented an "actual and real threat to human health and the environment," and Plaintiff's follow-up testing in 2019 was necessary to address it. *Cadillac Fairview*, 840 F.2d at 695. Thus, a triable issue exists whether Idaho Waste incurred necessary responsive costs by hiring PDG for $5,300.

Next, Idaho Waste also has raised a genuine dispute whether its $27,000 in costs to Olympus were incurred, responsive, and necessary to address the Subject Waste. First, the Court finds Plaintiff has pointed to material evidence to show it incurred these costs. As support, the record contains Idaho Waste's answer to an interrogatory, Mr. Yarborough's deposition testimony, and the undisputed fact that Olympus completed work in response to the Subject Waste. Plaintiff's answer to an interrogatory stated it paid Olympus for "[e]nvironmental consulting." Moreover, Mr. Yarborough explained it was "very possible" Plaintiff paid approximately $27,000. (Doc. 53-3, pp. 131-32). Mr. Yarborough also noted that Olympus tested for chromium hexavalent C6 in the landfill, which is undisputed by the parties. *Id.* at 131-32. Although bare, Plaintiff has offered enough evidence at the summary judgment stage that a reasonable juror could conclude Plaintiff incurred the $27,000 payment to Olympus. Relatedly, the Court notes that even if evidence of such expenses has not been produced in detail, enough evidence has been produced so that a jury could fairly estimate expenses.

Second, Plaintiff's costs of hiring Olympus could reasonably qualify as "responsive" under CERCLA. As discussed above, it is undisputed Olympus completed work in response to the Subject Waste, including testing for chromium. Such actions appear to squarely fit within investigatory costs meant to "monitor, assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601.

Third and finally, a triable issue exists whether such responsive costs were "necessary" under CERCLA. While the warm glow of hindsight suggests Idaho Waste's Olympus costs were ultimately unnecessary, a reasonable jury could conclude Plaintiff's relatively quick response was necessary because of the situation in March 2017. At this point on the timeline, Plaintiff learned that potentially hazardous waste had been deposited in its unqualified landfill. Before Defendants' experts and the IDEQ opined that the Subject Waste had not contaminated the environment and should remain in place, Plaintiff took initiative and hired Olympus. Such action appeared to advance certain "threat assessment or abatement goals" by seeking to formulate a plan to address the hazardous waste in its landfill. *Pakootas*, 905 F.3d at 579 (noting such remedial acts "need not

actually achieve" the "goals" of "threat assessment or abatement"). When viewed through the facts available in March 2017, the Court believes a jury could find the Subject Waste represented an "actual and real threat to human health and the environment," and Plaintiff's relatively quick response to address it was necessary.[7] *Cadillac Fairview*, 840 F.2d at 695.

In sum, the Court believes a triable issue exists whether Plaintiff incurred necessary response costs to Olympus for approximately $27,000 and to PDG for approximately $5,300.

### (d) Liable Classes of Persons

Only Snake River alleges it does not fall within a class of liable individuals for CERCLA. Four classes of persons may be liable in a private cause of action under CERCLA. *3550 Stevens Creek Assocs.*, 915 F.2d at 1358. The relevant class here is a "transporter" of hazardous substances. A transporter is defined as "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which cause the incurrence of response costs, of hazardous substance." *Id.*

Neither party cites to Ninth Circuit precedent to support their respective positions. Plaintiff appears to rely on its plain reading of the statute to conclude simply that Snake River "accepted any hazardous substances for transport to disposal or treatment facilities," and therefore falls within the statute. (Doc. 54 at p. 5). By contrast, Snake River strenuously points to the Third Circuit's interpretation of the statute, where a transporter is only liable when it has substantial input and active participation in the selection of the disposal site for hazardous waste. *Tippins Inc. v. USX Corp.*, 37 F.3d 87, 94–95 (3d Cir. 1994).

At least three district courts within the Ninth Circuit have found that a "transporter" under CERCLA must select the site of disposal to be liable. *United States v. Lyon*, No. CVF070491LJOGSA, 2008 WL 756294, at *3 (E.D. Cal. Mar. 17, 2008) (irrelevant whether transporter *knowingly* transported hazardous waste) (emphasis added); *Alcatel Info. Sys., Inc. v. Arizona*, 778 F. Supp. 1092, 1095 (D. Ariz. 1991) (noting the EPA apparently agreed with the interpretation involving site selection due to "its stated policy of enforcing the statute against only

---

[7] Moreover, if the Subject Waste is indeed hazardous, which is disputed, a jury could find it represents an "actual and real threat" to this day. *Chubb Custom Ins. Co.*, 710 F.3d at 961. Actions taken in March or April of 2017 to address the Subject Waste could therefore be found to have been reasonable.

transporters who selected the deposit site") (citing *United States v. W. Processing Co.*, 756 F. Supp. 1416, 1419 (W.D. Wash. 1991)).

Here, the Court believes a triable issue exists whether Snake River amounts to a transporter under CERCLA. The Court is inclined to find that a transporter must select the deposit site to be liable under CERCLA. As noted by the cases above, to hold otherwise could lead to the result "that transporters would be liable for carrying hazardous substances to previously-contaminated sites even if they did not select the site but would be liable for carrying waste to previously uncontaminated sites only if they selected the site." *Alcatel Info. Sys., Inc.*, 778 F. Supp. at 1096.

Applying this interpretation, the Court believes a genuine material dispute exists because it is unclear whether Snake River assisted ProTech in choosing the disposal site. Snake River's statement of material facts simply explains that "ProTech did not rely on Snake River's advice or expertise in the determination of a location *appropriate for hazardous waste*." (Doc. 57-2) (emphasis added). Snake River did not comment whether it assisted ProTech with selecting a location appropriate for *non-hazardous* waste, such as Plaintiff's landfill. Indeed, at least some evidence in the record shows Snake River was the sole decision-maker in picking Plaintiff's landfill to deposit the Subject Waste. (Doc. 79-2, p. 3). As a consequence, the Court believes a genuine issue of material fact exists as to whether Snake River selected or assisted in selecting the disposal site. This element should therefore be left for the jury. In short, Plaintiff's CERCLA claims should survive against all Defendants.

### (2) Sovereign Immunity for USAF on All Remaining Claims

The USAF argues that the independent contractor provision of the Federal Tort Claims Act (FTCA) deprives the Court of subject matter jurisdiction. Subject matter jurisdiction cannot be waived and therefore may be challenged at any time. *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) (citing Fed. R. Civ.P. 12(h)(3)). The burden of proof is on the moving party to assert a lack of subject matter jurisdiction. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). "When the jurisdictional motion involves factual issues which also go to the merits, a court should employ the standard applicable to a motion for summary judgment because resolution of those jurisdictional facts is akin to a decision on the merits." *Young v. United States*, 769 F.3d 1047, 1052 (9th Cir. 2014) (quoting *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.1983) (internal marks omitted)).

Generally, "[t]he United States is immune from suit unless it consents to be sued." *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016) (citing *Dalehite v. United States*, 346 U.S. 15, 30 (1953)). The FTCA constitutes "a limited waiver of . . . sovereign immunity, under which the United States is liable to the same extent as a private party for certain torts of federal employees . . . in accordance with the law of the place where the act or omission occurred." *Id.* (quoting *Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005) (internal marks omitted)). However, this limited waiver "does not include any contractor with the United States." 28 U.S.C. § 2671. Courts have construed this "independent contractor exception" to "protect the United States from vicarious liability for the negligent acts of its independent contractors." *Edison*, 822 F.3d at 518 (citing *Yanez v. United States*, 63 F.3d 870, 872 n.1 (9th Cir. 1995)).

Accordingly, the Court must consider two questions. First, whether the United States is vicariously liable—i.e. whether "the United States has declined to exercise control over the day-to-day operations of its contractors." *Id.* Second, "whether Plaintiff[] [has] alleged a separate nondelegable or undelegated duty, which the United States could be held directly liable for breaching." *Id.*

### a) Vicarious Liability

To distinguish a federal employee from a contractor, courts look at the "existence of federal authority to control and supervise 'detailed physical performance' and 'day to day operations' of the contractor." *Autery*, 424 F.3d at 956 (quoting *Hines v. United States*, 60 F.3d 1442, 1446 (9th Cir. 1995)). "Contractual provisions directing detailed performance" are insufficient to overcome the contractor exception. *Id.* at 957.

Here, ProTech acted as an independent contractor and the USAF did not provide substantial day-to-day supervision. (Doc. 53-4). All communication with ProTech occurred through a project manager hired and employed by ProTech. (Doc. 53-5). ProTech selected Snake River to transport the Subject Waste, and ProTech provided all equipment necessary to complete the project. *Id.* By the terms of the contract, ProTech acknowledged its independent liability for negligence, assuming "all damages to persons or property." (Doc. 53-4). Moreover, the contract delegated control over the testing and disposal of waste to ProTech. *Id.* That ProTech allegedly abused this discretion by improperly disposing of the Subject Waste does not abrogate sovereign immunity. Accordingly, the Court concludes that the USAF is not vicariously liable for ProTech's actions in this matter.

### b) Direct Liability

Next, the Court must consider whether the USAF is directly liable for a "nondelegable or undelegated duty." *See Edison*, 822 F.3d at 518. Plaintiff argues, in response to the USAF's motion to dismiss, that the USAF breached an undelegated duty to ensure ProTech complied with the safety provisions of the contract. Alternatively, Plaintiff argues the Subject Waste's disposal was a peculiar risk for which the USAF could not delegate its duty to remediate. Both arguments must fail.

The Court looks to Idaho law for what, if any, duties an employer has in relation to an independent contractor. *Id.* As Idaho follows the Restatement, the Court will consider the applicable sections 413 and 416 in turn. *See Fagundes v. State*, 774 P.2d 343, 345–46 (Idaho Ct. App. 1989).

First, under section 413 of the Restatement:

> One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer
> (a) *fails to provide in the contract that the contractor shall take such precautions*, or
> (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions.

Restatement (Second) of Torts § 413 (emphasis added).

It is clear the USAF properly delegated its duty to take precautions to Idaho Waste under section 413(a). The terms of the contract made ProTech responsible for taking precautions against hazardous waste. (Doc. 53-3, p. 12). Specifically, the contract states "[t]he contractor shall be responsible for the proper handling, storage, transporting, disposal and regulatory compliance with all [hazardous] substances and the cost incurred . . . ." *Id.* Therefore, the USAF properly delegated its duty under section 413.

Second, section 416 of the Restatement creates a nondelegable duty to ensure a contractor takes reasonable care to address a "peculiar risk," providing:

> One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise

>reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

Restatement (Second) of Torts 416.  The question for the Court is whether hazardous materials constituted a "peculiar risk."  "The peculiar risk doctrine does not encompass taking precautions against ordinary dangers which arise in the course of work." *Peone v. Regulus Stud Mills, Inc.*, 113 Idaho 374, 379 (1987) (finding that the risk of falling logs was ordinary in the logging industry, and therefore not a peculiar risk).  "Whether work creates a peculiar risk of physical harm is not the same question as whether work is dangerous.  Instead, it is a question of whether the risk is commonly encountered." *Fagundes*, 116 Idaho at 177.

Encountering hazardous materials is ordinary for construction and demolition projects.  As a contractor under minimal supervision, ProTech was in the best position to identify and mitigate potentially hazardous waste. *See id.* (noting the contractor, who supplied a helicopter and pilot, was in a better position to assess the risks of a helicopter crashing than the State of Idaho).  Despite Plaintiff's novel argument that the USAF was better positioned to recognize hazardous waste because "its employees presumably walk on [the floor] every single day," the chromium was undiscoverable so long as the floor remained intact.  Rather, ProTech had greater access to the waste materials in testable form.  For these reasons, the Court finds there was no nondelegable duty under section 416.  Accordingly, the Court concludes the USAF is not directly liable under Idaho law.  All tort claims under state law should therefore be dismissed against the USAF.

**(3) Continuing Nuisance Against Snake River and ProTech**

The Court next examines Plaintiff's nuisance claim against Snake River and ProTech.  In Idaho, a nuisance is defined as "[a]nything which is injurious to health or morals, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." IDAHO CODE § 52-101.  Two types of nuisances exist: those in fact and those per se. *McVicars v. Christensen*, 156 Idaho 58, 61 (2014).  A nuisance in fact "is not inherently a nuisance . . . but . . . may become such by reasons of surrounding circumstances, in the manner in which conducted." *Id.*  A nuisance per se "is a nuisance at all times and under all circumstances." *Id.*; *Larsen v. Vill. of Lava Hot Springs*, 88 Idaho 64, 72 (1964).

A nuisance usually involves the invasion of "intangible substances, such as noises or odors." *Moon v. N. Idaho Farmers Ass'n*, 140 Idaho 536, 541 (2004) (citations and quotations omitted).  By contrast, a "[t]respass comprehends an actual physical invasion by tangible matter."

*Id.* (citations and quotations omitted) (explaining that thick smoke generated by nearby "farmers' burning and the particulates emitted from the smoke onto the plaintiffs' land" could be both a trespass and a nuisance).

Snake River contends the Subject Waste is not injurious to health because no evidence has shown it has escaped its garbage-bag containers and polluted the environment. Snake River further alleges no obstruction of Plaintiff's free use of property because Idaho Waste purportedly resumed normal operations—and ceased remedial efforts related to the Subject Waste—in May 2017. Similarly, ProTech broadly argues that the Subject Waste was not hazardous and therefore cannot amount to a nuisance. In response, Idaho Waste claims chromium is defined as injurious to human health under federal law and, as a consequence, the Subject Waste amounts to a nuisance per se under Idaho law.

Here, the Court recommends dismissing the nuisance claim for Snake River and ProTech. No evidence in the record shows the contamination of ground water or the environment in a manner consistent with a nuisance. In fact, all defense experts and both of Plaintiff's hired contractors have found chromium levels within the relevant section of the landfill to be within legally-permissible limits. (Docs. 53-2; 57-2; 61-2).

Furthermore, Plaintiff's argument that chromium is "particularly toxic and unnatural," which therefore automatically makes it equivalent to a nuisance per se is unpersuasive. (Doc. 68, p. 3). Even taken as true, Plaintiff does not distinguish or argue how the presence of chromium amounts to a nuisance—as opposed to a trespass—under Idaho law. Nor does Plaintiff cite to any Ninth Circuit precedent for the proposition that the mere presence of a hazardous substance amounts to a nuisance per se. The Court accordingly recommends dismissal of this claim against Snake River and ProTech.

**(4) Continuing Trespass Against Snake River and ProTech**

The Court next examines Plaintiff's continuing trespass claim. "Trespass is a tort against possession" that occurs when an individual, "without permission, interferes with another's exclusive right to possession of the property." *Walter E. Wilhite Revocable Living Tr. v. Nw. Yearly Meeting Pension Fund*, 128 Idaho 539, 549 (1996); *Mock v. Potlatch Corp.*, 786 F. Supp. 1545, 1548 (D. Idaho 1992); *Moon*, 140 Idaho at 541; IDAHO CODE § 6-202. Such interference can occur by "causing some tangible thing to intrude upon [another person's] land." *Mock*, 786 F. Supp. at 1548. A subjective, good-faith belief is not a proper defense for a trespass claim. *State v. Camp*,

134 Idaho 662, 667–68 (Ct. App. 2000) (explaining a trespass only requires the "willingness to commit the act and does not require any intent to violate the law"); *see Bumgarner v. Bumgarner*, 124 Idaho 629, 639 (Ct. App. 1993).

Here, a triable issue exists on Plaintiff's continuing trespass claim. ProTech admitted to hiring Snake River to transport the Subject Waste, and Snake River admitted to transporting the Subject Waste to Plaintiff's landfill. The relevant act in question is whether the Subject Waste included hazardous substances, which is disputed. It therefore seems reasonable that a jury could conclude Snake River—and ProTech, by hiring Snake River—impermissibly "caused something tangible to intrude upon" Plaintiff's property that impacted Idaho Waste's exclusive possessory right. *See Mock*, 786 F. Supp. at 1548.

Snake River essentially argues it had permission to enter the landfill and dispose of the Subject Waste and did not know the Subject Waste was hazardous at the time. Such arguments are unpersuasive. For one, Snake River had permission to dispose of *non*-hazardous waste at Plaintiff's landfill. Simply because Snake River was permitted to enter the landfill did not mean it had consent to dispose of potentially hazardous materials. Further, a lack of intent is not a viable defense for the claim of trespass. *Camp*, 134 Idaho at 667 (subjective, good-faith belief is not a proper defense for a trespass claim).

Lastly, the Court examines the damages available to Plaintiff for its trespass claim.[8] A jury could find the $27,000 payment to Olympus and $5,300 payment to PDG amounted to damages for the reasons previously discussed. Thus, only one unsettled source of damages remains: the alleged diminution of property value due to the Subject Waste.

Here, a genuine dispute of fact exists regarding the valuation of Plaintiff's landfill. In Idaho, Mr. Yarborough amounts to a competent witness to the landfill's value. *See Schroeder v. Partin*, 151 Idaho 471, 477, 259 P.3d 617, 623 (2011) (explaining that, in Idaho, a property owner "is a competent witness to [the property's] value, as he is presumed to be familiar with its value by reason of inquiries, comparisons, purchases and sales") (quoting *Weaver v. Village of Bancroft*, 92 Idaho 189, 193 (1968)). Mr. Yarbrough testified to his belief that the landfill's value was diminished by at least $2,000,000 in part because a buyer apparently offered $8,200,000 to

---

[8] The Court also notes one additional remedy may be available to Plaintiff, as it seeks to force Defendants to abate the Subject Waste. (Doc. 32). However, as previously mentioned, AGEISS the IDEQ, Dr. Hennet, and Mr. Harr all recommend keeping the Subject Waste in place. (Docs. 53-2; 57-2). Plaintiff seems to offer no competent evidence in response.

purchase the property after the Subject Waste was deposited. (Doc. 53-3, p. 137). Mr. Yarbrough noted an appraisal from "several years ago" placed the property value at $13,000,000. *Id.* Such evidence is enough to genuinely dispute at least one appraisal offered by Defendants that found Plaintiff's landfill had not been reduced in value due to the Subject Waste. (Doc. 58-7). The Court accordingly recommends allowing Plaintiff's trespass claim to proceed to trial, with possible damages amounting to the $27,000 in costs to Olympus, $5,300 in costs to PDG, and the landfill's potentially diminished value.

**(5) Negligence and Negligence Per Se Against Snake River and ProTech**

The Court turns to Plaintiff's negligence and negligence per se claims against Snake River and ProTech. "Whether a defendant breached its duty of care and whether any breach caused the damages suffered is typically a factual question for a jury and not susceptible to resolution on a motion for summary judgment." *Gebhardt v. Cudd Pressure Control, Inc.*, No. 3:13-CV-00062 JWS, 2016 WL 7007478, at *4 (D. Alaska Nov. 29, 2016); *see Herman v. United States*, 330 F. App'x 133, 135 (9th Cir. 2009).

Here, Plaintiff's negligence claims should proceed to a jury. A reasonable juror could find the circumstances surrounding the Subject Waste, including whether such waste was hazardous, breached a duty of care that caused Plaintiff damages. Moreover, for the reasons discussed above Plaintiff has raised a triable issue as to damages based on its $27,000 payment to Olympus, its $5,300 payment to PDG, and a potential diminution in the landfill's value. The Court therefore recommends allowing Plaintiff's negligence claims to proceed against Snake River and ProTech.

**(6) Snake River's Cross Claim Against ProTech**

Lastly, the Court analyzes Snake River's motion for summary judgment on a cross claim against ProTech. Snake River seeks indemnity from ProTech "for any amounts which Snake River may be required to pay Plaintiff." (Doc. 74).

Under CERCLA, Snake River may seek contribution from another liable or potentially liable entity during or following the instant proceedings. 42 U.S.C. 9613(f)(1). The Court may "allocate response costs among the liable parties using such equitable factors as the court determines are appropriate." *Id.*

Moreover, in Idaho there is a "general rule that each person has a duty of care to prevent unreasonable, foreseeable risks of harm to others." *Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 389 (1999). "[W]here one is directed or employed by another to do an act not manifestly

wrong, or is induced to act by the fraudulent representations of another, he is generally held to be entitle to indemnity when a third party recovers against him." *Williams v. Johnston*, 92 Idaho 292, 294 (1968). "[U]nless liability of the claimed indemnitee to the third party is established, the right to indemnification does not arise." *Pinnacle Great Plains Operating Co., LLC v. Wynn Dewsnup Revocable Tr.*, No. 4:13-CV-00106-EJL-CWD, 2015 WL 5853139, at *3 (D. Idaho June 30, 2015), *report and recommendation adopted sub nom. Pinnacle Great Plains Operating Co., LLC. v. Wynn Dewsnup Revocable Tr.*, No. 4:13-CV-00106-EJL-CWD, 2015 WL 5884861 (D. Idaho Oct. 7, 2015) (quoting *Williams*, 92 Idaho at 298).

Snake River argues the undisputed facts support indemnity or contribution for all state law claims because it did not know the Subject Waste was potentially hazardous and was not required to test the Subject Waste. Snake River seeks indemnity through CERCLA for identical reasons. In response, ProTech argues genuine issues of material fact still exist regarding Snake River's breach of common law duty. ProTech further notes that Snake River could still be found liable under CERCLA as a transporter of hazardous substances.

Here, the Court recommends denying Snake River's motion for summary judgment on indemnity. The Court sees, and Snake River has offered, no good reason to apply indemnity or contribution at this stage of litigation. As previously discussed, disputed facts surround Plaintiff's CERCLA, trespass, and negligence claims. It seems to the Court that the abundance and magnitude of triable issues preclude, or at least impede, such a ruling at this stage. The Court therefore recommends denying Snake River's motion seeking indemnity.

## IV. CONCLUSION

For the reasons above, Plaintiff's motion for summary judgment should be denied. (Doc. 54). Defendants' motions for summary judgment should all be granted in part, specifically: granted on Count One Continuing Nuisance in favor of all Defendants; granted in part on Count Two Continuing Trespass in favor of the USAF and denied for Snake River and ProTech; granted in part on Count Three Equitable Indemnity and Contribution in favor of the USAF and denied for Snake River and ProTech; granted in part on Count Four Negligence and Negligence Per Se in favor of the USAF and denied for Snake River and ProTech; denied on Count Five Cost Recovery Under CERCLA for all Defendants; and denied on Count Six Contribution under CERCLA for all

Defendants. (Docs. 53, 57, 71). Lastly, Snake River's motion for summary judgment should be denied. (Doc. 74).[9]

Accordingly, IT IS THEREFORE RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order

DENYING Plaintiff Idaho Waste Systems, Inc.'s Motion for Partial Summary Judgment (Doc. 54);

GRANTING IN PART Defendant U.S. Air Force's combined Motion to Dismiss and Motion for Summary Judgment (Doc. 53);

GRANTING IN PART Defendant Snake River Rubbish, L.L.C.'s Motion for Summary Judgment (Doc. 57);

GRANTING IN PART Defendant ProTech Coatings, Inc.'s combined Motion for Summary Judgment and Joinder (Doc. 71); and

DENYING Defendant Snake River Rubbish, L.L.C.'s Motion for Summary on ProTech's Cross Claim (Doc. 74).

Counsel are reminded that each party has fourteen (14) days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in the Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

Dated this 27th day of January, 2020, at Jefferson City, Missouri.

*Willie J. Epps, Jr.*
Willie J. Epps, Jr.
United States Magistrate Judge

---

[9] In other words, if the Court, after an independent review, adopts this Report and Recommendations, the following claims will survive: the CERCLA claims against all Defendants (Counts Five and Six); and the trespass claim, indemnity/contribution claims, and negligence claims against Snake River and ProTech (Counts Two, Three, and Four). (Doc. 32).